# Exhibit B

# STOCK PURCHASE AGREEMENT

BY AND AMONG

JONATHAN H. PARDEE, DUNBAR/WHEELER TRUST
AND JONATHAN H. PARDEE CHARITABLE REMAINDER TRUST

AND OGDEN H. SUTRO

AND SST ACQUISITION CORP.

AND

CONSUMER PORTFOLIO SERVICES, INC.

Dated as of May 20, 1997

TABLE OF CONTENTS


| | | PAGE |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| SECTION 1.01 | ACCOUNTS | 1 |
| SECTION 1.02 | AFFILIATE | 1 |
| SECTION 1.03 | AGREEMENT | 1 |
| SECTION 1.04 | ASSETS | 1 |
| SECTION 1.05 | BALANCE SHEET | 2 |
| SECTION 1.06 | BANK ACCOUNTS | 2 |
| SECTION 1.07 | CLOSING OR CLOSING DATE | 2 |
| SECTION 1.08 | CODE | 2 |
| SECTION 1.09 | COMPANY | 2 |
| SECTION 1.10 | CONTRACTS | 2 |
| SECTION 1.11 | DOL | 2 |
| SECTION 1.12 | EQUIPMENT | 2 |
| SECTION 1.13 | ERISA | 2 |
| SECTION 1.14 | GAAP | 2 |
| SECTION 1.15 | INDEMNITOR | 2 |
| SECTION 1.16 | INTELLECTUAL PROPERTY | 3 |
| SECTION 1.17 | INTERIM FINANCIAL STATEMENTS | 3 |
| SECTION 1.18 | INVENTORY | 3 |
| SECTION 1.19 | INVESTMENTS | 3 |
| SECTION 1.20 | IRS | 3 |
| SECTION 1.21 | KNOWLEDGE | 3 |
| SECTION 1.22 | LAW | 4 |
| SECTION 1.23 | MATERIAL ADVERSE EFFECT | 4 |
| SECTION 1.24 | PBGC | 4 |
| SECTION 1.25 | PAYEES | 4 |
| SECTION 1.26 | PERMITS | 4 |
| SECTION 1.27 | PERMITTED LIENS | 4 |
| SECTION 1.28 | PERSON | 4 |
| SECTION 1.29 | PURCHASER | 4 |
| SECTION 1.30 | [INTENTIONALLY OMITTED.] | 5 |
| SECTION 1.31 | PURCHASER INDEMNIFIED PARTIES | 5 |
| SECTION 1.32 | REAL PROPERTY | 5 |
| SECTION 1.33 | REQUIRED CONSENTS | 5 |
| SECTION 1.34 | RESERVES | 5 |
| SECTION 1.35 | SEC | 5 |
| SECTION 1.36 | SEC REPORTS | 5 |
| SECTION 1.37 | SECURITIES ACT | 5 |
| SECTION 1.38 | SECURITIES LAWS | 5 |
| SECTION 1.39 | SELLER INDEMNIFIED PARTIES | 5 |

| | | |
|---|---|---|
| SECTION 1.40 | SELLER INDEMNIFYING PARTIES. | 5 |
| SECTION 1.41 | SELLERS | 6 |
| SECTION 1.42 | SHARES | 6 |
| SECTION 1.43 | SHAREHOLDERS | 6 |
| SECTION 1.44 | SSTAI TRUST | 6 |
| SECTION 1.45 | SUBSIDIARIES | 6 |
| SECTION 1.46 | SUTRO | 6 |
| SECTION 1.47 | TAXES | 6 |
| ARTICLE II | PURCHASE AND SALE OF SHARES | 6 |
| SECTION 2.00 | PURCHASE AND SALE | 6 |
| SECTION 2.01 | PURCHASE PRICE | 6 |
| SECTION 2.02 | CLOSING | 7 |
| ARTICLE III | REPRESENTATIONS AND WARRANTIES OF THE SELLERS WITH RESPECT TO THE COMPANY | 7 |
| SECTION 3.01 | ORGANIZATION OF THE COMPANY | 7 |
| SECTION 3.02 | CAPITALIZATION | 8 |
| SECTION 3.03 | SUBSIDIARIES | 8 |
| SECTION 3.04 | [INTENTIONALLY OMITTED] | 8 |
| SECTION 3.05 | CONSENTS AND APPROVALS; NO VIOLATIONS | 8 |
| SECTION 3.06 | NO ADVERSE CHANGE | 9 |
| SECTION 3.07 | NO LITIGATION | 9 |
| SECTION 3.08 | TITLE TO ASSETS | 9 |
| SECTION 3.09 | BANK ACCOUNTS; POWERS OF ATTORNEY | 9 |
| SECTION 3.10 | CONDITION OF EQUIPMENT | 10 |
| SECTION 3.11 | INVENTORY | 10 |
| SECTION 3.12 | BOOKS AND RECORDS | 10 |
| SECTION 3.13 | CONTRACTS | 10 |
| SECTION 3.14 | ACCOUNTS | 10 |
| SECTION 3.15 | REAL PROPERTY | 11 |
| SECTION 3.16 | INTELLECTUAL PROPERTY | 11 |
| SECTION 3.17 | FINANCIAL STATEMENTS | 12 |
| SECTION 3.18 | INSURANCE | 12 |
| SECTION 3.19 | EMPLOYEE BENEFIT PLANS | 12 |
| SECTION 3.20 | COMPLIANCE WITH LAW | 13 |
| SECTION 3.21 | TRANSACTIONS WITH AFFILIATES | 13 |
| SECTION 3.22 | FEES AND EXPENSES OF BROKERS AND OTHERS | 14 |
| SECTION 3.23 | TAX MATTERS | 14 |
| SECTION 3.24 | ENVIRONMENTAL MATTERS | 15 |
| SECTION 3.25 | LABOR MATTERS | 16 |
| SECTION 3.26 | ACCURACY OF INFORMATION | 16 |
| SECTION 3.27 | LIABILITIES | 16 |

| | | |
|---|---|---|
| SECTION 3.28 | SETTLEMENT AGREEMENTS. | 16 |
| SECTION 3.29 | TRUSTS | 17 |
| SECTION 3.30 | ADMINISTRATION OF TRUSTS | 17 |
| ARTICLE IV | SEVERAL REPRESENTATIONS AND WARRANTIES OF THE SELLERS | 17 |
| SECTION 4.01 | ORGANIZATION; INDIVIDUAL CAPACITY; ENFORCEABILITY | 18 |
| SECTION 4.02 | NO VIOLATION OR CONFLICT BY SELLERS | 18 |
| SECTION 4.03 | TITLE TO SHARES | 18 |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF THE PURCHASER AND THE INDEMNITOR | 18 |
| SECTION 5.01 | ORGANIZATION; ENFORCEABILITY | 19 |
| SECTION 5.02 | CONSENTS AND APPROVALS; NO VIOLATIONS | 19 |
| SECTION 5.03 | SEC FILINGS; FINANCIAL STATEMENTS | 19 |
| SECTION 5.04 | ABSENCE OF UNDISCLOSED LIABILITIES | 20 |
| SECTION 5.05 | ABSENCE OF CERTAIN CHANGES OR EVENTS | 20 |
| SECTION 5.06 | COMPLIANCE WITH LAWS | 21 |
| SECTION 5.07 | LITIGATION | 21 |
| SECTION 5.08 | STATEMENTS TRUE AND CORRECT | 22 |
| SECTION 5.09 | SOLVENCY; CAPITAL ADEQUACY | 22 |
| ARTICLE VI | COVENANTS | 22 |
| ARTICLE VII | CONDITIONS PRECEDENT TO CLOSING | 22 |
| SECTION 7.01 | CONDITIONS PRECEDENT TO OBLIGATIONS OF THE PURCHASER AND INDEMNITOR | 22 |
| SECTION 7.02 | CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLERS | 23 |
| ARTICLE VIII | TERMINATION; AMENDMENT; WAIVER | 24 |
| SECTION 8.01 | TERMINATION | 24 |
| SECTION 8.02 | EFFECT OF TERMINATION | 25 |
| SECTION 8.03 | AMENDMENT | 25 |
| SECTION 8.04 | EXTENSION; WAIVER | 25 |
| ARTICLE IX | INDEMNIFICATION | 26 |
| SECTION 9.01 | INDEMNIFICATION BY THE SELLERS AND SUTRO | 26 |
| SECTION 9.02 | INDEMNIFICATION BY THE PURCHASER, THE COMPANY AND THE INDEMNITOR | 28 |
| SECTION 9.03 | INDEMNIFICATION PROCEDURES | 30 |

SECTION 9.04 SURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS ... 32
SECTION 9.05 NO OFFSETS, ETC. ... 32

ARTICLE X MISCELLANEOUS ... 32

SECTION 10.01 ENTIRE AGREEMENT; ASSIGNMENT ... 32
SECTION 10.02 NOTICES ... 32
SECTION 10.03 GOVERNING LAW ... 34
SECTION 10.04 DESCRIPTIVE HEADINGS ... 34
SECTION 10.05 PARTIES IN INTEREST ... 34
SECTION 10.06 COUNTERPARTS ... 34
SECTION 10.07 SPECIFIC PERFORMANCE ... 34
SECTION 10.08 FURTHER ASSURANCES ... 34
SECTION 10.09 FEES AND EXPENSES ... 35
SECTION 10.10 SEVERABILITY ... 36

# EXHIBIT INDEX


| | |
|---|---|
| Exhibit 1.06 | Bank Accounts |
| Exhibit 1.16 | Intellectual Property |
| Exhibit 1.17 | Interim Financial Statements |
| Exhibit 1.26 | Permits |
| Exhibit 1.27 | Permitted Liens |
| Exhibit 1.32 | Real Property |
| Exhibit 1.33 | Required Consents |
| Exhibit 1.43 | Shareholders |
| Exhibit 3.01 | Organization of the Company |
| Exhibit 3.06 | Adverse Changes |
| Exhibit 3.13 | Contracts |
| Exhibit 3.14 | Accounts |
| Exhibit 3.19 | Employee Benefit Plans |
| Exhibit 3.20 | Compliance with Law - Seller/Company |
| Exhibit 3.21 | Transactions with Affiliates |
| Exhibit 3.22 | Fees and Expenses of Brokers and Others |
| Exhibit 3.23 | Tax Matters |
| Exhibit 3.29 | (a) SSTAI Trust |
| | (b) Prior Master Trusts |
| | (c) Payee Beneficiaries |
| Exhibit 3.30 | SSTAI Trust Assets |
| Exhibit 5.06 | Compliance with Law - Purchaser/Indemnitor |

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT dated as of May 20, 1997, is by and among all of the common shareholders of Settlement Services Treasury Assignments, Inc., a Rhode Island corporation (the "Company") listed in Exhibit 1.43 hereto (collectively, the "Sellers"), Ogden H. Sutro of Stonington, Connecticut ("Sutro") and SST Acquisition Corp., a Delaware corporation(the "Purchaser") and Consumer Portfolio Services, Inc., a California corporation (the "Indemnitor").

