# Exhibit F

**Jonathan H. PARDEE, et al., Plaintiffs,**

v.

**CONSUMER PORTFOLIO SERVICES, INC., Defendant.**

**Consumer Portfolio Services, Inc, Counterclaim Plaintiff,**

v.

**Jonathan H. Pardee, et al., Counterclaim Defendants.**

**C.A. No. 01–594L.**

United States District Court, D. Rhode Island.

Nov. 17, 2004.

**Background:** Shareholders of corporate defendant's predecessor brought action in a Rhode Island Superior Court seeking indemnification under the terms of a certain stock purchase agreement for legal costs stemming from two pending civil matters in California and Connecticut. Following removal, defendant filed a motion to stay proceedings.

**Holdings:** The District Court, Lagueux, Senior District Judge, held that:

(1) prior ruling denying motion to stay and to dismiss the case pursuant to the ripeness doctrine was not law of the case where, subsequent to time of prior decision, parties and claims had been added, pleadings had been amended, extensive discovery had been conducted and a related adversary proceeding had been filed, and language used by judge in prior ruling was preliminary in nature, and

(2) action was not ripe for adjudication, and would be stayed until out-of-state cases were resolved.

Motion granted.

**1. Action ⚷68**

A claim may be unripe in the prudential sense without necessarily being constitutionally defective to a degree that it deprives a court of subject matter jurisdiction; in such cases, unripe claims may be stayed rather than dismissed entirely.

**2. Action ⚷68**

Power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel and for litigants how that can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.

**3. Courts ⚷99(3)**

Prior ruling denying motion to stay and to dismiss the case pursuant to the ripeness doctrine was not law of the case where, subsequent to time of prior decision, parties and claims had been added, pleadings had been amended, extensive discovery had been conducted and a related adversary proceeding had been filed, and language used by judge in prior ruling was preliminary in nature.

**4. Courts ⚷99(7)**

Law of the case doctrine allows a court to exercise its discretion in determining whether or not to reconsider prior rulings by a coordinate judge.

**5. Federal Civil Procedure ⚷928**

Reconsideration is proper if the initial ruling was made on an inadequate record or was designed to be preliminary or tentative.

**6. Federal Civil Procedure ⚷1742(2)**

In most cases, lack of ripeness is grounds for dismissal.

**7. Action ⚷69(5)**

Action brought by shareholders of corporate defendant's predecessor seeking indemnification under the terms of a certain stock purchase agreement for legal costs stemming from two pending civil matters in California and Connecticut was not ripe for adjudication, and would be stayed until those cases were resolved; liability had not been fixed by judgment or settlement in the California and Connecticut cases, and therefore any claims for indemnity and declaratory relief were entirely contingent on uncertain future events, there was not only uncertainty as to whether shareholders would ultimately be held liable in the California case, but also undetermined what the factual and legal basis for liability might be, the final amount, if any, of the indemnification was almost certain to be unknown until the California and Connecticut cases were concluded, the uncertainty as to the bases of shareholders' potential liability presented court with an unacceptable risk of inconsistent results, there were plausible scenarios wherein others not before court could be adversely affected by a premature ruling, and postponing a decision would cause no material harm to shareholders because they could be made whole by a monetary judgment should they ultimately prevail after resolution of the out-of-state cases.

**8. Federal Courts ⚷12.1**

Ripeness doctrine finds its foundation in constitutional, jurisdictional and judicial economy concerns, and is applied to prevent courts, through the avoidance of premature adjudication, from entangling themselves in abstract agreements.

**9. Declaratory Judgment ⚷61, 272**

Declaratory Judgment Act does not expand subject matter jurisdiction, nor is it intended to alleviate the requirement that there exist an actual case or controversy as prescribed by the ripeness doctrine. 28 U.S.C.A. § 2201.

**10. Declaratory Judgment ⚷4, 5.1**

Declaratory Judgment Act neither imposes an unflagging duty upon the courts to decide declaratory judgment actions nor grants an entitlement to litigants to demand declaratory remedies. 28 U.S.C.A. § 2201.

**11. Declaratory Judgment ⚷62**

To determine whether a particular declaratory judgment claim is ripe for judicial action, district courts must examine: (1) the fitness of the issues for judicial determination, and (2) the hardship to the parties of withholding court consideration; fitness typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed, whereas hardship typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties. 28 U.S.C.A. § 2201.

**12. Federal Courts ⚷12.1**

Party asserting ripeness bears the burden of adducing evidence of facts sufficient to establish that both prongs of the ripeness test are satisfied.

**13. Federal Courts ⚷12.1**

Under ripeness test, critical consideration in determining the fitness of a claim is the extent to which the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all.

**14. Indemnity ⚷42, 81**

In Rhode Island, general rule regarding indemnity is that no claim arises as such until the indemnitee's liability is fixed

either by entry of judgment holding the indemnitee liable or by the settlement of the underlying claim by the indemnitee on the belief that he is liable.

**15. Federal Courts ⚷12.1**

Courts are more likely to find a claim ripe if it is of an intrinsically legal nature, and less likely to do so if the absence of a concrete factual situation seriously inhibits the weighing of competing interests.

**16. Federal Courts ⚷12.1**

Hardship prong of the ripeness test turns on whether the circumstances giving rise to the claim create a direct and immediate dilemma for the parties requiring them to choose between costly compliance and non-compliance, at the risk of punishment.

---

Christopher R. Bush, Jason B. Daly, Hinckley, Allen & Snyder, Providence, RI, Craig M. Scott, Ralph N. Gaboury, Duffy & Sweeney, Gerald J. Petros, Providence, RI, James W. Irey, Rene P. Tatro, Johnson & Tekosky, LLP, Los Angeles, CA, for Plaintiff.

Christopher H. Little, Matthew F. Medeiros, Scott K. Pomeroy, Little, Bulman, Medeiros & Whitney, P.C., Providence, RI, for Plaintiff/Defendant.

Scott K. Pomeroy, Little, Bulman, Medeiros & Whitney, P.C., Providence, RI, for Defendant.

*DECISION AND ORDER*

LAGUEUX, Senior District Judge.

After a long, convoluted motion, discovery and judicial assignment process, this Court, having satisfied itself that this case's status so warrants, now stays this matter until resolution of the related California and Connecticut cases. The stay includes the cross motions for summary judgment that are still awaiting decision. It is the conclusion of this Court that established case law coupled with concerns for judicial efficiency and comity clearly indicate that the existence and status of the related matters pending in both California and Connecticut provide sufficient cause for this Court to exercise its discretion to stay all activity in this matter until those cases are resolved.