## RECITALS

WHEREAS, the Shareholders are the owners of all of the issued and outstanding Shares of the Company; and

WHEREAS, the Shareholders desire to sell, and the Purchaser desires to purchase, all of the outstanding Shares for the consideration and upon the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and of the mutual representations, warranties, covenants, agreements and conditions set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01 Accounts. "Accounts" shall mean all accounts receivable, notes receivable and associated rights owned by the Company as of the Closing Date.

Section 1.02 Affiliate. See Section 3.21.

Section 1.03 Agreement. "Agreement" shall mean this Stock Purchase Agreement together with the Exhibits attached hereto, as amended from time to time in accordance with the terms hereof.

Section 1.04 Assets. "Assets" shall mean all of the assets of the Company as of the Closing Date, including, without limitation, any Accounts, Bank Accounts, Contracts, Equipment, Intellectual Property, Inventory, Investments and Real Property, and the Company's interest as the sole beneficiary (except as set forth in Exhibit 3.29 (c)) of the SSTAI Trust.

Section 1.05 Balance Sheet. "Balance Sheet" shall mean the audited consolidated balance sheet of the Company as of December 31, 1995, included in Exhibit 1.05 attached hereto.

Section 1.06 Bank Accounts. "Bank Accounts" shall mean the checking accounts, savings accounts, custodial accounts, certificates of deposit, safe deposit boxes and other bank accounts maintained by the Company as of the Closing Date, all of such Bank Accounts being listed on Exhibit 1.06 attached hereto.

Section 1.07 Closing or Closing Date. "Closing" shall mean the conference held on the date and at the time determined in accordance with Section 2.02 hereof, at the offices of Hinckley, Allen & Snyder, 1500 Fleet Center, Providence, Rhode Island 02903 or at such other place as the parties may mutually agree in writing. "Closing Date" shall mean the date upon which the Closing is completed by performance by each party of his or its obligations hereunder.

Section 1.08 Code. "Code" shall mean the Internal Revenue Code of 1986, as amended.

Section 1.09 Company. "Company" shall mean Settlement Services Treasury Assignments, Inc., a Rhode Island corporation.

Section 1.10 Contracts. "Contracts" shall mean all contracts, agreements, leases, licenses, relationships and commitments, written or oral, to which the Company is a party or by which the Company is bound as of the Closing Date.

Section 1.11 DOL. "DOL" means the United States Department of Labor.

Section 1.12 Equipment. "Equipment" shall mean all machinery, vehicles, equipment, furniture, fixtures, furnishings, parts, tools, engineering and other items of tangible personal property owned or leased by the Company as of the Closing Date.

Section 1.13 ERISA. "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

Section 1.14 GAAP. "GAAP" shall mean generally accepted accounting principles as in effect in the United States of America at the time of the preparation of the subject financial statement.

Section 1.15 "Indemnitor" shall have the meaning set forth in the initial paragraph of this Agreement.

Section 1.16 Intellectual Property. "Intellectual Property" shall mean (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto and all patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, trade names and corporate names, together with all translations,

adaptations, derivations and combinations thereof and including all goodwill associated therewith and all applications, registrations and renewals in connection therewith, (c) all copyrightable works, all copyrights and all applications, registrations and renewals in connection therewith, (d) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information and business and marketing plans and proposals), (e) all computer software (including data and related documentation), (f) all other proprietary rights, (g) all rights as a licensee or authorized user of the intellectual property of any third party and (h) all copies and tangible embodiments thereof (in whatever form or medium), in all the foregoing cases to the extent owned by the Company or used by the Company in the business of the Company as of the Closing Date, including, without limitation, the Intellectual Property listed on Exhibit 1.16 attached hereto. Exhibit 1.16 sets forth separately (x) all Intellectual Property of which the Company is the exclusive owner, identifying the subject matter, any related registration and the owner, (y) all Intellectual Property which the Company uses pursuant to license or other authorization of a third party, listing the subject matter, any ancillary registration and the source of authorization and (z) all Intellectual Property that the Company owns jointly with a third party.

Section 1.17 Interim Financial Statements. "Interim Financial Statements" shall mean the unaudited financial statements of the Company as of and for the month and year-to-date ended December 31, 1996 and March 31, 1997, copies of which are attached as Exhibit 1.17 hereto.

Section 1.18 Inventory. "Inventory" shall mean all inventories of goods and supplies owned by the Company as of the Closing Date.

Section 1.19 Investments. "Investments" shall mean the entire right, title and interest of the Company in investments in any fund or other Person.

Section 1.20 IRS. "IRS" shall mean the Internal Revenue Service.

Section 1.21 Knowledge. "Knowledge" shall mean the actual knowledge of the person referred to. "Knowledge of the Sellers" shall mean the actual knowledge of any Seller or Sutro and "Knowledge of the Purchaser" shall mean the actual knowledge of any officer or director of the Purchaser and/or the Indemnitor.

Section 1.22 Law. "Law" shall mean any federal, state, local or other law or governmental requirement of any kind, domestic or foreign, and the rules, regulations and orders promulgated thereunder.

Section 1.23 Material Adverse Effect. "Material Adverse Effect" shall mean an event, change or occurrence which, individually or together with any other event, change or occurrence, has a material adverse impact on (i) the financial position,

business, or results of operations of a Person and its Subsidiaries, taken as a whole, or (ii) the ability of such Person to perform its obligations under this Agreement or to consummate the other transactions contemplated by this Agreement, provided that "material adverse impact" shall not be deemed to include the impact of (a) changes in Laws of general applicability or interpretations thereof by courts or governmental authorities, (b) changes in generally accepted accounting principles or regulatory accounting principles, or (c) actions and omissions of a party hereto (or any of its Subsidiaries) taken with the prior informed written consent of the other parties in contemplation of the transactions contemplated hereby.

Section 1.24 PBGC. "PBGC" shall mean the Pension Benefit Guaranty Corporation.

Section 1.25 Payees. "Payees" shall have the meaning set forth in Section 3.28.

Section 1.26 Permits. "Permits" shall mean all permits, licenses and governmental authorizations, registrations and approvals used or required in the conduct of the business of any Person.

Section 1.27 Permitted Liens. "Permitted Liens" shall mean those liens, encumbrances, mortgages, charges, claims, restrictions, pledges, security interests, impositions and other matters affecting the Assets that are specifically listed on Exhibit 1.27 attached hereto.

Section 1.28 Person. "Person" shall mean a natural person or any legal, commercial or governmental entity, such as, but not limited to, a corporation, general partnership, joint venture, limited partnership, limited liability company, trust, business association, group acting in concert, or any person acting in a representative capacity.

Section 1.29 Purchaser. "Purchaser" shall have the meaning set forth in the initial paragraph of this Agreement.

Section 1.30 [Intentionally omitted.].

Section 1.31 Purchaser Indemnified Parties. "Purchaser Indemnified Parties" shall have the meaning set forth in Section 9.01(a).

Section 1.32 Real Property. "Real Property" shall mean any real property owned or leased by the Company as of the Closing Date, together with the improvements located thereon, including all appurtenant rights, claims and interests, all of such Real Property being listed on Exhibit 1.32 attached hereto.

Section 1.33 Required Consents. "Required Consents" shall mean the consents of third parties necessary to consummate and make effective the transactions contemplated by this Agreement as set forth on Exhibit 1.33.

Section 1.34 Reserves. "Reserves" shall mean the Company's reserves, including excess and obsolete inventory reserves, in the amounts set forth in the Interim Financial Statements.

Section 1.35 SEC. "SEC" shall mean the Securities and Exchange Commission.

Section 1.36 SEC Reports. "SEC Reports" shall have the meaning set forth in Section 5.03(a).

Section 1.37 Securities Act. "Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.38 Securities Laws. "Securities Laws" shall mean the Securities Act, the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, the Investment Advisors Act of 1940, as amended, the Trust Indenture Act of 1939, as amended, and the rules and regulations of any regulatory authority promulgated thereunder, but excluding any rules, regulations or procedures of self-regulatory organizations.

Section 1.39 Seller Indemnified Parties. "Seller Indemnified Parties" shall have the meaning set forth in Section 9.02.

Section 1.40 Seller Indemnifying Parties. "Seller Indemnifying Parties" shall have the meaning set forth in Section 9.01(a).

Section 1.41 Sellers. "Sellers" shall have the meaning set forth in the initial paragraph of this Agreement.

Section 1.42 Shares. "Shares" shall mean all issued and outstanding shares of capital stock of the Company, consisting of 555.5556 shares of common stock, $1.00 par value per share.

Section 1.43 Shareholders. "Shareholders" shall mean all record holders of the Shares. A true and correct schedule of the names, addresses and Share holdings of each Shareholder along with any agreements between the Company and any Shareholder, and any agreements between Shareholders relating to the Shares, is attached hereto as Exhibit 1.43.

Section 1.44 SSTAI Trust. "SSTAI Trust" shall have the meaning set forth in Section 3.28.

Section 1.45 Subsidiaries. "Subsidiaries" shall mean all of the corporate or other business entities with respect to which a Person has the direct or indirect right to vote shares representing 50% or more of the votes eligible to be cast in the election of directors of each such entity as of the Closing Date.

Section 1.46 Sutro. "Sutro" means Ogden H. Sutro of Stonington, Connecticut and the beneficiary of the Dunbar/Wheeler Trust.