*BACKGROUND*

This is an action by Jonathan H. Pardee and Carol Havican, as Trustee of the Jonathan H. Pardee Charitable Remainder Trust (collectively "Plaintiffs") to enforce against Consumer Portfolio Services, Inc. ("CPS") what they allege are their rights to indemnification under the terms of a certain Stock Purchase Agreement dated May 20, 1997 ("SPA").

Plaintiffs seek reimbursement of the attorneys' fees and other costs that each has incurred in defending related litigation in California and Connecticut arising out of the failure of Stanwich Financial Services, Inc. ("Stanwich")to make certain structured settlement payments beginning in late 2000. Plaintiffs were shareholders in Settlement Services Treasury Assignments, Inc. or "SSTAI", a Connecticut corporation, prior to May 20, 1997, when they sold all of their stock in that company which later became Stanwich.[1] Plaintiffs allege that CPS has refused to honor its indemnification obligations as set forth in the SPA.

This case was initially filed in the Rhode Island Superior Court by Pardee against CPS in mid-December of 2001. It was

1. There is no dispute that Stanwich defaulted on its structured settlement payment obligations beginning in late 2000, and that litigation has arisen in California and Connecticut as a result thereof.

removed to this Court by CPS shortly thereafter. Upon removal the case was assigned to Chief Judge Ernest Torres. On January 31, 2002, CPS filed a motion to stay proceedings, arguing that the instant action, wherein Pardee seeks indemnification of legal costs stemming from two pending civil matters, one in California Superior Court ("the California case") and one in the Connecticut Bankruptcy Court ("the Connecticut case") was not ripe for adjudication. In response, Judge Torres issued an Order to Show Cause "why this case should not be dismissed because the claims asserted are not yet ripe for adjudication" on March 13, 2002. A hearing on was held on the show cause order on June 25, 2002. At that hearing, CPS reasserted its allegation that the case should be dismissed or stayed as not yet ripe for adjudication. Pardee contended that dismissal was not appropriate.

On July 17, 2002, Judge Torres held further hearings regarding the ripeness and abstention arguments and ruled that Pardee had shown that the case should not be dismissed and also ruled that the case should not be stayed. On July 23, 2002, Judge Torres issued an order denying a stay of the proceedings and confirmed his earlier ruling that Pardee had shown cause why the case should not be dismissed. Having thus dealt with the contentions of both parties, Judge Torres allowed the case to move forward. On August 8, 2002, CPS filed its answer to the initial Complaint. Along with its answer, CPS also filed a counterclaim against Pardee. On August 28, 2002, Pardee filed his Answer to the Counterclaim. In addition to asserting claims against Pardee, the Counterclaim made allegations against an additional entity, known as The Dunbar/Wheeler Trust (the "Trust"). Preliminary motion practice continued in the case, and the Trust was issued a Summons on November 24, 2002. On December 4, 2002, Judge Torres issued an order transferring the entire matter to Judge William E. Smith.

A status conference before Judge Smith was scheduled for January 15, 2003 pursuant to Fed. R. Civ. Pro. 16. Prior to the Rule 16 conference, Pardee filed an Amended Complaint, which added Carol Havican as an additional plaintiff in her capacity as Trustee of the Jonathan Pardee Charitable Remainder Trust. On January 16, 2003, Judge Smith issued a scheduling order, setting the discovery cutoff date as September 2, 2003, establishing a motion deadline date of December 12, 2003 and also a pretrial memorandum filing date of December 12, 2003. The case continued to move forward and on January 24, 2003 a number of papers were filed by both parties. Among the filings were Defendant's Answer to Plaintiffs' Amended Complaint, a Motion and Memorandum in Support thereof for Leave To File Exhibits exceeding ten pages by Plaintiffs; and a Motion for Summary Judgment, also by Plaintiffs (including a Statement of Undisputed Facts in support thereof).

On January 29, 2003, Judge Smith granted Plaintiffs' Motion for Leave to File Exhibits Exceeding Ten Pages and the flurry of paper continued: on February 7, 2003, the Trust filed its Answer to Defendant's Amended Counterclaims; on February 10, 2003, Plaintiffs filed their Answer to Defendant's Amended Counterclaims; and, on February 14, 2003, Defendant filed a Motion for Leave to File Exhibits exceeding twenty pages. On February 18, 2003, Judge Smith granted Defendant's Motion for Leave to File Exhibits exceeding twenty pages and on that same day, Plaintiffs' Motion for Summary Judgment was referred to Judge Smith by his calendar clerk along with Defendant's Objection and Memorandum in support thereof to Plaintiffs' Motion for Summary Judgment.

On February 19, 2003, CPS filed a Motion to Enlarge Time to file its substantive objection to Plaintiffs' Motion for Summary Judgment until September 15, 2003. Subsequent to Plaintiffs' objection to Defendant's Motion to Enlarge Time (referred to by Plaintiffs as a Motion to Stay), Judge Smith held a hearing regarding both motions on April 11, 2003.

Judge Smith took the matter under advisement and upon review of post hearing memoranda submitted by both parties (including a copy of the Chapter 11 Reorganization Plan pending in the Connecticut case)issued an order granting Defendant's Motion to Enlarge Time to file its substantive objection to Plaintiffs' Motion for Summary Judgment on May 14, 2003, with the caveat that: "In the event defendant attempts to use the Bankruptcy Proceeding pending in the District of Connecticut, or proceeding in any other court to attempt to diminish the Plaintiffs' right to indemnification being sought in this case, the Plaintiffs may petition the Court for a modification or vacation of this order to permit them to immediately proceed with their Motion for Summary Judgment."

After continued discovery motions and practice, including revision of the Scheduling Order by Judge Smith, a motion by CPS for Leave to File Third–Party Complaint against Hinckley Allen & Snyder, LLP ("HA & S"), the law firm that had been involved in the sale of Plaintiffs' company was filed.

On July 17, 2003, Judge Smith issued an Order of Recusal and the case was reassigned to Judge Torres. After reassignment and a subsequent motion to enlarge time filed jointly by Plaintiffs and Defendant, discovery began in earnest and notices were filed by Defendant to take the depositions of multiple non-parties.