Section 1.47 Taxes. "Taxes" means all Federal, state, local and foreign income, payroll, withholding, excise, sales, use, license, lease, personal and other property, use and occupancy, business and occupation, mercantile, real estate, gross receipts, employment, severance, stamp, premium, windfall profits, social security (or similar unemployment), disability, transfer, registration, value-added, alternative or add-on minimum, estimated, capital stock and franchise, and goods and services taxes; all customs, import and export taxes or duties; and all unemployment insurance premiums, and other tax of any kind whatsoever, including interest, penalties and fines on any of foregoing, whether or not disputed.

## ARTICLE II
## PURCHASE AND SALE OF SHARES

Section 2.00 Purchase and Sale. The Sellers agree to sell the Shares to the Purchaser and the Purchaser agrees to purchase the Shares from the Sellers, in all cases subject to and in accordance with the provisions of this Agreement.

Section 2.01 Purchase Price. The aggregate purchase price for the Shares (the "Purchase Price") shall be an amount equal to $30,706.60 per Share for Jonathan H. Pardee Shares and $29,556.72 per Share for all other Shares for a total of $16,833,400.00 payable in immediately available funds at the Closing.

Section 2.02 Closing. Subject to the terms and conditions of this Agreement, the Closing will be held at the offices of Hinckley, Allen & Snyder, 1500 Fleet Center, Providence, Rhode Island 02903, as soon as practicable after all of the conditions to the obligations of the parties hereunder have been satisfied or waived, but in no event later than 10:00 a.m. on May 20, 1997, unless extended by either the Sellers or the Purchaser to a date no later than May 31, 1997, and unless a further extension is mutually agreed upon by the parties.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS AND SUTRO WITH RESPECT TO THE COMPANY

All representations and warranties of each of the Sellers and Sutro contained in this Agreement or in any other document delivered to the Purchaser and/or Indemnitor

in connection with the transactions contemplated by this Agreement, to the extent relating to periods prior to March 1, 1993, shall be to the Knowledge of the Sellers. All representations and warranties of each of the Sellers and Sutro contained in this Agreement or in any other document delivered to the Purchaser and/or Indemnitor in connection with the transactions contemplated by this Agreement, to the extent relating to periods commencing March 1, 1993 and thereafter shall be to the Knowledge of the Sellers only if expressly stated to be to the Knowledge of the Sellers in this Agreement or in any other such document.

The Sellers and Sutro each hereby jointly and severally represent and warrant to the Purchaser as follows:

Section 3.01 Organization of the Company. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Rhode Island and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted. Settlement Services Treasury Assignments, Inc., a California corporation which was merged into the Company on or about January, 1, 1995 was a corporation duly organized, validly existing and in good standing under the laws of the State of California with all requisite power and authority to own, lease and operate its properties and to carry on its business immediately prior to such merger. The Company is duly qualified or licensed and in good standing to do business in each other jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to so qualify would not have a Material Adverse Effect on the Company. Exhibit 3.01 attached hereto is a true and complete list of all such jurisdictions for the Company.

Section 3.02 Capitalization. The Company is authorized to issue 10,000 shares of common stock, $1.00 par value each, and no other class of common or preferred stock or other security convertible into, or which may be exchanged for, shares of common or preferred stock. The Shares represent all of the issued and outstanding capital stock of the Company, have been duly and validly issued and are fully paid and nonassessable, and were not issued in violation of any preemptive or other right. All of the Shares were offered and sold in compliance with all applicable federal and state securities laws and regulations. Exhibit 1.43 describes any agreements between the Company and any Shareholder, and any agreements between Shareholders, relating to the Shares, true and correct copies of which agreements have been delivered to the Purchaser. The Company holds 0 capital shares as treasury stock. There are no outstanding or authorized options, warrants, purchase rights, conversion rights, exchange rights, or other contracts or commitments to subscribe for or purchase any capital stock of the Company or securities convertible into or exchangeable for, or which otherwise confer on the holder any right to acquire, any capital stock of the Company, nor is the Company committed to issue any such option, warrant or other right. There are no outstanding stock appreciation, phantom stock, profit participation or similar rights with respect to the capital stock of the Company.

Section 3.03 Subsidiaries. The Company has no Subsidiaries.

Section 3.04 [Intentionally omitted].

Section 3.05 Consents and Approvals; No Violations. No filing or registration with, and no permit, authorization, consent or approval of, any public body or authority is necessary or required in connection with the execution and delivery of this Agreement by the Sellers or for the consummation by the Sellers of the transactions contemplated by this Agreement. Assuming that the Required Consents have been obtained, neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby by the Sellers will (i) conflict with or result in any breach of any provision of the certificate of incorporation or bylaws of the Company, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, any of the terms, conditions or provisions of any material note, bond, mortgage, indenture, license, contract, agreement or other instrument or obligation to which the Company is a party or by which it or any of its properties or assets may be bound or (iii) to the Knowledge of the Sellers, violate any material order, writ, injunction, decree or Law applicable to the Company or any of its properties or assets.

Section 3.06 No Adverse Change. Except as set forth in Exhibit 3.06, since March 31, 1997, there has not been: (a) any event or other occurrence which has had, or may have, a Material Adverse Effect on the Company; (b) any loss, damage, condemnation or destruction to any of the properties of the Company which has a Material Adverse Effect on the Company (whether covered by insurance or not); (c) any material increase, other than in the ordinary course of business, in the rates of pay of any of the employees of the Company; (d) any labor dispute or disturbance, litigation or any event or condition of any character that could have a Material Adverse Effect on the Company; (e) any borrowings by the Company other than in the ordinary course of business; (f) any mortgage, pledge, lien or encumbrance made on any of the properties or assets of the Company, except for Permitted Liens; (g) any material sale, transfer or other disposition of assets of the Company other than in the ordinary course of business or in anticipation or as contemplated by this Agreement and other than transfers of assets to the SSTAI Trust or the Company's bank account at Bankers Trust Company of New York, sales of investments and transfers of the proceeds thereof to the SSTAI Trust or to the Company's bank account at Bankers Trust Company of New York and termination of reverse repurchase agreements, pledges and borrowings; or (h) any dividend or other distribution by the Company to its shareholders other than payments for services rendered in the ordinary course of the Company's business. Since March 31, 1997, neither the Company nor the Shareholders have adopted or taken any action in contemplation of any plan of liquidation, dissolution or merger involving the Company.

Section 3.07 No Litigation. There is no litigation, arbitration proceeding, governmental investigation, citation or action of any kind pending or, to the Knowledge of the Sellers, proposed or threatened (a) against the Company, the Sellers or the SSTAI Trust (b) relating to the business, assets, properties or products of the Company or the SSTAI Trust or (c) that seeks restraint, prohibition, damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby.

Section 3.08 Title to Assets. The Company owns good and marketable title to the Assets (excluding, for purposes of this sentence, Assets held under leases), free and clear of any and all mortgages, liens, encumbrances, charges, claims, restrictions, pledges, security interests or impositions, except the Permitted Liens. The Assets include all tangible and intangible assets, contracts and rights necessary or desirable for the operation of the business of the Company in accordance with past practice and as currently conducted.

Section 3.09 Bank Accounts; Powers of Attorney. The Bank Accounts constitute all checking accounts, savings accounts, custodial accounts, certificates of deposit, safe deposit boxes or other similar accounts maintained by the Company as of the Closing Date. Exhibit 1.06 is a true and complete listing of the Bank Accounts, and sets forth the name of each person with signature authority for each such account immediately prior to the Closing Date. Except as set forth on Exhibit 1.06, the Company has granted no outstanding powers of attorney to any person with respect to any matter.

Section 3.10 Condition of Equipment. The Equipment, which consists of two file cabinets and various files, taken as a whole, is in good operating condition and repair and is fit for use in accordance with the Company's past practices.

Section 3.11 Inventory. The Company has no Inventory.

Section 3.12 Books and Records. The books and records of the Company are complete and correct in all material respects and the Sellers have made available to Purchaser for examination the originals or true and correct copies of all documents material to the business of the Company as conducted prior to the Closing Date and all other documents which Purchaser has requested in connection with the transactions contemplated by this Agreement. The Sellers and Sutro make no representation or warranty with respect to (a) the Bear, Stearns & Company Excel spread sheets of cash flow of the SSTAI Trust or (b) the calculation or statements of basis for tax purposes of the Assets in the SSTAI Trust.

Section 3.13 Contracts. Exhibit 3.13 attached hereto is a true and complete list of all of the Contracts that constitute: (a) a lease of any interest in any real property; (b) a lease of any personal property (a) an agreement to purchase or sell a capital asset; (b) an agreement relating to the borrowing or lending of money; (c) a guaranty,

contribution agreement or other agreement that includes any indemnification, contribution or support obligation; (d) an agreement limiting in any respect the Company's ability to compete in any line of business or with any person; and (e) any other agreement involving an amount in excess of $1,000 and (f) any agreement other than the SSTAI Trust and the Settlement Agreements (defined below) not terminable by the Company at will without penalty. The Company has performed each material term, covenant and condition of each of the Contracts that is to be performed by them at or before the date hereof. No event has occurred that would, with the passage of time or compliance with any applicable notice requirements, constitute a default by the Company or, to the Knowledge of the Sellers, any other party under any of the Contracts, and, to the Knowledge of the Sellers, no party to any of the Contracts intends to cancel, terminate or exercise any option under any of the Contracts.

Section 3.14 Accounts. The Accounts all have arisen from bona fide transactions in the ordinary course of business, and there are no offsets or credits involving amounts in excess of $1,000 individually or $5,000 in the aggregate that may be applied against the Accounts. All accounts payable of the Company have arisen from bona fide transactions in the ordinary course of business and will be paid in accordance with normal trade practice. All accounts receivable of the Company have arisen from bona fide transactions in the ordinary course of business and were, on the Balance Sheet, subject to adequate Reserves in accordance with the Company's past practice. Except as set forth in Exhibit 3.14 hereto, to the Knowledge of the Sellers, none of the accounts receivable is in dispute or subject to any reduction or counterclaim involving amounts in excess of $1,000 individually or $5,000 in the aggregate.