On July 23, 2003, Magistrate Judge Lovegreen, who had been overseeing the discovery process, referred the Motion for Leave to File Third–Party Complaint against HA & S back to Judge Torres. After receipt of additional discovery motions (primarily notices of deposition filed by Defendant), and without ruling on the Motion for Leave to File Third–Party Complaint against HA & S, Judge Torres signed an order of recusal and the case was assigned to Judge Mary Lisi. Discovery continued subsequent to that assignment but Judge Lisi made no dispositive rulings.

On September 18, 2003, Judge Lisi held an in-chambers conference and on September 22, 2003 issued an order recusing herself from the case and the matter was assigned to this writer on that same day. On September 24, 2003, this Court granted the pending unopposed motion to Enlarge Time for Plaintiffs to Respond to Defendant's Motion for Leave to File a Third Party Complaint. Additionally, this Court granted a motion to extend all discovery deadlines by sixty days.

Discovery continued under the watchful eyes of Magistrate Judges Lovegreen and Martin and this Court heard arguments on the cross Motions for Summary Judgment (and Objections to same) on April 22, 2004. At that hearing, the undersigned decided to hold the pending motions in abeyance and instructed the parties to file briefs regarding whether or not this case was ripe for adjudication. On July 12, 2004 this Court held a hearing to address the ripeness arguments, and took the matter under advisement. On September 13, 2004, in response to continued filings regarding the addition and/or disqualification of HA & S, this Court heard arguments regarding the pending Motion for Leave to File Third–Party Complaint against HA & S. The arguments were taken under advisement and on September 22, 2004, this Court issued an order denying the Motion for Leave to File Third–Party Complaint

against HA & S because that firm had previously been made a defendant in the Connecticut case and that could resolve the issue of their liability on all pending matters.

*THE CALIFORNIA AND CONNECTICUT CASES*

Currently, no judgment of liability has been entered against Plaintiffs in either the California [2] or the Connecticut [3] case. Pardee has not settled any of the claims asserted against him in either of those proceedings.

In the California case, a global settlement of the California payee plaintiffs' claims is now final. That settlement apparently called for the settling defendants to pay more than $90,000,000 to the California plaintiffs. On April 27, 2004, the Los Angeles Superior Court entered an order confirming that each of the conditions of the settlement had been met and in early May of 2004 that Court entered an order directing that the settlement proceeds be distributed to the California class-action plaintiffs.

However, Pardee is not participating in the global settlement and therefore the California agreement does little to clarify matters in this instant action. Indeed, because of Pardee's non-participation in the California Settlement Agreement, all of the payee claims against him have been assigned to Bankers Trust, the California defendant that made the largest contribution to the settlement. In addition to Pardee, the Bradleys [4] [the parties who really purchased SSTAI from Pardee through SST Acquisition Corporation ("SST") ] and CPS are non-settling parties in the California action. At the time of this writing, the claims against Pardee, CPS, and the Bradleys remain unresolved.

In addition to the Bankers Trust claims against Pardee, the pending claims in the California case include a large number of cross-claims that had been asserted in that case before the California court ordered such claims severed and stayed. For example, Bankers Trust asserted cross-claims against Pardee for fraud, misrepresentation, and contractual and equitable indemnification. Wells Fargo, Bank of America, and U.S. Trust Co. also filed various cross-claims against Pardee including claims for intentional and negligent interference with contractual relations, negligent interference with prospective economic advantage, breach of contract, tortious interference with security, unjust enrichment, indemnity, contribution and declaratory relief. Pardee has also asserted at least one indemnity cross-claim in the California case. As of the time of this writing, each of the above mentioned claims remain unresolved. A status conference was held in the California case on September 9, 2004 at which a further continuance was granted to the parties. A Trial Readiness Conference has been scheduled for February 22, 2005 and the Jury Trial is scheduled for March 8, 2005.

The Connecticut case is still at the pleadings stage. The Creditors Committee moved for leave to amend the complaint last fall. Pardee and his Connecticut co-defendants including HA & S, have opposed that motion. Extensive memoranda are on file with the Connecticut Bankruptcy Court concerning the question of wheth-

2. *In re structured Settlement Litigation,* Case No. BC–244111, Los Angeles California Superior Court.

3. *Official Committee of Unsecured Creditors v. Jonathan H. Pardee, et al.,* Case No. 02–5023, United States Bankruptcy Court for the District of Connecticut.

4. The Bradleys and their involvement in this matter are more fully discussed later in this opinion.

er the proposed amendment should be allowed. As of this writing, the Connecticut case remains mired in the pleadings stage, the most recent legal wrangling has been over injunctions and other preliminary orders of the Bankruptcy Judge. CPS represents to this Court that issues pertaining to the proper scope and interpretation of the indemnity provision in the SPA at issue in this matter may also be litigated in connection with the main bankruptcy proceedings in Connecticut.

*THE FACTUAL ALLEGATIONS*

At this stage in the case, with much yet to be decided, this Court discusses the factual allegations upon which the claims and counterclaims are predicated simply to describe the backdrop for this ruling; they are not findings of fact.

In or about 1991, Pardee became an officer of SSTAI's predecessor, and in 1992, upon gaining majority control of the company's shares, changed its name to SSTAI. Prior to Pardee's acquisition of SSTAI's predecessor, the company's business had been to facilitate structured settlements for individual plaintiffs who had agreed to receive periodic payments in settlement of their individual personal injury lawsuits in California.

In each of these structured settlements, the settlement recipients, SSTAI's predecessor, and a bank selected to serve as trustee, executed several interrelated written agreements, usually consisting of the initial settlement agreement, an assumption and assignment agreement, a trust agreement and an order of payments, collectively referred to as the structured settlement documents. SSTAI's predecessor would then take the settling defendants' lump sum payment and use it to purchase U.S. Treasury bonds which it would then place in an irrevocable, spendthrift trust for the sole purpose of funding future periodic payments for the settlement recipients.

The structured settlements were designed to achieve certain goals that were important to the settling parties. For example, the use of U.S. Treasury Bonds held in an irrevocable, spendthrift trust protected the long-term security of the future periodic payments. SSTAI's predecessor served as an intermediary between the settling parties freeing the settling defendant of ongoing liability for the periodic payments, while allowing both parties to take advantage of favorable tax laws enacted to encourage just such settlements. Thus, SSTAI's predecessor was contractually bound by the structured settlement documents to hold the settlement proceeds in an irrevocable trust that could not be sold, pledged or encumbered by the company or its shareholders for financial gain.