Section 3.15 Real Property.

(a) Owned Real Property. The Company owns no Real Property.

(b) Leased Real Property. Exhibit 1.32 contains a true and complete list of the only Real Property leased by the Company (as lessor or lessee) under any real property lease. The Company has a valid leasehold estate in all such Real Property, subject to the real property lease relating thereto, for the full term thereof. Each such real property lease is a legal, valid and binding agreement of the Company, enforceable against the Company in accordance with its terms, and except as set forth in Exhibit 1.32, to the Knowledge of the Sellers, there is no default (or any event which, after notice or lapse of time or both, would constitute a default) thereunder.

(c) Documents. The Company has no written Real Property lease.

Section 3.16 Intellectual Property.

(a) To the Knowledge of the Sellers, the Company owns exclusively or has the exclusive right to use pursuant to license, sublicense, agreement or permission

all material Intellectual Property necessary for the operation of the businesses of the Company as presently conducted by the Company.

(b) To the Knowledge of the Sellers, the Company has not interfered with, infringed upon, misappropriated or otherwise come into conflict with any intellectual property rights of any third party, and, to the Knowledge of the Sellers, the Company has not received any unresolved charge, complaint, claim, demand or notice alleging any such interference, infringement, misappropriation or violation (including any claim that the Company must license or refrain from using any intellectual property rights of any third party). To the Knowledge of the Sellers, no third party has interfered with, infringed upon, misappropriated or otherwise come into conflict with any Intellectual Property rights of the Company.

(c) The Company owns no patent, trademark, copyright or other registration with respect to any of its Intellectual Property and has no pending application or application for registration with respect to any of its Intellectual Property and has granted no license, agreement or other permission to any third party with respect to any of its Intellectual Property. Exhibit 1.16 also identifies each trade name or unregistered trademark used by the Company in connection with its business. With respect to each item of Intellectual Property required to be identified therein:

(i) the item is not subject to any outstanding injunction, judgment, order, decree, ruling or charge;

(ii) no action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand is pending or, to the Knowledge of the Sellers, is threatened which challenges the legality, validity, enforceability, use or ownership of the item; and

(iii) the Company has not licensed or permitted any third party to use any such item.

Section 3.17 Financial Statements. The Balance Sheet, including the notes thereto, a copy of which has been delivered to the Purchaser, is true and correct in all material respects, presents fairly the financial position of the Company as of December 31, 1995, and was prepared in accordance with GAAP applied on a basis consistent with the Company's past practice. The Company's audited statement of income and shareholders' equity and statement of cash flows for the fiscal year ended December 31, 1995 hereto, are true and correct in all material respects, present fairly the results of operations and cash flows for such period, and were prepared in accordance with GAAP applied on a basis consistent with the Company's past practice. The Interim Financial Statements, copies of which are included in Exhibit 1.17 hereto, are true and correct in all material respects, present fairly the financial position of the Company as of December 31, 1996 and March 31, 1997, and for the periods then

ended, respectively and were prepared on a basis consistent with the Company's past practice.

Section 3.18 Insurance. Schedule 3.18 contains a true and complete list of all material insurance policies (including policies providing property, casualty, liability and worker's compensation coverage and bond and surety arrangements) maintained by the Company. Each such insurance policy is in full force and effect and all premiums due thereunder or self-insurance funding amounts required thereby, as the case may be, have been paid or funded. The Company has not received any notice of cancellation or termination with respect to any such insurance policy, and the Company is not in default thereunder in any material respect.

Section 3.19 Employee Benefit Plans. The Company has no liability, fixed or contingent, relating to any Employee Benefit Plan, whether maintained by the Company or any other Person. Neither the Company nor any Affiliated Entity has any Employee Benefit Plan. When used in this Section 3.19 (i) "Affiliated Entity" means any corporation, trade or business (whether or not incorporated) that is, along with the Company, a member of a controlled group of corporations or a controlled group of trades or businesses, as described in Section 414(b) or (c) of the Code or Section 4001(a) (14) of ERISA, or which, with the Company, is treated as a single employer under the Code or ERISA;

(ii) "Employee Benefit Plan" means any domestic or foreign plan, fund, program, policy, arrangement, practice, custom or understanding providing benefits of economic value, whether formal or informal, whether or not set forth in writing, and whether covering one person or more than one person, sponsored or maintained by the Company or an Affiliated Entity and covering one or more Employees, one or more former employees of the Company or an Affiliated Entity, or one or more present or former beneficiaries, dependents or assignees of any such Employee or former Employee to or under which the Company or an Affiliated Entity has an obligation to contribute or for benefits, other than regular salary, wages or commissions paid substantially concurrently with the performance of the services for which paid. Without limitation, the term "Employee Benefit Plan" includes any employee welfare benefit plan within the meaning of Section 3(1) of ERISA and any employee pension benefit plan within the meaning of Section 3(2) of ERISA, provided, however, that, except as otherwise specifically provided, such term does not include any Multiemployer Plan; and

(iii) "Employee" means any person employed by the Company or an Affiliated Entity at the Closing Date; and

(iv) "Multiemployer Plan" means any plan to which more than one employer (treating the Company and each Affiliated Entity as a single employer) is required to contribute and which is maintained pursuant to one or more collective bargaining agreements.

Section 3.20 Compliance with Law. The conduct of the business of the Company and the use of its Assets does not violate or conflict, and has not violated or conflicted, with any Law in any material respect. All material Permits required with respect to the conduct of the businesses of the Company have been obtained, are in full force and effect and are being complied with in all material respects. Exhibit 1.26 is a true and complete list of all such Permits. The Permits will remain in full force and effect immediately following the consummation of the transactions contemplated herein.

Section 3.21 Transactions With Affiliates. Except as set forth in Exhibit 3.21 attached hereto, since March 31, 1997, the Company has not, except in the ordinary course of business, purchased, leased or otherwise acquired any material property or assets or obtained any material services from, or sold, leased or otherwise disposed of any material property or assets or provided any material services to (except with respect to remuneration for services rendered as a director, officer, independent contractor or employee of the Company in the ordinary course), (i) any employee of the Company, (ii) any Shareholder of the Company, (iii) any person, firm or corporation that directly or indirectly controls, is controlled by or is under common control with the Company, or (iv) any member of the immediate family of any of the foregoing persons (collectively, an "Affiliate"). Except as set forth in Exhibit 3.21, (a) the Contracts do not include any material obligation or commitment between the Company and any Affiliate, (b) the Assets do not include any material receivable or other material obligation or commitment from an Affiliate to the Company and (c) the liabilities reflected on the Balance Sheet do not include any material obligation or commitment to any Affiliate.

Section 3.22 Fees and Expenses of Brokers and Others. Except as set forth on Exhibit 3.22, neither the Company nor the Sellers have had any dealings, negotiations or communications with any investment banking firm, broker or other intermediary in connection with the transactions contemplated by this Agreement, none of them is committed to any liability for any brokers' or finders' fees or any similar fees in connection with the transactions contemplated by this Agreement and none of them has retained any investment banking firm, broker or other intermediary to act on his or its behalf in connection with the transactions contemplated by this Agreement.

Section 3.23 Tax Matters.

(a) Except as set forth on Exhibit 3.23:

(i) the Company is not a member of an affiliated group, within the meaning of Section 1504(a) of the Code;

(ii) the Company has filed or caused to be filed all tax returns and reports required to have been filed by or for it on or before the Closing Date, provided that the Company's tax returns for Company fiscal year ending December 31,

1996 are on extension until September 1997 and all information set forth in such returns or reports is accurate and complete in all material respects;

(iii) the Company has paid or made adequate provision for all Taxes, additions to Tax, penalties and interest for periods covered by those returns or reports;

(iv) there are no unpaid Taxes, additions to Tax, penalties or interest payable by the Company or by any other person that are or could become a lien on any asset, or otherwise adversely affect the business, properties or financial condition, of the Company;

(v) the Interim Financial Statements fully and properly reflect, as of the date hereof, the liabilities of the Company for all Taxes, additions to Tax, penalties and interest;

(vi) except as disclosed on Exhibit 3.23 neither the Company nor any predecessor has been the subject of an audit by federal or state tax authorities; and

(viii) the Company has always been classified as a "C" corporation under the Code.

(b) Exhibit 3.23 describes all tax elections, consents and agreements made by or affecting the Company and lists all types of Taxes paid and returns filed by or on behalf of the Company, in each case since March 1, 1993.

Section 3.24 Environmental Matters.

(a) Definitions. When used in this Section 3.24:

(i) "Environmental Laws" shall mean any and all federal, state, local municipal (in each case whether United States or foreign) laws, rules, orders, regulations, statutes, ordinances, codes, decrees or requirements of any Governmental Authority, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. 9601 et seq. ("CERCLA"), the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq.; the Clean Water Act, 33 U.S.C. 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. 2601 et seq.; the Safe Drinking Water Act, 42 U.S.C. 300(f) et seq.; and the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. 136 et seq. as each may be amended at any time, or analogous state statutes or regulations, regulating, relating to or imposing liability or standards of conduct concerning any environmental matters, including without limitation Hazardous Materials or Petroleum Products, the off-site or on-site disposal of wastes, or the release, discharge or disposal of any pollutants,

contaminants, irritants or waste (a "Release") as in effect at the Closing Date or at any time in the past;

(ii) "Governmental Authority" shall mean any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, or any court, in each case whether of the United States or foreign;

(iii) "Hazardous Materials" shall mean any hazardous material, hazardous waste, infectious medical waste, hazardous or toxic substance defined or regulated as such in or under any Environmental Law, including, without limitation, materials exhibiting the characteristics of ignitability, corrosivity, reactivity or extraction procedure toxicity, as such terms are defined in connection with hazardous materials or hazardous wastes or hazardous or toxic substances in any Environmental Law; and

(iv) "Petroleum Products" shall mean gasoline, diesel fuel, motor oil, waste or used oil, heating oil, kerosene and any other petroleum products.