In 1991, SSTAI's predecessor sued to remove Wells Fargo Bank, N.A. as trustee for the various trusts that had been established under the structured settlement agreements. In those proceedings, the Los Angeles Superior Court twice ruled that SSTAI's predecessor did not have the power to replace the trustee under the existing trust agreements without the consent of the settlement payees. Whilst the case was pending on appeal, the company negotiated a settlement with Wells Fargo under which Wells Fargo agreed to resign as trustee. About the same time as the Wells Fargo litigation, HA & S became legal counsel to SSTAI, its predecessor and Pardee. HA & S still serves as Pardee's legal counsel.

After Wells Fargo was removed as trustee, SSTAI engaged U.S. Trust Co., N.A. (U.S.Trust) to serve as trustee for the settlement packages and at the same time executed a new trust agreement. That agreement, entitled "Settlement Services

Treasury Agreements, Inc. Amended and Restated Master Trust Agreement" was dated December 1, 1992. It referenced and purported to supercede all previously existing trust agreements, including the prior agreement that SSTAI's predecessor had executed with Wells Fargo. CPS argues in this case that SSTAI did not notify or obtain the consent of the settlement payees, nor did it obtain any court approval for the changes; thus, to the extent that the 1992 Master Trust Agreement purported to alter or amend any of the provisions contained in the original agreement documents, it was without force or effect.

By 1993, it became clear that Pardee, HA & S and SSTAI's other shareholders were aware of, and interested in tapping the excess equity that had arisen in the trust assets as the market value of the Treasury Bonds had grown. CPS alleges, however, that the "excess equity" was in fact illusory as to SSTAI because pursuant to the binding trust agreement, neither SSTAI nor its shareholders had any financial interest in the trust assets, nor did they have the right to pay off the settlement recipients early (at a discount) to gain control of the Bonds. CPS also alleges that the entire increase in the value of the Bonds merely reflected the fact that interest rates had fallen and that a greater quantity of new, lower-rate Bonds would be required to generate the same fixed interest income that was being generated by the current, higher-rate Bonds held in trust. These two factors, they argue, rendered the representations made by Pardee at the time CPS agreed to be guarantor on the SPA, fraudulent.

By the summer of 1993, Pardee, with the help of his legal counsel, HA & S had decided to "harvest" the excess equity by using the trust assets (Treasury Bonds) to secure cash loans. Despite some misgivings and discussion regarding the legality of using the trust assets as loan collateral, particularly in light of the trust agreement, Pardee and his lawyers attempted to convince U.S. Trust to allow SSTAI to borrow against the trust assets. U.S. Trust refused and Pardee began to look for a trustee to replace U.S. Trust that would allow him to access the trust asset equity.

Eventually, Pardee settled on Bankers Trust Co. of New York ("Bankers Trust") and using the powers that he had conferred on SSTAI in the 1992 Master Trust Agreement, replaced U.S. Trust as trustee with Bankers Trust. After some negotiations, SSTAI and Bankers Trust drafted and finalized a new trust agreement on December 7, 1994 entitled "Settlement Services Treasury Assignments, Inc. Master Trust Agreement" ("1994 Master Trust Agreement"). The 1994 Master Trust Agreement was to supersede the 1992 Master Trust Agreement and made several key changes to it. According to CPS, the changes include, inter alia, (1) the elimination of any requirement that the trust estate consist of Treasury Bonds; (2) allowing SSTAI to decide at its discretion whether the trust assets were more than needed to meet payment obligations to the settlement payees and instructing Bankers Trust to remit any surpluses to SSTAI; (3) authorization for the trustee to invest the trust assets in any way that SSTAI directed; (4) authorization for the trustee to sell the Treasury Bonds upon SSTAI's instruction; (5) allowing SSTAI the right to alter, amend, restate or terminate the trust at its sole discretion; and, (6) allowing SSTAI the right to borrow against the trust assets and use the borrowed funds to re-invest for SSTAI's financial benefit. CPS notes that again SSTAI did not notify or obtain the consent of the settlement payees with regard to the changes made to the existing trust agreements.

While Bankers Trust was serving as trustee, SSTAI entered into repurchase agreements using the Treasury Bonds as collateral to obtain a line of credit at Morgan Stanley, an investment house. Using the proceeds of the repurchase transactions, SSTAI made various transactions through Morgan Stanley. Pardee and SSTAI kept the proceeds of these transactions. SSTAI did not notify or obtain the consent of the settlement payees with regard to the repurchase transactions or the profits derived therefrom.

In late 1996, Pardee and the SSTAI shareholders hired Bear Stearns & Co. to assist them in selling SSTAI. During the sale process, SSTAI stressed the availability of capital to be derived from the valuable Treasury Bonds. By early 1997, Bear Stearns and Pardee found buyers for SSTAI, namely Charles E. Bradley Sr. and Charles E. Bradley, Jr. ("the Bradleys") [5]. The Bradleys, owners of an array of financial and other companies, including SST and CPS [6], were attracted to the possibility of using SSTAI as a vehicle for obtaining large amounts of capital through loan and repurchase agreements. Indeed, CPS, the guarantor of the indemnity portion of the SPA, alleges that the primary reason for the purchase of SSTAI was the buyers' belief that SSTAI had an actual financial interest in the Treasury Bonds.

On May 20, 1997, Pardee, SSTAI's other shareholders, SST and CPS executed the SPA. Pursuant to the terms of that agreement, SSTAI's shareholders agreed to sell and SST agreed to purchase all of the outstanding shares of SSTAI in consideration of and subject to the terms set forth in the Agreement.