(b) The Company has not used, stored, treated, transported, manufactured, refined, handled, produced or disposed of any Hazardous Materials or Petroleum Products, any other wastes or caused any Release on, under, at, from or in any way affecting any of its properties or assets, or otherwise, in any manner which at the time of the action in question violated any Environmental Law, and (ii) to the Knowledge of the Sellers, no owner of such property or asset or any tenant, subtenant, prior tenant or prior subtenant thereof has used, stored, transported, treated, manufactured, refined, handled, produced or disposed of any Hazardous Materials, Petroleum Products, any other wastes or caused any Release on, from or in any way affecting any such property or asset, or otherwise, in any manner which at the time of the action in question violated any Environmental Law.

Section 3.25 Employees, Labor Matters, etc. The Company is not a party to or bound by any collective bargaining or other labor agreement, and there are no labor unions or other organizations representing any employees employed by the Company. Since March 31, 1993, there has not occurred or been threatened any material strike, slowdown, picketing, work stoppage, concerted refusal to work overtime or other similar labor activity with respect to any employees of the Company. There are no labor disputes currently subject to any grievance procedure, arbitration or litigation and there is no representation petition pending or threatened with respect to any employee of any of the Company.

Section 3.26 Accuracy of Information. Neither this Agreement nor any other document provided by the Company or any Sellers to the Purchaser in connection with the transactions contemplated herein contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.

Section 3.27 Liabilities. There are outstanding as of the date hereof no liabilities of or claims against the Company, other than those reflected on the Balance Sheet, the Interim Financial Statements, or disclosed on Exhibit 3.27 or any other Exhibit to this Agreement.

Section 3.28. Settlement Agreements. The Sellers have delivered to the Purchaser copies of schedules (, the "Payee Schedules"), setting forth information relating to all Settlement Agreements and/or Assignment Agreements (collectively, the "Settlement Agreements") between the Company (as successor by merger to Settlement Services Treasury Assignments, Inc., a California Corporation) (the "California Corporation")) and the individuals named or referred to in the Payee Schedules (collectively, the "Payees" and individually, a "Payee"). All of the obligations of the Company and the California Corporation under each of the Settlement Agreements required to be paid or performed by it through the date of this Agreement have been paid and performed. The information set forth in the Payee Schedules is true, correct and accurate as of May 19, 1997.

Section 3.29. Trusts. The Company is the sole beneficiary and trustor, and Bankers Trust Company of New York is the sole trustee, of a trust (the "SSTAI Trust") established under that certain Settlement Services Treasury Assignments, Inc. Amended and Restated Master Trust Agreement executed as of July 12, 1995, a copy of which is attached hereto as Exhibit 3.29(a). Except for the SSTAI Trust, there are no other trusts in effect relating to any of the Settlement Agreements. Except for Payees under Settlement Agreements described or referred to in Exhibit 3. 29(c), the Payees are solely unsecured creditors of the Company. The SSTAI Trust is in full force and effect and complies with applicable law and with the obligations of the Company and the California Corporation under the Settlement Agreements. Exhibit 3.29(b) sets forth, in chronological order, each master trust agreement relating to the Settlement Agreements (other than the SSTAI Trust) to which the Company or the California Corporation was a party. Each trust relating to the Settlement Agreements or any of them (collectively, the "Prior Trusts"), the termination thereof and the transfer of assets held thereunder to each successor trustee complied with applicable law and the obligations of the Company and the California Corporation under the Settlement Agreements. The Prior Trusts were consolidated into master trusts which were Prior Trusts. Accounts for Payees under the Prior Trusts whose Settlement Agreements have not been satisfied in full are now maintained under the SSTAI Trust. Exhibit 3.29(c) lists the Payees whose Settlement Agreements state that they are beneficiaries of their Prior Trusts.

Section 3.30. Administration of Trusts. Exhibit 3.30 contains a true and complete list of all assets owned by SSTAI and held by the SSTAI Trust as of May 19, 1997, which assets are owned free and clear of all liens and encumbrances of every kind. Since such date, there has been no disposition of such assets except as required to satisfy obligations under Settlement Agreements. The administration of each of the SSTAI Trust and the Prior Trusts, and the investment of the assets held by the

Company or in the SSTAI Trust or the Prior Trusts, to the extent under the control or direction of the Company or the California Corporation, have not violated the terms of any of the Settlement Agreements or applicable law. The Company is not a party to, and has no interest in, and no assets or property relating to any Settlement Agreement are held in, any trust except the SSTAI Trust in SSTAI's bank account at Bankers Trust Company of New York listed on Exhibit 1.06.

## ARTICLE IV
## SEVERAL REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each of the Sellers represents and warrants to the Purchaser with respect solely to himself or itself as follows:

Section 4.01 Organization; Individual Capacity; Enforceability. Each Seller that is a trust is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, with full power, legal right and authority to enter into this Agreement and to perform its obligations hereunder. Each Seller who is a natural person has full power, legal right and capacity to enter into this Agreement and to perform his obligations hereunder. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by the trustees of each Seller that is a trust, and no other action under the terms of any trust on the part of any Seller is necessary to authorize this Agreement or to consummate the transactions contemplated herein. This Agreement is, and the other documents and instruments required hereby will be, when executed and delivered by the parties hereto, the valid and binding obligations of each of the Sellers, enforceable against each of the Sellers in accordance with their respective terms.

Section 4.02 No Violation or Conflict by Sellers. The execution, delivery and performance of this Agreement by each of the Sellers (a) do not and will not conflict with or violate any provision of the trust agreement of any Seller, or any Law, judgment, order or decree binding any of the Sellers or any contract or agreement to which any of the Sellers is a party or by which any of the Sellers is bound, and (b) will not require the consent or approval of any other party. No notice to, filing or registration with, or authorization, consent or approval of, any governmental, regulatory or self-regulatory agency is necessary or is required to be made or obtained by any of the Sellers in connection with the execution and delivery of this Agreement by it or him or the consummation by it or him of the transactions contemplated hereby.

Section 4.03 Title to Shares. Each of the Sellers owns of record and beneficially good, valid and marketable title to his or its Shares, free and clear of any and all mortgages, liens, encumbrances, charges, claims, restrictions, pledges, security interests or impositions. Exhibit 1.43 is a true and correct list of the Shares owned of record and beneficially by each of the Shareholders immediately prior to the Closing Date. The representations and warranties in Section 3.02 are accurate.

ARTICLE V
REPRESENTATIONS AND WARRANTIES
OF THE PURCHASER AND THE INDEMNITOR

The Purchaser and the Indemnitor hereby jointly and severally represent and warrant to the Sellers as follows:

Section 5.01 Organization; Enforceability. The Purchaser and the Indemnitor are corporations each duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation with full power, legal right and authority to enter into this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by the Purchaser and the Indemnitor and no other corporate proceedings are necessary to authorize this Agreement or to consummate the transactions contemplated herein. This Agreement is, and the other documents and instruments required hereby will be, when executed and delivered by the parties hereto, the valid and binding obligations of the Purchaser and the Indemnitor, enforceable against it in accordance with their respective terms.

Section 5.02 Consents and Approvals; No Violations. No filing or registration with, and no permit, authorization, consent or approval of, any public body or authority is necessary or required in connection with the execution and delivery of this Agreement by the Purchaser and the Indemnitor or for the consummation by the Purchaser and the Indemnitor of the transactions contemplated by this Agreement. Assuming that all filings, registrations, permits, authorizations, consents and approvals contemplated by the immediate preceding sentence have been duly made or obtained, neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby by the Purchaser or the Indemnitor will (i) conflict with or result in any breach of any provision of the Articles of Incorporation or bylaws of the Purchaser or the Indemnitor, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, contract, agreement or other instrument or obligation to which the Purchaser and/or the Indemnitor is a party or by which it or any of its properties or assets may be bound or (iii) violate any order, writ, injunction, decree or Law applicable to the Purchaser and/or the Indemnitor or any of its properties or assets.

Section 5.03 SEC Filings; Financial Statements.

(a) The Indemnitor has timely filed all forms, proxy statements, registration statements, reports, schedules, and other documents including without limitation the Indemnitor's $20,000,000 10.50% Participating Equity Notes Due 2004

Prospectus dated April 15, 1997 filed, or required to be filed, by the Indemnitor and/or any of its Subsidiaries with any regulatory authority pursuant to the Securities Laws since December 31, 1993 or such later date as the Purchaser or the Indemnitor first filed, or was first obligated to file, such documents (the "SEC Reports"). The SEC Reports (i) at the time filed, complied in all material respects with the applicable requirements of the Securities Laws and other applicable Laws and (ii) did not, at the time they were filed (or, if amended or superseded by a filing, then on the date of such filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated in such SEC Reports or necessary in order to make the statements in such SEC Reports, in light of the circumstances under which they were made, not misleading. No Subsidiary of the Purchaser or Indemnitor is required to file any SEC Reports.

(b) Each of the Purchaser's and Indemnitor's financial statements (including, in each case, any related notes) contained in the SEC Reports complied as to form in all material respects with the applicable published rules and regulations of the SEC with respect thereto, was prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except to the extent required by changes to GAAP or as may be indicated in the notes to such financial statements or, in the case of unaudited interim statements, as permitted by Form 10-Q of the SEC), and fairly presented in all material respects the consolidated financial position of the Purchaser, the Indemnitor and its Subsidiaries as at the respective dates and the consolidated results of operations and cash flows for the periods indicated, except that the unaudited interim financial statements were or are subject to normal and recurring year-end adjustments which were not or are not expected to be material in amount or effect.

Section 5.04 <u>Absence of Undisclosed Liabilities</u>. Neither the Indemnitor nor any Subsidiary of the Indemnitor has any obligations or liabilities that are reasonably likely to have, individually or in the aggregate, a Material Adverse Effect on the Purchaser or the Indemnitor, except obligations or liabilities which are accrued or reserved against in the consolidated balance sheets of the Indemnitor as of December 31, 1996 and as of March 31, 1997 or which are disclosed in the SEC Reports. Neither the Indemnitor nor any Subsidiary of the Indemnitor has incurred or paid any liability or obligation since December 31, 1996, except for such liabilities or obligations disclosed in the SEC Reports or incurred or paid in the ordinary course of business consistent with past business practice and which are not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect on the Purchaser or the Indemnitor.