In the SPA, CPS agreed, as guarantor of the contract, and subject to its terms, to indemnify Pardee and SSTAI's other shareholders from claims arising subsequent to the purchase of the stock and to be indemnified from certain claims resulting from the shareholders' acts or omissions prior to closure of the agreement. It is the indemnification provision that lies at the heart of this instant matter, and pursuant to its terms, CPS allegedly agreed to, *inter alia:*

> ... Indemnify and hold each of the Sellers ... and each of the Seller's trustees and agents ... harmless from and against and agree to defend promptly each of the Seller Indemnified Parties for, any and all losses, damages, costs, expenses, fines, penalties, settlement payments and expenses, liabilities, obligations and claims of any kind, including, without limitation, reasonable attorneys' fees, and other legal and professional costs and expenses (hereinafter referred to collectively as "Seller Losses"), that any of the Seller Indemnified Parties may at any time suffer or incur, or become subject to, as a result of or in connection with the following (the "Seller Claims"): ... (iv) any failure of the Purchaser, the Indemnitor and/or the Company [SSTAI or Stanwich], after the date hereof, to carry out and perform its obligations under any agreement, instrument or other document to which the Company is now bound or becomes bound, (v) any fraudulent behavior by the Company, the Purchaser and/or Indemnitor arising after the date hereof, (vi) any claim that the purchase and sale of the Shares constitutes a fraudulent transfer or

5. The Bradleys are co-defendants along with Pardee in the California case.

6. Charles E. Bradley, Sr. is the founder of CPS and Chairman of its Board of Directors. He owns nearly 25% of CPS's stock. Charles E. Bradley, Jr. has been the President and director of CPS since its formation in 1991.

fraudulent conveyance under applicable federal or state law and (vii) any failure to fulfill any obligation of the Sellers, the Company [SSTAI or Stanwich] and/or the SSTAI Trust to any Payee as and when due at any time after the closing date.

In conjunction with the consummation of the sale, SST and CPS requested that SSTAI's counsel, HA & S provide a legal opinion to provide further assurances that SSTAI did in fact have a financial interest in the trust assets and had the legal right to borrow against the Treasury Bonds. Relying in large part on the ongoing representation of SSTAI, HA & S provided just such an opinion, and CPS now alleges that HA & S's opinion letter became part of the basis of the bargain. Arguing that the legal opinion rendered by HA & S along with various and sundry representations made by SSTAI and Pardee prior to consummation of the sale constituted false representations, CPS alleges that the indemnification clause upon which Pardee bases his claim in this matter, in effect, is invalid.

After finalizing the stock purchase agreement in the summer of 1997, the Bradleys changed the company's name from SST to Stanwich Financial Services Corporation [7]. Next, the Bradleys entered into a repurchase agreement with Morgan Stanley and used the proceeds to pay Pardee approximately $16 million dollars of the purchase price for SSTAI. The Bradleys thereafter continued the practice of selling the U.S. Treasury Bonds pursuant to their repurchase agreement with Morgan Stanley.

The Bradleys continued to search for ways to benefit from the former SSTAI holdings and eventually instructed Stanwich to loan over $45 million to companies under their control, including CPS, NAB Asset Corporation [8] and Reunion Industries, Incorporated [9]. As alleged by the California class-action plaintiffs, the Bradleys' companies were in precarious financial condition at the time the loans were made, and the loans had little prospect of being repaid. Stanwich also made personal loans to both Bradleys.

In December 1997, Morgan Stanley notified Stanwich that it intended to terminate the repurchase agreements and that Stanwich either had to repurchase the U.S. Treasury Bonds or Morgan Stanley would sell them. After granting Stanwich several delays, Morgan Stanley eventually sold the Bonds, paid itself from the proceeds and remitted the balance to Stanwich.

Stanwich did not disclose the loss of the Bonds to the settlement payees. Due in large part to the loss of the Bonds, by November of 2000, Stanwich was no longer able to continue making the periodic payments to the structured settlement payees. Stanwich's inability to pay was exacerbated by the fact that its investments yielded insufficient returns to satisfy the minimal obligations incurred by virtue of the Treasury Bond repurchase transactions. As a consequence of the non-payments by Stanwich, many of the structured settlement payees asserted claims in the California courts against Pardee, CPS and other entities associated with the initial structured settlements, the trust amendments and the

7. The Bradleys allegedly own 92.5% of Stanwich. According to the various pleadings, Stanwich is either a Rhode Island or Connecticut Corporation with its principal place of business in Stamford, Connecticut.

8. Charles E. Bradley, Sr. is the Chairman and Chief Executive Officer of NAB. NAB is a Texas corporation with its principal place of business in California.

9. Charles E. Bradley, Sr. is the Chairman and Chief Executive Officer of Reunion Industries, Inc. Reunion is a Delaware corporation with its principal place of business in Pennsylvania.

Treasury Bond repurchase transactions. The claims were eventually consolidated in a class-action suit in the Los Angeles Superior Court, becoming what this Court has earlier referred to as the "California case". In that case, the settlement recipients allege, inter alia, that one of the fundamental causes of their loss was Pardee's alteration of the trust agreements in order to allow him to access the excess funds generated by the Treasury Bonds held therein.

Pardee remains a named (and as yet non-settling) defendant in the California case and in adversary proceedings in the U.S. Bankruptcy Court for the District of Connecticut. Here, Pardee and the Jonathan H. Pardee Trust, relying on the indemnification clause of the SPA, seek indemnification from CPS for their legal costs arising from those cases. CPS has denied liability in the California case and, more importantly in this instant matter, denies indemnification liability to Pardee or SSTAI's shareholders.

### *JURISDICTION*

[1] Pursuant to precedent established by this Court in *Terra Nova Ins. Co. v. DiStefano,* 663 F.Supp. 809 (D.R.I.1987), it is this Court's opinion that it has the jurisdiction and discretion in this case to stay the proceedings at this time. As *Terra Nova* recognizes, there is a thin line between the ripeness doctrine's two sources: Article III limitations on judicial power and the discretionary power of a court to refuse to hear unripe matters. Therefore, a claim may be unripe in the prudential sense (as here)without necessarily being constitutionally defective to a degree that it deprives a court of subject matter jurisdiction. *Terra Nova,* 663 F.Supp. at 812. In such cases, unripe claims may be stayed rather than dismissed entirely. *Id.; Colonial Courts Apartment Co. v. Paradis,* 780 F.Supp. 88, 91 (D.R.I., 1992)(staying, rather than dismissing unripe claim).

[2] Additionally, this Court finds further foundation upon which to rest its decision to stay -rather than dismiss this casein its inherent discretionary authority. As the Supreme Court has stated, "... [the] power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel and for litigants ... [how] this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936). Here, the status of this case and its underlying claims, make it abundantly clear that staying this case pending the outcome of both the California and Connecticut cases is the most prudent, fair, and therefore appropriate action to take at this time.