Section 5.05 <u>Absence of Certain Changes or Events</u>. Since December 31, 1996, except as disclosed in the SEC Reports or financial statements delivered to the Sellers prior to the date of this Agreement, (i) there have been no events, changes or occurrences which have had, or are reasonably likely to have, individually or in the aggregate, a Material Adverse Effect on the Purchaser or the Indemnitor and (ii) neither the Purchaser, the Indemnitor nor any Subsidiary of either of them has taken

any action, or failed to take any action, prior to the date of this Agreement, which action or failure, if taken after the date of this Agreement, would represent or result in a material breach or violation of any of the covenants and agreements of the Purchaser or the Indemnitor contained in this Agreement.

Section 5.06 Compliance with Laws. The Purchaser, the Indemnitor and each of either's Subsidiaries has in effect all Permits necessary for it to own, lease or operate its material assets and to carry on its business as now conducted except where the failure to possess such Permit would not have a Material Adverse Effect on the Purchaser, the Indemnitor or any such Subsidiary. Except as disclosed in Exhibit 5.06 hereto, neither the Purchaser, the Indemnitor nor any Subsidiary of either of them:

(a) is in default of any Laws or Permits applicable to its business or employees conducting its business, except for any default that would not have a Material Adverse Effect on the Purchaser, Indemnitor or any Subsidiary of either of them; or

(b) has received any notification or communication from any agency or department of federal, state, or local government or any regulatory authority or the staff thereof (i) asserting that the Purchaser, the Indemnitor or any Subsidiary of either of them is in material non-compliance with any of the Laws which such governmental authority or regulatory authority enforces which have not been resolved, or (iii) requiring the Purchaser, the Indemnitor or any Subsidiary of either of them to enter into or consent to the issuance of a cease and desist order, formal agreement, directive, commitment or memorandum of understanding, or to adopt any board resolution or similar undertaking, which restricts materially the conduct of its business.

Copies of all material reports, correspondence, notices and other documents relating to any inspection, audit, monitoring or other form of review (other than a review by the SEC of a public offering of equity securities by the Purchaser or the Indemnitor) or enforcement action by a federal or state governmental authority have been made available to the Sellers.

Section 5.07 Litigation. Except as disclosed in the SEC Reports, there is no litigation, arbitration proceeding, governmental investigation, citation or action of any kind pending or, to the Knowledge of the Purchaser or the Indemnitor, proposed or threatened (a) against the Purchaser, the Indemnitor or any Subsidiary of either of them, (b) relating to the business, assets, properties or products of the Purchaser or the Indemnitor or any Subsidiary of either of them or (c) that seeks restraint, prohibition, damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby. The matters disclosed in the SEC Reports, if decided in a manner adverse to the Purchaser, the Indemnitor or any Subsidiary of either of them, are not reasonably likely to have, individually or in the

aggregate, a Material Adverse Effect on the Purchaser, the Indemnitor or any such Subsidiary.

Section 5.08 Statements True and Correct. No statement, certificate, instrument or other writing furnished or to be furnished by the Purchaser, the Indemnitor or any Subsidiary of either of them to the Company or the Sellers pursuant to this Agreement or any other document, agreement or instrument referred to herein and so furnished to the Company or the Sellers contains or will contain any untrue statement of material fact or will omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 5.09 Solvency; Capital Adequacy. After giving effect to the consummation of the purchase and sale of the Shares pursuant to this Agreement, each of the Purchaser and the Indemnitor (a) will be able to pay its debts as they become due, (b) will have funds and capital sufficient to carry on its business and all businesses in which it is about to engage, and (c) will own property in the aggregate having a value both at fair valuation and at fair saleable value in the ordinary course of its business greater than the amount required to pay its indebtedness, including for this purpose unliquidated and disputed claims. Neither he Purchaser nor the Indemnitor will be rendered insolvent by the execution and delivery of this Agreement and the consummation of any transactions contemplated herein.

## ARTICLE VI
## [INTENTIONALLY OMITTED

## ARTICLE VII
## CONDITIONS PRECEDENT TO CLOSING

Section 7.01 Conditions Precedent to Obligations of the Purchaser and Indemnitor. The obligations of the Purchaser and the Indemnitor hereunder are subject to the satisfaction or waiver at or prior to (except for Section 7.01(i)) the Closing Date of the following conditions precedent:

(a) nothing shall have occurred which would have a Material Adverse Effect on the Company from the date hereof to the Closing Date except as a result of transactions reflected in the Interim Financial Statements;

(b) the representations and warranties of the Sellers contained in Article III and IV shall be true and correct in all material respects when made and at and as of the Closing Date with the same force and effect as if those representations and warranties had been made at and as of such time (with such exceptions, if any, necessary to give effect to events or transactions expressly permitted herein);

(c) the Sellers shall, in all material respects, have performed all obligations and complied with all covenants necessary to be performed or complied with by them on or before the Closing Date;

(d) the Company shall have obtained any Required Consents;

(e) the Purchaser shall have received a certificate of the Chairman, President or Executive Vice President of the Company, in form satisfactory to counsel for the Purchaser, certifying fulfillment of the matters referred to in paragraphs (a) through (d) of this Section 7.01;

(f) all proceedings, corporate or other, to be taken by any Seller or the Company in connection with the transactions contemplated by this Agreement, and all documents incident thereto, shall be reasonably satisfactory in form and substance to the Purchaser, the Indemnitor and the Purchaser's and the Indemnitor's counsel, and the Sellers shall have made available to the Purchaser and the Indemnitor for examination the originals or true and correct copies of all documents that the Purchaser and Indemnitor may reasonably request in connection with the transactions contemplated by this Agreement;

(g) the Purchaser shall have received the opinion of Hinckley, Allen & Snyder, counsel for the Sellers, dated the Closing Date, with respect to such matters as the Purchaser may reasonably request and substantially in the form of Exhibit 7.01 hereto;

(h) no order, decree or injunction shall have been enacted, entered, promulgated or enforced by any federal, state or other court of competent jurisdiction in the United States or any federal, state or local governmental authority which prohibits the consummation of the transactions contemplated herein; provided, however, that the parties hereto shall use their best efforts to have any such order, decree or injunction vacated or reversed; and

(i) reasonably promptly after the Closing Date, the Sellers shall cause ML Financial Services, Inc., a California corporation to change its name to a name dissimilar from ML Financial Services, Inc.

Section 7.02 Conditions Precedent to Obligations of the Sellers. The obligations of the Sellers hereunder are subject to the satisfaction or waiver at or prior to the Closing Date of the following conditions precedent:

(a) the representations and warranties of the Purchaser and Indemnitor contained in Article V shall be true and correct in all material respects when made and at and as of the Closing Date with the same force and effect as if those representations and warranties had been made at and as of such time (with such

exceptions, if any, necessary to give effect to events or transactions expressly permitted herein);

(b) the Purchaser and the Indemnitor shall, in all material respects, have performed all obligations and complied with all covenants necessary to be performed or complied with by them on or before the Closing Date;

(c) the Sellers shall have received a certificate of the Chairman, Vice Chairman, President or any Vice President of the Purchaser and the Indemnitor, in form satisfactory to counsel for the Sellers, certifying fulfillment of the matters referred to in paragraphs (a) and (b) of this Section 7.02;

(d) all proceedings, corporate or other, to be taken by the Purchaser and the Indemnitor in connection with the transactions contemplated by this Agreement, and all documents incident thereto, shall be reasonably satisfactory in form and substance to the Sellers and the Sellers' counsel, and the Purchaser and Indemnitor shall have made available to the Sellers for examination the originals or true and correct copies of all documents that the Sellers may reasonably request in connection with the transactions contemplated by this Agreement;

(e) the Sellers shall have received the opinions of Cameron & Mittleman and Mark A. Creatura, Esq., counsel for the Purchaser and Indemnitor, dated the Closing Date, with respect to such matters as the Sellers may reasonably request; and

(f) no order, decree or injunction shall have been enacted, entered, promulgated or enforced by any federal, state or other court of competent jurisdiction in the United States or any federal, state or local governmental authority which prohibits the consummation of the transactions contemplated herein; provided, however, that the parties hereto shall use their best efforts to have any such order, decree or injunction vacated or reversed.

## ARTICLE VIII
## TERMINATION; AMENDMENT; WAIVER

Section 8.01 Termination. This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time prior to the Closing Date:

(a) by mutual written consent of the Purchaser, the Indemnitor and the Sellers;

(b) by the Purchaser and Indemnitor at any time following the Purchaser and the Indemnitor becoming aware that any Seller has breached any

representation, warranty or covenant contained in this Agreement in any material respect, if the Purchaser and the Indemnitor has notified the Sellers of the breach and the breach has continued without cure for a period of 30 days after the notice of breach;

(c) by the Sellers at any time following the Sellers becoming aware that the Purchaser or the Indemnitor has breached any representation, warranty or covenant contained in this Agreement in any material respect, if the Sellers have notified the Purchaser or the Indemnitor of the breach and the breach has continued without cure for a period of 30 days after the notice of breach,

(d) by the Purchaser, the Indemnitor or the Sellers, if the Closing Date shall not have occurred on or before May 31, 1997, unless the Closing shall have been extended as provided in Section 2.02 hereof (provided that the right to terminate this Agreement under this Section 8.01(d) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of or has resulted in the failure of the Closing Date to occur on or before such date);

(e) by the Purchaser, the Indemnitor or the Sellers, if any federal, state or other court of competent jurisdiction in the United States or other federal, state or local governmental body shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated herein and such order, decree, ruling or other action shall have become final and nonappealable.

Section 8.02 Effect of Termination. If this Agreement is terminated pursuant to Section 8.01 hereof, this Agreement shall forthwith become void and have no effect, without any liability on the part of any party or its directors, officers, trustees, shareholders or agents for such party's action in terminating this Agreement pursuant to Section 8.01 hereof; provided, however, that nothing contained in this Section 8.02 shall relieve any party from liability for any breach of this Agreement.

Section 8.03 Amendment. This Agreement may be amended by action taken by the Sellers, Sutro, the Purchaser and the Indemnitor at any time before Closing Date. No amendment to this Agreement shall be made except by an instrument in writing signed on behalf of all of the parties.