[3] As noted above, at the outset of this case, CPS moved to stay all proceedings before Judge Torres pending resolution of the California case. Upon hearing arguments from both parties Judge Torres denied CPS's motion to stay and declined to dismiss the case pursuant to the ripeness doctrine. However, Judge Torres' decision, made as it was, at such an early stage in the proceedings, is not set in stone and the law of the case doctrine does not preclude this Court from reconsidering the ripeness issue in light of the nearly three years of motion practice and discovery that has been undertaken since that time. *See McConaghy v. Sequa Corp.,* 294 F.Supp.2d 151, 160 (D.R.I.2003) (noting that "... an issue must be actually decided on the merits before it can be considered the law of the case.").

[4] To the contrary, the law of the case doctrine allows a court to exercise its discretion in determining whether or not to reconsider prior rulings by a coordinate

judge. *See Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)(holding that the law of case doctrine does not limit a court's power to reconsider prior rulings); *Ellis v. United States,* 313 F.3d 636, 646 (1st Cir. 2002)(same); *see also Perez–Ruiz v. Crespo–Guillen,* 25 F.3d 40, 42 (1st Cir.1994)(holding that the law of the case doctrine is neither an absolute bar to reconsideration nor a limitation on a federal court's power).

**[5]** As the First Circuit explained in *Ellis,* "reconsideration is proper if the initial ruling was made on an inadequate record or was designed to be preliminary or tentative." *Ellis,* 313 F.3d at 647. This case, given its long and checkered history and the many changes that it has undergone since the initial filing fits squarely within the circumstances described in *Ellis.* Since Judge Torres' decision, parties and claims have been added, pleadings have been amended, extensive discovery has been conducted and the Connecticut adversary proceeding has been filed. Thus at the time Judge Torres examined the question of ripeness, many of the issues now facing this Court had not yet been joined. This Court is not, therefore, barred from revisiting Judge Torres' earlier decision.

An examination of Judge Torres earlier bench decision offers additional support for the application of *Ellis.* Indeed, there is no question that Judge Torres intended that his decision be a preliminary one. He stated from the bench: "this matter should not be dismissed at least at this point, on the ground that it is not yet ripe." Judge Torres went on to state that "the defendant has failed to show, at least at this point, that the matter should be stayed." This language is avowedly preliminary in nature, and this Court concludes that a revisitation of Judge Torres' early decision is appropriate in light of the law of the case doctrine as explicated in *Ellis.*

In addition, other federal courts have recognized that fundamental questions of subject matter jurisdiction are "particularly suited for reconsideration." *DiLaura v. Power Authority of NY,* 982 F.2d 73, 77 (2d Cir.1992); *Public Interest Research Group v. Magnesium Elektron,* 123 F.3d 111, 118 (3d Cir.1997); *Safir v. Dole,* 718 F.2d 475, 481 n. 3 (D.C.Cir.1983). Because the ripeness doctrine, at its core, is a jurisdictional concept, this Court's decision to reconsider Judge Torres' decision is well grounded in the law. *See Ernst & Young v. Depositors Economic Protection Corp.,* 45 F.3d 530, 535 (1st Cir.1995).

### *RIPENESS*

**[6, 7]** While it is certain that in most cases lack of ripeness is grounds for dismissal, *Operation Clean Gov't v. Rhode Island Ethics Comm'n.,* 315 F.Supp.2d (D.R.I.2004), this Court concludes that the most appropriate course of action in this case is to stay all pending matters until the California and Connecticut cases are resolved. Indeed, the existence of common factual and legal allegations between this and the California and Connecticut cases, taken together with the overwhelming amount of time already dedicated by all concerned to *this* case, makes it incumbent upon this Court to exercise its discretion to stay this case and in so doing preserve the practical interests of judicial economy.

Because many of the claims pending in this Court are likely to be litigated and decided in either the California or Connecticut cases, upon conclusion of those cases this Court will be in a better position to determine what issues remain to be litigated here. Furthermore, the parties, as well as multiple judges and magistrate judges on this court, have dedicated substantial resources to the discovery process

and dismissal at this stage would create an unnecessary likelihood that these efforts would have to be duplicated at a later date.

[8] The ripeness doctrine, upon which this Court relies to stay this matter, finds its foundation in constitutional, jurisdictional and judicial economy concerns, and is applied to "... prevent courts, through the avoidance of premature adjudication, from entangling themselves in abstract agreements." *See e.g. Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *PSC v. Wycoff Co.*, 344 U.S. 237, 242–44, 73 S.Ct. 236, 97 L.Ed. 291 (1952); *Mangual v. Rotger–Sabat*, 317 F.3d 45, 59 (1st Cir.2003); *Ernst & Young* 45 at 535; *Massachusetts Ass'n of Afro–American Police, Inc. v. Boston Police Dep't*, 973 F.2d 18, 20 (1st Cir.1992); *see also Operation Clean Gov't*, 315 F.Supp.2d 187 (D.R.I.2004).

[9, 10] While the Declaratory Judgment Act, 28 U.S.C. § 2201 (2004), empowers this Court to grant declaratory relief where appropriate, the Act certainly does not expand subject matter jurisdiction, nor is it intended to alleviate the requirement that there exist an *actual* case or controversy as prescribed by the ripeness doctrine. *See Altvater v. Freeman*, 319 U.S. 359, 363, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943)(holding that requirements of "case" or "controversy," in order to sustain federal jurisdiction, are no less strict under the Declaratory Judgment Act than in other suits; quoting *United States v. West Virginia*, 295 U.S. 463, 475, 55 S.Ct. 789, 79 L.Ed. 1546 (1935)). Rather, the Act makes "[declaratory judgment] an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis." *Ernst & Young*, 45 F.3d at 534. The Act "neither imposes an unflagging duty upon the courts to decide declaratory judgment actions nor grants an entitlement to litigants to demand declaratory remedies." *Id.* (*quoting El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 493 (1st Cir.1992)).

As this Court noted in *Operation Clean Gov't*, 315 F.Supp.2d at 187:

> "Because ... [the Declaratory Judgment] Act offers litigants a window of opportunity, not a guarantee of access, the courts ultimately must decide, and have substantial discretion in determining, whether declaratory relief is appropriate in a given action. In evaluating whether declaratory relief is warranted, one critical consideration is whether the cause of action is ripe for judicial review. If it is determined that the declaratory judgment action before the court is unripe for judicial determination, there is no alternative but to dismiss the case."

*Id.* at 194 (internal quotations omitted). Here, there is an alternative to dismissal: a stay.