Section 8.04 Extension; Waiver. At any time prior to the Closing Date, the parties may (i) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (ii) waive any inaccuracies in the representations and warranties contained herein or in any document, certificate or writing delivered pursuant hereto or (iii) waive compliance with any of the agreements or conditions contained herein. Any agreement on the part of any party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

ARTICLE IX
INDEMNIFICATION

Section 9.01 Indemnification by the Sellers and Sutro.

(a) Subject to Sections 9.01(b) hereof, each of the Sellers and Sutro, (collectively the "Seller Indemnifying Parties") hereby jointly and severally indemnify and hold the Purchaser, the Indemnitor and each of the Purchaser's and Indemnitor's respective officers, directors, employees, agents, and shareholders and, from and after the Closing Date, the Company and the Company's officers, directors, employees, agents and shareholders (collectively, the "Purchaser Indemnified Parties") harmless from and against, and agree to defend promptly each of the Purchaser Indemnified Parties for, any and all losses, damages, costs, expenses, fines, penalties, settlement payments and expenses, liabilities, obligations and claims of any kind, including, without limitation, reasonable attorneys' fees and other legal and professional costs and expenses (hereinafter referred to collectively as "Purchaser Losses"), that any of the Purchaser Indemnified Parties may at any time suffer or incur, or become subject to, as a result of or in connection with the following (the "Purchaser Claims"): (i) any breach or inaccuracy of any of the representations and warranties made by the Sellers or Sutro in or pursuant to this Agreement; (ii) any failure of the Sellers to carry out, perform, satisfy and discharge any of their covenants, agreements, undertakings, liabilities or obligations under this Agreement or under any of the documents and instruments delivered by the Sellers pursuant to this Agreement; (iii) any liability for the payment by the Sellers of federal, state or foreign taxes, (iv) any fraudulent behavior by any Seller Indemnifying Party of any kind or nature in connection with the transactions under or pursuant to this Agreement or any subparagraphs of this Section 9.01(a) and (v) any failure of the Sellers to pay the fees and expenses listed on Exhibit 3.22. Notwithstanding the foregoing provisions of this Section 9.01(a), any indemnification obligation under clause (i) above based on any representation or warranty contained in Article IV, shall be solely the obligation of the Seller with respect to whom or which the representation and warranty is inaccurate.

(b) the right of the Purchaser Indemnified Parties to indemnification set forth in Section 9.01(a) is limited as follows:

(i) the Seller Indemnifying Parties shall not be required to indemnify the Purchaser Indemnified Parties under Section 9.01(a) (except under Section 9.01(a)(iv) and (v) unless and until the amount of all Purchaser Losses for which indemnification is sought shall first exceed $25,000, the ("Threshold Amount") at which point the Seller Indemnifying Parties will be obligated to indemnify the Purchaser Indemnified Parties for all Purchaser Losses in excess of the Threshold Amount; and

(ii) the period for which Purchaser Claims may be made under the indemnification obligations of the Seller Indemnifying Parties under Section 9.01(a) shall be (a) with respect to Section 9.01(a)(i) under representations and warranties contained in Section 3.23 and Section 9.01(a)(iii) the date on which the income tax returns of the Company and the Sellers, respectively for calendar year 1997 are no longer subject to audit by applicable federal and state tax authorities and (b) with respect to Section 9.01(a)(i) under other representations and warranties, or Section 9.01(a)(ii), except in each such case on account of any failure to make required payments to the Payees due and payable prior to the Closing Date or payments under Section 9.01(a)(v) or on account of any Purchaser Claims arising under any other clause of Section 9.01(a), two (2) years from the Closing Date, (c) with respect to Section 9.01(a)(iv) or (v) unlimited and (d) with respect to any failure to make required payments to the Payees due and payable prior to the Closing Date, the period ending on the date set forth in Section 9.02(b)( ).

(c) Indemnification for Tax Matters.

(v) General. Seller Indemnifying Parties agree to indemnify and hold harmless the Purchaser Indemnified Parties from and against all Taxes of the Company including Taxes due by virtue of the Company being a successor to another Person by merger, liquidation, purchase of assets or similar transaction (or for which the Company is liable pursuant to Treasury Regulations Section 1.1502-6 or any analogous state or local tax provisions) (i) with respect to all taxable periods ending on or prior to the Closing Date, (ii) with respect to any taxable period beginning before the Closing Date and ending after the Closing Date, but only with respect to the portion of such period up to and including the Closing Date (such portion, a "Pre-Closing Partial Period"), or (iii) payable as a result of a breach of any representation or warranty set forth in Section 3.23. Notwithstanding the foregoing, the Seller Indemnifying Parties shall not be required to indemnify the Purchaser Indemnified Parties for Taxes (x) to the extent of the liability for the Company's accrued taxes reflected on the Interim Financial Statements, (y) payable as a result of any election made (or deemed made) or caused to be made by the Purchaser under Section 338 of the Code, or (z) payable as a result of any events occurring on the Closing Date, but after the Closing, which are outside of the ordinary course of business and are caused to occur by the Purchaser Indemnified Parties.

(w) Effect of Carryovers and Carrybacks. For purposes of this Section 9.01(c) any reduction of a Tax or Taxes which would have been due but for the application of any credit or net operating or capital loss carryover or carryback of Purchaser or a member of a consolidated group of which Purchaser is a member, shall be ignored.

(x) Allocation between Partial Periods. Any Taxes for a period including a Pre-Closing Partial Period and a taxable period beginning before the Closing Date and ending after the Closing Date, but only with respect to the portion of

such period commencing on and after the Closing Date (such portion, a "Post-Closing Partial Period shall, for purposes of Section 9.01(c), be allocated between a Pre-Closing Partial Period and a Post-Closing Partial Period (i) for personal property Taxes, on a per diem basis and (ii) in the case of other Taxes, on the actual activities, accruals, taxable income or taxable loss of the Company during such Pre-Closing Partial Period and such Post-Closing Partial Period.

(y) Tax Effect of Payments. Purchaser, Indemnitor, Sutro and Sellers agree that any indemnification payments made pursuant to this Section 9.01(c) shall be treated for tax purposes as an adjustment to the Purchase Price unless otherwise required by applicable law.

Section 9.02 Indemnification by the Purchaser, the Company and the Indemnitor.

(a) The Purchaser, the Indemnitor and, from and after the Closing Date, the Company hereby indemnify and hold each of the Sellers, Sutro and each of the Sellers' respective trustees and agents (collectively, the "Seller Indemnified Parties") harmless from and against, and agree to defend promptly each of the Seller Indemnified Parties for, any and all losses, damages, costs, expenses, fines, penalties, settlement payments and expenses, liabilities, obligations and claims of any kind, including, without limitation, reasonable attorneys' fees and other legal and professional costs and expenses (hereinafter referred to collectively as "Seller Losses"), that any of the Seller Indemnified Parties may at any time suffer or incur, or become subject to, as a result of or in connection with the following (the "Seller Claims"): (i) any breach or inaccuracy of any of the representations and warranties made by the Purchaser and/or the Indemnitor in or pursuant to this Agreement; (ii) any failure of the Purchaser and/or the Indemnitor to carry out, perform, satisfy and discharge any of its or their covenants, agreements, undertakings, liabilities or obligations under this Agreement or under any of the documents and instruments delivered by the Purchaser and/or the Indemnitor pursuant to this Agreement; (iii) any liability for the payment by the Purchaser, the Indemnitor and/or the Company of federal, state or foreign taxes arising from and after the date hereof; (iv) any failure of the Purchaser, the Indemnitor and/or the Company, after the date hereof, to carry out and perform its obligations under any agreement, instrument or other document to which the Company is now bound or hereafter becomes bound, (v) any fraudulent behavior by the Company, the Purchaser and/or the Indemnitor arising after the date hereof, (vi) any claim that the purchase and sale of the Shares constitutes a fraudulent transfer or fraudulent conveyance under applicable federal or state law and (vii) any failure to fulfill any obligation of the Sellers, the Company and/or the SSTAI Trust to any Payee as and when due at any time after the Closing Date.

(b) the right of the Seller Indemnified Parties to indemnification set forth in Section 9.02(a) is limited as follows:

(i) the Purchaser Indemnifying Parties shall not be required to indemnify the Seller Indemnified Parties under Section 9.02(a) (except under Section 9.02(a)(v) unless and until the amount of all Seller Losses for which indemnification is sought shall first exceed the Threshold Amount at which point the Purchaser Indemnifying Parties will be obligated to indemnify the Seller Indemnified Parties for all Seller Losses in excess of the Threshold Amount; and

(ii) the period for which Seller Claims may be made under the indemnification obligations of the Purchaser Indemnifying Parties under Section 9.02(a) shall be (a) with respect to Section 9.02(a)(iii) the date on which the income tax returns of the Company for calendar year 1997 are no longer subject to audit by applicable federal and state tax authorities and (b) with respect to Section 9.02(a)(i), Section 9.02(a)(ii) and Section 9.02(a)(iv), except in each such case on account of any failure to make required payments of Taxes or to the Payees due and payable after the Closing Date or on account of any Seller Claims arising under any other clause of Section 9.02(a), two (2) years from the Closing Date, (c) with respect to Section 9.02(a)(v) and Section 9.02(a)(vi) unlimited and (d) with respect to any failure to make required payments to the Payees due and payable after to the Closing Date, December 31, 2014 except with respect to Treasury bonds of the SSTAI Trust which are called, as to which the date shall be December 31, 2009.

(c) In connection with preparation and filing of the Company's 1997 income tax returns (or consolidated returns of the Purchaser which include the Company), the Purchaser and the Company will not take positions reasonably likely to be adverse to the Sellers or Sutro or the Seller Indemnifying Parties' indemnification obligations and the Purchaser and the Company will permit the Sellers' accountants to review such returns prior to filing in order to determine whether the Purchaser or the Company is taking positions therein which are reasonably likely to be adverse to the Sellers or Sutro or the Seller Indemnifying Parties' indemnification obligations under Section 9.01(a) and in the event that the Sellers' accountants make such a determination, the Sellers and the Purchaser will cause their respective accountants to resolve the matter in a manner acceptable to the Sellers and the Purchaser. In the event of failure to so resolve the matter within 30 days after Purchaser receives notice of Sellers' accountants' determination, the matter shall be referred to a nationally recognized accounting firm for resolution and the decision of such nationally recognized accounting firm shall be final and binding on the parties to this Agreement; provided that the Company or the Purchaser shall be permitted to file the tax return(s) in question in a timely manner, but if the matter is resolved in favor of the Sellers, Sutro and/or the Seller Indemnifying Parties, the Seller Indemnifying Parties shall have no indemnification obligation to the Purchaser Indemnified Parties on account thereof.