[11, 12] To determine whether or not a particular declaratory judgment claim is ripe for judicial action, the United States Supreme Court instructs the district courts to examine: (1) *the fitness* of the issues for judicial determination, and (2) *the hardship to the* parties of withholding court consideration. *Id.* at 195 *quoting Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507 (emphasis added). In discussing these factors, the First Circuit has observed: "Fitness typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed, whereas hardship typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties". *Id.* at 195, *citing Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999). The party asserting ripeness bears the burden of adducing evidence of facts sufficient to establish that both prongs of

the ripeness test are satisfied. *Id.* at 33; *Ernst & Young,* 45 F.3d at 535.

*1. Fitness*

**[13]** In this Circuit, the "critical consideration" in determining the fitness of a claim is the extent to which "the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all". *Operation Clean Government,* 315 F.Supp.2d at 195; *Ernst & Young,* 45 F.3d at 536 (quoting *Massachusetts Ass'n of Afro–American Police, Inc. v. Boston Police Dep't,* 973 F.2d 18, 20 (1st Cir.1992)). In this case it is clear that Plaintiffs' indemnity claims are contingent on events in both the California and Connecticut cases that, given the nature of litigation, may not occur as anticipated and may indeed not occur at all.[10]

**[14]** In Rhode Island, the general rule regarding indemnity is that no claim arises as such until the indemnitee's liability is fixed either by entry of judgment holding the indemnitee liable or by the settlement of the underlying claim by the indemnitee on the belief that he is liable. *A & B Constr. v. Atlas Roofing & Skylight Co.,* 867 F.Supp. 100, 113 (D.R.I.1994)(holding that indemnity arises where one party has been compelled by reason of some legal obligation to pay damages); *Muldowney v. Weatherking Prods.,* 509 A.2d 441, 443 (R.I.1986)(holding that a necessary element of indemnity claim is that the party seeking indemnity must be liable to a third party); *See also Runyan v. United Brotherhood of Carpenters,* 566 F.Supp. 600, 609 (D.Colo.1983)(finding that no cause of action for indemnity accrues until there has been a judgment or settlement of claim, and that indemnity does not accrue until the indemnitee's liability is fixed); *Read Drug & Chemical Co. v. Colwill Constr. Co.,* 250 Md. 406, 243 A.2d 548, 558 (1968)(stating: "[I}t is clear that the right of indemnity or contribution does not accrue until [indemnitee] suffers or pays a judgment, or settles with the plaintiffs.").

Aptly, federal courts in other jurisdictions have routinely found that indemnity claims are unripe until the alleged indemnitee's liability has been fixed by a judgment or settlement. *See e.g., Armstrong v. Alabama Power Co.,* 667 F.2d 1385, 1388–89 (11th Cir.1982); *A/S J. Ludwig Mowinckles Rederi v. Tidewater Constr. Corp.,* 559 F.2d 928, 932–33 (4th Cir.1977); *Cunningham Bros., Inc. v. Bail,* 407 F.2d 1165, 1169 (7th Cir.1969); *National Valve & Mfg. Co. v. Grimshaw,* 181 F.2d 687, 689–90 (10th Cir.1950); *UNR Indus., Inc. v. American Mutual Liability Ins.,* 92 B.R. 319, 325–27 (N.D.Ill.1988); *Companion Assurance Co. v. Alliance Assurance Co.,* 585 F.Supp. 1382, 1385 (D.Vi.1984).

In *Mowinckles,* 559 F.2d at 928, a pier constructed by the defendant, Tidewater Construction Corporation, collapsed while a ship owned by plaintiff A/S J. Ludwig Mowinckles Rederi was being unloaded causing much damage and injury. Injured pier workers and others filed personal injury and wrongful death actions against both Mowinckles and Tidewater in state and federal court. Before any of the many suits went to trial, Mowinckles filed an action for indemnity against Tidewater and Lone Star, the pier owner. The District Court ruled that Mowinckles was entitled to indemnity. However, that ruling was subsequently reversed by the Fourth Circuit who vacated the district court's decision on the grounds that the indemnity claim was not ripe. The Court stated:

> Whether an indemnification issue is ripe for adjudication depends on the facts

10. It is worthy of mention that the undersigned takes no position on the outcome of either of the pending cases and simply notes that, as thirty-six years on the bench will attest, litigation outcomes are rarely if ever as anticipated.

and circumstances of the case under consideration. Here, there has been neither a determination of liability nor a settlement in any of the personal injury or wrongful death actions pending against Mowinckles and Tidewater in the district court and state courts. We cannot tell at this time what the outcome of those actions will be; the fact finders therein may find, on the evidence presented to them, that Mowinckles or Tidewater or both are liable to the plaintiff or plaintiffs in those cases. To award, in this action, indemnification against all liability and expenses, incurred or which may be incurred by Mowinckles or Tidewater in those actions, could lead to incongruous results. The fact that they have already incurred some expenses in defending those actions does not make ripe their claims for indemnification against all potential liability and expenses. We conclude that a ruling on indemnification in the setting presented to the district court was premature.

*Id.* at 932. *See also Lincoln House, Inc. v. Dupre,* 903 F.2d 845, 848 (1st Cir.1990)(citing Mowinckles and Armstrong for the proposition that where a claim is conditioned on the entry of a judgment in another case, the claim is not ripe.).

Here, liability has not been fixed by judgment or settlement in the California and Connecticut cases, and therefore any claims for indemnity and declaratory relief are entirely contingent on uncertain future events. As the parties note, there is not only uncertainty as to whether Plaintiffs in this case will ultimately be held liable in the California case, it is also as yet undetermined what the factual and legal basis for liability might be. Lastly, the final amount, if any, of the indemnification is almost certain to be unknown until the California and Connecticut cases are concluded.

As described by the parties, the claims pending against Pardee in California and against all of the sellers in the transaction in Connecticut include allegations that they breached (or caused the company to breach) contractual and fiduciary duties owed to the structured settlement payees. CPS argues that if liability is imposed on such a basis, the fact of Pardee's pre-sale breach means that the express representations in the SPA by Pardee to the purchasers of the stock were false at the time of the 1997 sale. CPS has represented to this Court in the summary judgment papers that such misrepresentations render the indemnity provisions unenforceable for failure of consideration and non-occurrence of conditions precedent. Obviously, this Court cannot rule on these pending matters absent an established indicia of liability upon which to rely.