(d) Indemnification for Tax Matters.

(i) General. Purchaser Indemnifying Parties agree to indemnify and hold harmless the Seller Indemnified Parties from and against all Taxes of

the Company (1) with respect to all taxable periods beginning on or after the Closing Date, (2) with respect to any taxable period beginning before the Closing Date and ending after the Closing Date, but only with respect to the portion of such period commencing on and after the Closing Date (such portion, a "Post-Closing Partial Period"). Notwithstanding the foregoing, the Purchaser Indemnifying Parties shall not be required to indemnify the Seller Indemnified Parties for Taxes payable as a result of any events occurring on the Closing Date, but before the Closing, which are outside of the ordinary course of business and are caused to occur by the Seller Indemnified Parties.

(ii) Effect of Carryovers and Carrybacks. For purposes of this Section 9.02(d) any reduction of a Tax or Taxes which would have been due but for the application of any credit or net operating or capital loss carryover or carryback of the Company or a member of a consolidated group of which Company is a member, shall be ignored.

(iii) Allocation between Partial Periods. Any Taxes for a period including a Pre-Closing Partial Period and a Post-Closing Partial Period shall, for purposes of Section 9.02(d), be allocated between a Pre-Closing Partial Period and a Post-Closing Partial Period (i) for personal property Taxes, on a per diem basis and (ii) in the case of other Taxes, on the actual activities, accruals, taxable income or taxable loss of the Company during such Pre-Closing Partial Period and such Post-Closing Partial Period.

(iv) Tax Effect of Payments. Purchaser and Sellers agree that any indemnification payments made pursuant to this Section 9.02(c) shall be treated for tax purposes as an adjustment to the Purchase Price unless otherwise required by applicable law.

Section 9.03 Indemnification Procedures.

(a) Without limiting the rights of either party at law or in equity, the indemnified party or indemnified parties (the "Indemnified Party") shall have the right to receive payment from the indemnifying party or indemnifying parties (the "Indemnifying Party") hereunder for indemnification claims pursuant to Section 9.01 or 9.02, as applicable, subject to the following:

i. The Indemnified Party shall provide to the Indemnifying Party a certificate signed, if the Indemnified Party is a Purchaser Indemnified Party, by the Purchaser Indemnified Party's chief financial officer or president, or, if the Indemnified Party is a Seller Indemnified Party, by such Seller or Sutro, describing the amount of the indemnification claim and the basis thereof (a "Claim Notice").

ii. If the Indemnifying Party shall notify the Indemnified Party within ten (10) days of the Indemnifying Party's receipt of the Indemnified Party's certification that the Indemnifying Party disputes the claim or the amount thereof, and thereafter the Indemnifying Party and the Indemnified Party are unable to resolve such dispute within thirty (30) days, then the Indemnified Party may seek its legal remedies to enforce such indemnification.

iii. If the Indemnifying Party does not so notify Indemnified Party as provided above, or if there is a dispute, then upon resolution of the dispute as evidenced by a written agreement by both the Indemnifying Party and the Indemnified Party or a determination by a court of competent jurisdiction in an order that is not subject to appeal, the Indemnifying Party shall promptly pay to the Indemnified Party the amount of the claim, subject to the limitations set forth in this Article IX.

iv. Legal proceedings with respect to indemnification shall be commenced in the courts of the State of Rhode Island, whose courts shall have exclusive jurisdiction over the matter, and each of the parties does hereby submit to such jurisdiction and service of process with respect to any such proceeding.

(b) The Indemnified Party shall, promptly after the receipt of notice of the commencement of any action against such Indemnified Party in respect of which indemnification may be sought against the Indemnifying Party, notify the Indemnifying Party in writing of the commencement thereof. Failure of the Indemnified Party to give such notice will reduce the liability of the Indemnifying Party by the amount of damages attributable to the failure of the Indemnified Party to give notice to the Indemnifying Party; but the omission to notify the Indemnifying Party of any such action shall not relieve the Indemnifying Party from any liability that it may have to such Indemnified Party otherwise than under this Article IX. In case any such action shall be brought against an Indemnified Party and such Indemnified Party shall notify the Indemnifying Party of the commencement thereof, the Indemnifying Party may, or if so requested by such Indemnified Party shall, participate therein or assume the defense thereof, with counsel satisfactory to such Indemnified Party (it being understood that, except as hereinafter provided, the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Party in such action), and after notice from the Indemnifying Party to such Indemnified Party of an election so to assume the defense thereof the Indemnifying Party will not be liable to such Indemnified Party under this Article IX for any legal or other expenses subsequently incurred by such Indemnified Party in connection with the defense thereof other than reasonable costs of investigation; provided, however, that unless and until the Indemnifying Party assumes the defense of any such action at the request of such Indemnified Party, the Indemnified Party shall have the right to participate at the Indemnifying Party's expense in the defense of such action. If the Indemnifying Party shall not have employed counsel to have charge of the defense of any such action or if an Indemnified Party shall have reasonably concluded that there may be defenses

available to it that are different from or additional to those available to the Indemnifying Party (in which cases the Indemnifying Party shall not have the right to direct the defense of such action on behalf of such Indemnified Party), reasonable legal and other expenses, not including settlement expense (unless such settlement is approved by the Indemnifying Party) but including the expenses of separate counsel satisfactory to the Indemnifying Party (which shall not unreasonably withhold such approval), reasonably incurred by such Indemnified Party shall be borne by the Indemnifying Party.

Section 9.04 Survival of Representations, Warranties and Covenants. The representations and warranties made herein by the Sellers, Sutro, the Purchaser and the Indemnitor shall survive the Closing and the Closing Date for respective periods equal to the periods set forth in Section 9.01(b)(ii) and Section 9.02(b)(ii).

Section 9.05 No Offsets, etc. The indemnification obligations of the Purchaser Indemnifying Parties and the Seller Indemnifying Parties contained in Sections 9.01 through 9.04 shall be fulfilled without deduction for any claim, defense or offset of any type, including without limitation any claims, defenses or offsets under any other provision of this Agreement and regardless of whether any claims, defenses or offsets exist.

## ARTICLE X
## MISCELLANEOUS

Section 10.01 Entire Agreement; Assignment. This Agreement (a) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties or any of them with respect to the subject matter hereof, and (b) shall not be assigned by operation of law or otherwise; provided, that the Purchaser may assign its rights and obligations to any affiliate of the Purchaser, but no such assignment shall relieve the Purchaser, as the case may be, of its obligations hereunder if such assignee does not perform such obligations.

Section 10.02 Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by cable, telecopy, telegram or telex, or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties as follows:

if to the Purchaser:

SST Acquisition Corp.
c/o Stanwich Partners, Inc.
One Stamford Landing
Stamford, CT 06902
Attn: President

with a copy to:

Joseph F. Whinery, Esq.
Cameron & Mittleman
56 Exchange Terrace
Providence, Rhode Island 02903

if to the Indemnitor:

Consumer Portfolio Services, Inc.
2 Ada - Suite 100
Irvine, CA 92618
Attn: President

with a copy to:

Mark A. Creatura, Esq.
Sr. Vice President and General Counsel
Consumer Portfolio Services, Inc.
2 Ada - Suite 100
Irvine, CA 92618

if to the Shareholders:

to their respective addresses set
forth on Exhibit 1.43 attached hereto

with a copy to:

Malcolm Farmer III, Esq.
Hinckley, Allen & Snyder
1500 Fleet Center
Providence, Rhode Island 02903

or to such other address as the person to whom notice is given may have previously furnished to the others in writing in the manner set forth above.

Section 10.03 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Rhode Island regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

Section 10.04 Descriptive Headings. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

Section 10.05 Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

Section 10.06 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

Section 10.07 Specific Performance. The parties hereto agree that irreparable damage would occur in the event any of the provisions of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

Section 10.08 Further Assurances. Each party hereto agrees to execute and deliver to any other party hereto such documents, and take such actions, as may be reasonably requested by any such other party and necessary to implement and effectuate the transactions contemplated by this Agreement; provided that no party shall be so obligated if such execution, delivery or action could subject such party to additional cost or liability unless such party is indemnified against such additional cost or liability to such party's reasonable satisfaction. In addition, whichever party received reports, statements, or financial information for the month of May, 1997 with respect to the Company or the SSTAI Trust shall promptly provide the other parties with true copies thereof and each party will provide the other parties and their representatives with access to all information possessed by the providing party with respect to the Company, the SSTAI Trust and the Settlement Agreements in the event of any audit, inquiry or proceeding by any governmental agency or in the event of any Claim by any third party or Payee relating thereto; provided that the costs of providing such information and copies of any documents are borne by the party requesting same unless covered by the indemnification obligations under Article IX.

Section 10.09 Fees and Expenses. Except as otherwise provided in this Agreement, all costs and expenses incurred in connection with this Agreement and the

transactions contemplated hereby shall be paid by the party incurring such expenses, whether or not the transaction is consummated.

Section 10.10 Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effectuate the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

SST ACQUISITION CORP.

By: Charles E. Bradley
Name: Charles E Bradley
Title: President

CONSUMER PORTFOLIO SERVICES, INC.

By: Charles E Bradley
Name: Charles E Bradley
Title: Chairman

SHAREHOLDERS:

______________________________
Jonathan H. Pardee

DUNBAR/WHEELER TRUST u/a
4/28/86, as amended 5/31/94

By: Virginia S. Morse, Trustee
Virginia S. Morse, as trustee and not individually

By: ______________________________
Peter M. Dodge, as trustee and not individually

Jonathan H. Pardee Charitable
Remainder Trust U/A May 17, 1997

By: Carol P. Havican
Carol P. Havican, as trustee and not individually

SUTRO

______________________________
Ogden H. Sutro