Moreover, this Court has yet to decide the scope of the indemnity agreement itself, a decision that cannot and must not be made until a final analysis regarding liability is forthcoming from the California and Connecticut courts. Under such circumstances, uncertainty as to the bases of Pardee's liability presents this Court with an unacceptable risk of inconsistent results between this and the other courts should this Court attempt to adjudicate these instant claims before the natural conclusion of the California and Connecticut cases.

Lastly, the grounds upon which the California court chooses to rely in deciding that case may have more of an influence on the outcome of this instant claim for indemnification than the outcome of that litigation itself. For example, in addition to contesting the factual grounds for the allegations in the California case, Pardee has also raised defenses based on the California statute of limitations, as well as asserting that his actions were not the proximate cause of CPA's damages. There exists,

therefore, a possibility that Pardee could prevail on those defenses, leaving unresolved an essential element of CPS's defense to the indemnification claim: namely that Pardee made false representations in the SPA.

[15] As the First Circuit has noted, "[another] factor in the fitness calculus is the extent to which the claim is bound up in the facts ..." *Riva v. Massachusetts,* 61 F.3d 1003, 1009–10 (1st Cir.1995). As the *Riva* Court explains, "... [c]ourts are more likely to find a claim ripe if it of an intrinsically legal nature, and less likely to do so if the absence of a concrete factual situation seriously inhibits the weighing of competing interests." *Id.* In an effort to shape their allegations to conform with this factor Plaintiffs have attempted to characterize the issues in this instant matter as ones that could be resolved with a remedy derived solely from a *legal* construction of the indemnity provision. Despite Plaintiffs' best efforts, however, a review of the claims and allegations in the summary judgement and other papers in this case, leads this Court to conclude that there are indeed factual *and* legal questions surrounding Pardee's liability in the California and Connecticut cases that are at the root of, and, therefore inseparable from Plaintiffs' request for indemnification in this matter. Because this Court finds that Plaintiffs' case is "bound up in the facts" this additional consideration "in the fitness calculus" leads the Court to conclude that this case is not ripe at this time.

Pursuant to *Riva,* "... [another] salient factor that enters into the assessment of fitness involves the presence or absence of adverseness." *Id.* at 1010. This factor turns on such basic queries as "whether all affected parties are before the court" and "whether the controversy as framed permits specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). Although the primary parties to the indemnification agreement at issue in this case are before the Court, CPS has raised several plausible scenarios wherein others not before this Court could be adversely affected by a premature ruling.

Indeed, due to the fact that the status and amount of the indemnification is tied to and arises from the as yet undetermined outcomes in both the California and Connecticut cases parties to those cases could conceivably suffer the consequences of a ruling by this Court. For example parties such as Pardee's Co–Defendant Bankers Trust in the California case and the Creditors Committee in the Connecticut case both have demonstrable interests in the outcome of this case and yet are not parties to the narrow indemnification matter before this Court. However, as evidenced by the allegations of both parties in the pleadings, this Court cannot make a determination on indemnification without making findings of fact that could unfairly and inappropriately damage Bankers Trust, the Creditors Committee and others. Because this Court is not satisfied that it can resolve this matter in a manner that mitigates the risk of adverse effect on other, non-pleading parties, this factor "in the fitness calculus" weighs on the side of a stay.

*2. Hardship*

[16] The hardship prong of the ripeness test turns on whether the circumstances giving rise to the claim create "a direct and immediate dilemma for the parties requiring them to choose between costly compliance and non-compliance, at the risk of punishment." *W.R. Grace & Co. v. United States EPA,* 959 F.2d 360, 364 (1st Cir.1992)(internal citations omitted). The First Circuit further notes that "... [u]tility is the flip side of the same

coin", and an inquiring court, in assaying the hardship to the parties, may find it revealing to ask whether "granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest." *Riva,* 61 F.3d at 1010 (quoting *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 693 (1st Cir.1994).

Courts, including this one, have clarified this directive and have provided telling examples of what indeed constitutes a dilemma that is sufficiently "direct and immediate" to require early intervention of the court. An oft cited example is one in which plaintiffs were faced with the immediate prospect of deciding whether to spend millions of dollars in construction costs for new nuclear power plants in the face of legal uncertainty as to whether the new plants would ultimately be certified. In the face of this dilemma, the Supreme Court ultimately held that "... [t]o require industry to proceed without knowing whether the moratorium [on the power plants] is valid would impose a palpable and considerable hardship on the [utility company] ...". *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 201–02, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). This Court has described such a dilemma as one in which a party must choose "between, on one hand, detrimentally changing their behavior in order to comply with a law and, on the other hand, refusing to comply with the law and risking the initiation of a proceeding against them". *Colonial Courts;* 780 F.Supp. at 91.

As the facts make clear, Plaintiffs face no such dilemma here. In point of fact, no matter what the outcome of this case is, Pardee will continue to defend himself in the California and Connecticut cases. Therefore, the remedy sought by Plaintiffs, namely the defense costs incurred in those matters, will have to be borne by somebody regardless of who ultimately prevails here. It is this essential point that differentiates this claim from those that truly pose an immediate dilemma to the parties. Indeed, because the outcome of this case has no bearing on whether or not Plaintiffs will continue to defend themselves in California and Connecticut, the possibility that Pardee would be forced to detrimentally change his behavior or that the resources that Pardee spends on his defense would be largely or entirely wasted, *Pacific Gas,* 461 U.S. at 201–202, 103 S.Ct. 1713, simply does not exist. Therefore, this Court agrees with CPS that postponing a decision here will cause no material harm to Plaintiffs because they can be made whole by a monetary judgement should they ultimately prevail after resolution of the out-of-state cases. See *Colonial Courts Apartment Co.,* 780 F.Supp. at 91.

## *CONCLUSION*

In light of the above, Plaintiffs have made no showing that (1)the outcome of this case is not contingent on the, as yet, unknown outcome of the California and Connecticut cases, and; (2) that they are faced with hardship and/or a "direct and immediate dilemma" if this case is postponed. Plaintiffs are unable, therefore, to satisfy either the fitness or the hardship prong of the ripeness inquiry; and it is here that the ripeness inquiry ends. Plaintiffs have offered nothing to overcome the overwhelming logic of staying this matter until such time as the out-of-state cases are resolved. Therefore, all activity in this case is stayed until the California and Connecticut case are resolved, or until further order of this Court.

It is so ordered.

WEST KEY NUMBER SYSTEM