# Exhibit G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

FILED
JAN 25 2005
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

CONSUMER PORTFOLIO SERVICES, INC.,
Plaintiff,

v.

HINCKLEY, ALLEN & SNYDER, LLP,
Defendant.

C.A. No.04-493 L

AMENDED COMPLAINT;
JURY TRIAL DEMAND; and
NOTICE OF PENDENCY OF OTHER
ACTIONS AND PROCEEDINGS

## AMENDED COMPLAINT

This Amended Complaint seeks indemnification, damages, and other relief arising out of intentional and negligent representations made to Consumer Portfolio Services, Inc. ("CPS") by Hinckley, Allen & Snyder, LLP ("HA&S") to induce CPS's agreement to be an indemnitor in connection with the sale of stock in Settlement Services Treasury Assignments, Inc. ("SSTAI") to SST Acquisition Corp. Prior to the sale, HA&S entered a contract with SSTAI to provide legal services intended, *inter alia*, to secure the right of any prospective purchaser of SSTAI to borrow against certain trust assets and loan the proceeds to others. Inasmuch as HA&S and SSTAI knew and intended that parties to the sale transaction and prospective loan recipients such as CPS would benefit from and rely on HA&S's performance of such legal services, CPS is a third-party beneficiary entitled to recover damages caused by HA&S's breach of its contract with SSTAI.

### Parties and Jurisdiction

1. CPS, Plaintiff, is a California corporation with its principal place of business located in California.

2. HA&S, Defendant, on information and belief, is a Rhode Island limited liability partnership with its principal place of business located in Rhode Island.

3. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

**Factual Background**

4. In the late 1970s and early 1980s, SSTAI's predecessor (doing business under various names including IBAR, Inc., Merrill Lynch IBAR, Inc., Merrill Lynch Settlement Services, Inc., and ML Settlement Services, Inc.) facilitated structured settlements for more than 200 individual plaintiffs who had agreed to receive periodic payments in settlement of their individual lawsuits. In each of these structured settlements, the parties to the underlying litigation, SSTAI's predecessor, and a bank selected to serve as trustee, executed several inter-related written agreements usually consisting of a settlement agreement, an assumption and assignment agreement, a trust agreement, and an order of payment (collectively "structured settlement documents").

5. Under the terms of the structured settlement documents, a settling plaintiff typically agreed to release his or her claims against a settling defendant in exchange for the settling defendant's promise to pay a lump sum to SSTAI's predecessor and SSTAI's predecessor's promise to purchase U.S. Treasury Bonds with the proceeds and place the Treasury Bonds in an irrevocable, spendthrift trust for the sole purpose of funding the future periodic payments to the plaintiff. The dollar amount of the lump sum payment was calculated so that the fixed interest from the Treasury Bonds would equal the amounts of the periodic payments that were promised to the plaintiff plus a minimal fee for the trustee. At maturity, or if

called early by the government, the entire proceeds from the bonds would be paid to the plaintiff as a final lump sum.

6. SSTAI's predecessor served only as an intermediary to facilitate these structured settlements in exchange for a small commission. Although identified as a nominal trust beneficiary in the structured settlement documents, SSTAI's predecessor did not have any ongoing or residual interest in the Treasury Bonds and was not permitted to use the trust assets for any purpose other than funding the settling plaintiffs' periodic payments.

7. The structured settlements were designed to achieve certain goals that were important to the settling plaintiffs and settling defendants. For example, the use of U.S. Treasury Bonds held in an irrevocable, spendthrift trust protected the long-term security of the future periodic payments. The use of SSTAI's predecessor as an intermediary freed the settling defendants of ongoing liability for the periodic payments. In addition, the mutual agreements were designed to allow both settling plaintiffs and defendants to take advantage of favorable tax laws enacted to encourage such structured settlements.

8. On information and belief, SSTAI's predecessor induced plaintiffs and defendants to use the company's services in facilitating structured settlements through its representations: that the Treasury Bond trusts could not be revoked, altered, or amended; that SSTAI's predecessor would have no financial interest in the trust assets; and that the settling plaintiffs' ("settlement payees") future periodic payments were absolutely secure.

9. The structured settlement documents for each structured settlement were intended and designed to be read together as a complete package reflecting and memorializing a single structured settlement agreement. For example, in most, if not all, cases, the separate settlement agreements and/or assumption and assignment agreements expressly referenced and incorporated

the terms contained in the individual trust or master trust that was established to hold the Treasury Bonds. Thus, SSTAI's predecessor contractually promised the settlement payees that the trusts were irrevocable and that the trust assets could not be sold, pledged, or encumbered by SSTAI's predecessor or used by SSTAI's predecessor for the company's or its shareholder's financial gain.

10. Under the structured settlement documents, any material change in the terms of an individual trust or the original master trust without the consent of the affected settlement payees, even if valid as between SSTAI's predecessor and the trustee, would constitute a breach of SSTAI's predecessor's contractual and fiduciary duties to the affected settlement payees.

11. Under the orders of payment and other structured settlement documents, the trustee was required to make the periodic payments directly to the settlement payees.

12. In or about 1991, Jonathan Pardee became an officer and shareholder of SSTAI's predecessor. In or about 1992, Pardee became the company's controlling shareholder, and later, he changed its name to SSTAI.

13. In 1991, SSTAI's predecessor sued to remove Wells Fargo Bank, N.A. ("Wells Fargo") as trustee for the various trusts that had been established under the structured settlement agreements. In these proceedings, the Los Angeles Superior Court twice ruled that SSTAI's predecessor did not have the power to replace the trustee under the controlling trust agreements absent consent of the settlement payees and explicitly held that in light of the purpose of the Treasury Bond trusts, SSTAI's predecessor was not the "sole beneficiary" of the trusts. While the case was pending on appeal, the company negotiated a settlement with Wells Fargo under which Wells Fargo agreed to resign as trustee. In connection with this settlement, the Los Angeles Superior Court allowed the entry of a joint stipulated order that reversed the court's

prior rulings. SSTAI's predecessor did not give notice to or seek the consent of the settlement payees in connection with its efforts to remove Wells Fargo as trustee or in connection with the stipulated order.

14. Beginning at or near the time of the litigation with Wells Fargo, HA&S entered a contract or contracts with SSTAI (or its predecessor) to perform legal services for and provide legal counsel to SSTAI. HA&S remained as SSTAI's legal counsel until May 20, 1997. From at least early 1992 until May 20, 1997, a number of attorneys at HA&S (including Malcolm Farmer, III and others) provided substantive legal advice to SSTAI in connection with all aspects of SSTAI's business pursuant to HA&S's contract or contracts with SSTAI.

15. After suing to remove and replace Wells Fargo as trustee, SSTAI engaged U.S. Trust Co., N.A. ("U.S. Trust") to serve as trustee for the Treasury Bonds. At that time, SSTAI and U.S. Trust executed a new trust agreement. That agreement, entitled "Settlement Services Treasury Assignments, Inc. Amended and Restated Master Trust Agreement" and dated December 1, 1992 (the "1992 Master Trust Agreement"), referenced and purported to supersede all previously existing trust agreements, but it omitted or revised several material portions of the previous trust agreements. For example, the 1992 Master Trust Agreement deleted the prohibition against revocation or alteration of the terms of the trust, revised the anti-hypothecation provisions to apply only to the settlement payees and not to SSTAI, created a right of SSTAI to replace the trustee at its whim, and deleted the requirement that any successor trustee assume the obligations of the prior trustee.

16. SSTAI did not notify or obtain the consent of the settlement payees in connection with the changes contained in the 1992 Master Trust Agreement. Nor did SSTAI obtain any court's approval for these changes. Thus, to the extent that the 1992 Master Trust Agreement

purported to alter or amend any of the provisions contained in the original structured settlement documents, it was without legal force or effect.

17. By 1993, attorneys at HA&S, including Farmer, knew and understood that Pardee and SSTAI's other shareholders believed that "surplus equity" existed with respect to the trust assets because the market value of the Treasury Bonds had increased. In reality, this "surplus equity" was illusory because, *inter alia*, SSTAI had no financial interest in the trust assets, SSTAI had no right to pay-off the settlement payees early at a discount, and the entire increase in the value of the bonds merely reflected the fact that interest rates had fallen—*i.e.*, that a greater quantity of new, lower-rate bonds would be required simply to generate the same fixed interest income currently being generated by the older, higher-rate bonds held in trust.

18. By 1993, attorneys at HA&S, including Farmer, had begun, at Pardee's request, to assist and advise Pardee and SSTAI's other shareholders in their scheme to "tap" or "harvest" the "surplus equity" for SSTAI's and its shareholders' financial gain. For example, on or about June 3, 1993, Farmer wrote a memorandum to HA&S attorneys Peter Olsen and James Keeley, explaining that he had been asked by Pardee to investigate

> whether (1) under the trust [SSTAI] can amend the trust to provide for disposition and replacement of the securities and (2) if under the settlement agreement, assignment and assumption and trustor's order for payment there is any risk of personal liability or risk a California court ordering a restoration of the original securities in the trust upon a complaint by a plaintiff. [sic]

In this same memorandum, Farmer acknowledges his awareness that one of the problems in SSTAI borrowing against the Treasury Bonds is language in the relevant documents "which prohibits disposition of the collateral [trust assets] except to make distributions to the plaintiffs."

19. Shortly thereafter, on or about June 9, 1993, Farmer wrote to the California counsel that had represented SSTAI in its litigation with Wells Fargo with questions regarding the same issues. In his letter, Farmer explained,

> It would appear that the risk inherent in the language [of the structured settlement documents] is a claim that the plaintiff relied upon the Trustor's Order for Payment in entering into the Assignment and Assumption Agreement, that the plaintiff has a claim should the nature of the collateral change to something less creditworthy and that the plaintiff is entitled to restoration of the original collateral, which pursuant to the Trustor's Order for Payment became a part of the contract.
>
> * * *
>
> In summary, it would appear that a plaintiff would have to rely upon either an attached Trustor's Order for Payment . . . or a reference to specific treasury bonds in an attached trust agreement. The confusing language in the various agreements would seem to mitigate the significance of the plaintiff's arguments, as might a theory of "no harm, no foul" *so long as the plaintiffs are getting paid.* (Emphasis added.)

20. In his July 26, 1993 reply to Pardee and Farmer, the California counsel confirmed that "the security of all payments" was something that "SSTAI, as Trustor may be contractually obligated to provide to the plaintiffs." He also opined that the risk of future liability for amendments to the trusts was "negligible," but only so long as the amendments were "lawful modifications" and "in all cases the corpus of the trust, however composed, will be more than sufficient to provide for the security of all payments" to the settlement payees. Attorneys at HA&S, including Farmer, knew and understood that the pledge of trust assets contemplated by Pardee and SSTAI's other shareholders would put that security at risk.

21. Through their own legal research and analysis, attorneys at HA&S, including Farmer, also became aware that there was substantial doubt as to SSTAI's right to use the trust assets for its own benefit:

a. For example, in early April 1997 (one month before the sale of SSTAI), Farmer conferred with HA&S attorney Mark Bianchi regarding what Farmer's notes refer to as "SSTAI's Special Project." Farmer and Bianchi concluded, *inter alia*, that there could be "no assurances [of] no lawsuit." Regardless of any trust language, Farmer wrote that a court in equity could still determine that the settlement payees were trust beneficiaries to whom SSTAI owed a fiduciary duty because the "Whole purpose of corp. was to benefit ΠΙs."

b. For example, in October of 1993, Farmer conferred with HA&S attorney Howard Walker regarding the potential for SSTAI corporate, officer, and shareholder liability in connection with Pardee's scheme. Farmer's notes reflect that SSTAI and its officers could be held liable to the settlement payees under any number of legal theories including breach of contract, tortious interference with contractual relations, breach of fiduciary duties, and negligence in making "risky investments." Moreover, they concluded SSTAI's shareholders could be held individually liable on a piercing the corporate veil theory.

22. Nevertheless, in furtherance of Pardee's scheme, attorneys at HA&S eventually encouraged U.S. Trust to allow SSTAI to borrow against a small portion of the trust assets. However, U.S. Trust raised concerns with HA&S attorneys, including Farmer, in light of the purpose of the trust and the structured settlement documents, that the settlement payees were actually trust beneficiaries and that SSTAI and/or U.S. Trust would therefore be subject to liability if the trust assets were lost. Pardee, and attorneys at HA&S, including Farmer, were ultimately unable to convince U.S. Trust to allow SSTAI to use the entire corpus of trust assets as collateral because U.S. Trust believed such use to be contrary to and inconsistent with the terms and purpose of the relevant structured settlement documents and 1992 Master Trust Agreement.

23. In 1993 and 1994, attorneys at HA&S, including Farmer, became actively involved in attempting to secure a replacement trustee because of U.S. Trust's reluctance to allow SSTAI unrestricted use of the trust assets for the company's own purpose. In these efforts, attorneys at HA&S learned that other potential trustees, upon review of the relevant structured settlement documents and the 1992 Master Trust Agreement, also believed that the settlement payees were trust beneficiaries and had substantial doubt about the legality and propriety of Pardee's scheme. For example, in November of 1993, a representative of Fidelity Personal Trust Services ("Fidelity") informed Farmer that Fidelity's counsel had raised a number of such concerns. On information and belief, other potential replacement trustees brought similar questions and concerns to the attention of attorneys at HA&S.

24. Shortly after Fidelity's counsel had raised questions and concerns regarding the legality and propriety of Pardee's scheme, Pardee suggested to Farmer that the 1992 Master Trust Agreement be substantially altered to purport to give SSTAI the "necessary room to run the business"—*i.e.*, to explicitly authorize use of the Treasury Bonds for SSTAI's own financial gain. Among the changes proposed, and ultimately contained in subsequent master trust agreements, was the elimination of any reference to the orders of payment being part of the trust agreement. For example, Pardee told Farmer to delete language specifying that "In no instance will the Trustor impair the rights of any Payee to receive his or her payments pursuant to the respective Order, settlement agreement, assignment agreement and related documents . . . ."

25. Using the powers purportedly conferred by the amendments contained in the 1992 Master Trust Agreement, SSTAI subsequently terminated U.S. Trust as trustee. Attorney Farmer drafted the letter Pardee sent to U.S. Trust notifying it that it had been terminated.

26. Using the powers purportedly conferred by the amendments contained in the 1992 Master Trust Agreement, SSTAI replaced U.S. Trust as trustee with Bankers Trust Co. of New York ("Bankers Trust"). Attorneys at HA&S, including Farmer, were substantially involved in the negotiation and drafting of the resulting trust agreement between SSTAI and Bankers Trust. That agreement, entitled "Settlement Services Treasury Assignments, Inc. Master Trust Agreement" and dated December 7, 1994 (the "1994 Master Trust Agreement") purported to supersede the 1992 Master Trust Agreement. *Inter alia*, the changes in the 1994 Master Trust Agreement purported to:

a. eliminate any requirement that the trust estate consist of Treasury Bonds;

b. allow SSTAI to decide in its discretion whether the trust assets were more than needed to meet payment obligations to the settlement payees and instruct Bankers Trust to remit the surplus to SSTAI;

c. authorize the trustee to invest trust assets in any way that SSTAI directed;

d. authorize the trustee to sell the Treasury Bonds upon SSTAI's instruction;

e. grant SSTAI the right to alter, amend, restate, or terminate the trust at its sole discretion; and

f. allow SSTAI the right to borrow against the trust assets and use the borrowed funds to re-invest for SSTAI's financial benefit.

27. SSTAI did not notify or obtain the consent of the settlement payees in connection with the changes contained in the 1994 Master Trust Agreement. Nor did SSTAI obtain any court's approval for these changes. Thus, to the extent that the 1994 Master Trust Agreement purported to alter or amend any of the provisions contained in the original structured settlement documents, it was without legal force or effect.

28. Using the powers purportedly conferred by the amendments contained in the 1994 Master Trust Agreement, SSTAI subsequently entered a new trust agreement with Bankers Trust entitled "Settlement Services Treasury Assignments, Inc. Master Trust Agreement" and dated July 12, 1995 ("1995 Master Trust Agreement"). Attorneys at HA&S, including Farmer, were substantially involved in the negotiation and drafting of the 1995 Master Trust Agreement which purported to supersede the 1994 Master Trust Agreement and provided, *inter alia*, that SSTAI had the right to borrow against the Treasury Bonds and use the borrowed funds to invest for SSTAI's own financial gain.

29. In rendering legal services to SSTAI in connection with the 1995 Master Trust Agreement, attorneys at HA&S, including Farmer, knew and intended that a purpose of the trust amendments was to make SSTAI more attractive to a "prospective buyer." As such, HA&S and SSTAI intended that any future purchaser of SSTAI that might use the rights purportedly conferred in the 1995 Master Trust Agreement and any other party to the sale transaction would benefit from the legal services that HA&S had agreed to provide to SSTAI.

30. SSTAI did not notify or obtain the consent of the settlement payees in connection with the changes contained in the 1995 Master Trust Agreement. Nor did SSTAI obtain any court's approval for these changes. Thus, to the extent that the 1995 Master Trust Agreement purported to alter or amend any of the provisions contained in the original structured settlement documents, it was without legal force or effect.

31. While Bankers Trust was serving as trustee, SSTAI entered into repurchase agreements using the Treasury Bonds as collateral to obtain a line of credit at Morgan Stanley. With the proceeds of these "repo" transactions, SSTAI made various investments through Morgan Stanley and other brokers with the objective of generating a larger return than the

interest on the "repo" agreement. Pardee and SSTAI kept the profits. Attorneys at HA&S, including Farmer, were substantially involved in the negotiation and drafting of the various agreements necessary to facilitate the "repo" transactions and the re-investment of funds borrowed against trust assets.

32. In rendering legal services to SSTAI in connection with the "repo" transactions, attorneys at HA&S, including Farmer, knew that SSTAI's ability to make such use of the Treasury Bonds was essential to any potential or prospective purchaser's valuation of SSTAI. As such, HA&S and SSTAI intended that any future purchaser of SSTAI that might use the trust assets for "repo" transactions and any other party to the sale transaction would benefit from the legal services that HA&S had agreed to provide to SSTAI.

33. SSTAI did not notify or obtain the consent of the settlement payees in connection with the "repo" transactions or the re-investment of borrowed funds secured by the Treasury Bonds. Nor did SSTAI obtain any court's approval for such transactions.

34. In or about 1996 or 1997, Pardee and SSTAI's other shareholders hired Bear, Stearns & Co. ("Bear Stearns") to assist them in selling SSTAI. HA&S provided substantive legal advice and counsel to Pardee and SSTAI in connection with the efforts to sell the company.

35. In connection with providing legal advice in connection with the marketing and sale of SSTAI, HA&S knew that SSTAI's ability to engage in "repo" transactions with trust assets and make loans or investments with the proceeds was the basis for SSTAI's value to potential purchasers. As such, HA&S and SSTAI intended that any future purchaser of SSTAI who might use the proceeds from "repo" transactions to make loans to others and any other party to the sale transaction or recipient of the loans would benefit from the legal services that HA&S had agreed to provide to SSTAI.

36. In connection with efforts to sell the company, Bear Stearns prepared a summary of the benefits and value of SSTAI to induce potential purchasers. Bear Stearns's summary provided in relevant part:

> ACQUISITION OPTIONS
>
> Because the Company [SSTAI] has not acquired new business since 1992, any acquisition should be viewed as a purchase of high quality, highly liquid and flexible assets, primarily US Treasury Bonds.
>
> Value comes from the following:
> - Ability to borrow against more than $94 million in US Treasuries at Fed Fund rates and earn a positive spread from highly flexible reinvestment (i.e. fund warehouse facilities, short term capital needs, fixed income investments or commercial paper)
> - Present value of Treasury payments exceeds future payment liabilities by $2.2 million
> - Real cash equity is over $2 million
>
> * * *
>
> **OTHER HIGHLIGHTS**
>
> * * *
>
> - Company currently pledges US Treasury bonds for repo primarily with Morgan Stanley and uses the proceeds to invest in Morgan Stanley fixed income vehicles and private investments at Sanford Berstein, Fidelity, Vanguard, and other accounts.

37. Pardee and SSTAI's other shareholders also represented to potential buyers that SSTAI had the legal authority to borrow money at repo rates (about 5.5–6.0%) using the Treasury Bonds as collateral and that they had reinvested the funds in equities and fixed income securities earning a spread of about 150 basis points over cost.

38. Attorneys at HA&S, including Farmer, knew that Bear Stearns, Pardee, and SSTAI's other shareholders were making such representations to potential buyers. Attorneys at HA&S, including Farmer, also knew that the sole basis for SSTAI's value to any buyer was the

buyer's belief that the company actually had a financial interest in the Treasury Bonds. Attorneys at HA&S, including Farmer, also knew that the issues regarding potential liability for the trust amendments and "repo" transactions remained unresolved. For example, in a December 2, 1996 memorandum to HA&S attorney William Grimm, Farmer wrote:

> Two types of buyers have emerged as a result of the investment banker's search. The first type of buyer is valuing the company simply on the basis of the value of the existing treasury bond holdings over the existing obligations to plaintiffs over a period of years. These buyers offer prices of $5,000,000 to $10,000,000. They do not appear to be motivated by a high need for cheap capital.
>
> The second class of buyer is exemplified by an automobile finance company . . . . The automobile finance company will apparently bid a significantly higher price for SSTAI. The reason for the higher bid is that the automobile finance company can utilize the capital provided by ownership of SSTAI at a much lower cost than its current lines of credit. Thus, SSTAI has much more potential value to the automobile finance company than it does to a large insurance company. In effect, it would appear that the value to the automobile finance company lies in the possibility of maximizing the use of treasury bonds as collateral for borrowings to be used in its automobile finance business. The risk of loss of trust assets is greater than the risk resulting from SSTAI's current borrowing program due to the concentration of use of such assets for borrowings in a noninvestment grade company's business.
>
> In the event that a buyer purchases SSTAI stock and proceeds to lose the trust assets as a result of poor investment decisions, on what theory or basis could Jon Pardee, individually, be held liable for the resulting losses suffered by plaintiffs? Are there recommendations we can make to Pardee to mitigate any such risk?
>
> Pardee is anxious to get an answer to the above questions . . .

39. On May 20, 1997, Pardee, SSTAI's other shareholders, SST Acquisition Corp. ("SST"), and CPS executed a Stock Purchase Agreement ("Stock Purchase Agreement"). Pursuant to the terms of the Stock Purchase Agreement, SSTAI's shareholders agreed to sell and

SST agreed to purchase all of the outstanding shares of SSTAI for the consideration and subject to the terms set forth in the Agreement.

40. CPS agreed, subject to the terms set forth in the Stock Purchase Agreement, both to indemnify Pardee and SSTAI's other shareholders from claims that might arise subsequent to the purchase of the stock and to be indemnified from certain claims resulting from the shareholders' acts or omissions prior to closing.

41. Attorneys at HA&S, including Farmer, were substantively involved in the negotiation and drafting of the Stock Purchase Agreement and in providing substantive legal counsel to Pardee and SSTAI in connection with the sale.

42. HA&S knew that SST planned to engage in "repo" transactions with the trust assets after the sale of SSTAI and that SST planned to use the "repo" transaction proceeds to make loans to CPS and others. As such, HA&S and SSTAI intended that SST and CPS would benefit from the legal services that HA&S had agreed to provide to SSTAI in connection with the various trust modifications including those reflected in the 1995 Master Trust Agreement, the negotiation and execution of "repo" transactions prior to the sale, the efforts to market and sell SSTAI, and the sale itself.

43. The Stock Purchase Agreement contains various representations and warranties by SSTAI's shareholders and their counsel that CPS and SST relied upon in providing indemnity and purchasing the stock. These representations included the following:

> Section 3.08. <u>Title to Assets</u>. The Company owns good and marketable title to the Assets [defined in Section 1.04 as ". . . all of the assets of the Company as of the Closing Date, including without limitation, . . . the Company's interest as the sole beneficiary . . . of the SSTAI Trust."]. . . . *free and clear of any and all* mortgages, liens *encumbrances, charges, claims, restrictions, pledges,* security interests or impositions, . . . . (Emphasis added.)

Section 3.20. Compliance with Law. The conduct of the business of the Company and the use of its Assets *does not violate* or conflict, and has not violated or conflicted, with *any law in any material respect*. . . . (Emphasis added.)

Section 3.26. Accuracy of Information. Neither this Agreement nor any other document provided by the Company or any Sellers to the Purchaser in connection with the transactions contemplated herein contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.

Section 3.28. Settlement Agreements. All of the obligations of the Company and the California Corporation under each of the Settlement Agreements required to be paid or performed by it through the date of this Agreement have been paid and performed.

Section 3.29. Trusts. The Company is the *sole beneficiary and trustor*, and Bankers Trust Company of New York is the sole trustee, of a trust (the "SSTAI Trust") established under that certain Settlement Services Treasury Assignments, Inc. Amended and Restated Master Trust Agreement executed as of July 12, 1995. . . . Except for the SSTAI Trust, there are no other trusts in effect relating to any of the Settlement Agreements. . . . *the Payees are solely unsecured creditors of the Company. The SSTAI Trust is in full force and effect and complies with applicable law and with the obligations of the Company and the California Corporation under the Settlement Agreements.* Exhibit 3.29(b) sets forth, in chronological order, each master trust agreement relating to the Settlement Agreements (other than the SSTAI Trust) to which the Company or the California Corporation was a party. Each trust relating to the Settlement Agreement or any of them (collectively, the "Prior Trusts"), the termination thereof and the transfer of assets held thereunder to each successor trustee complied with applicable law and the obligations of the Company and the California Corporation under the Settlement Agreements. The Prior Trusts were consolidated into master trusts which were Prior Trusts. Accounts for Payees under the Prior Trusts whose Settlement Agreements have not been satisfied in full are now maintained under the SSTAI Trust. (Emphasis added.)

Section 3.30. Administration of Trusts. Exhibit 3.30 contains a true and complete list of all assets owned by SSTAI and held by the SSTAI Trust as of May 19, 1997, *which assets are owned free and clear of all liens and encumbrances of every kind*. . . . The administration of each of the SSTAI Trust and the Prior Trusts, and the investment of the assets held by the Company or in the SSTAI Trust or the Prior Trusts, to the extent under the control of direction of the Company or the California Corporation, *have not violated the terms of the Settlement Agreement or applicable law*. (Emphasis added.)

44. Before consummating the sale, SST and CPS requested that SSTAI's counsel provide a legal opinion to provide further assurances that SSTAI did in fact have a financial interest in the trust assets and did in fact have the legal right to borrow against the Treasury Bonds. To induce and provide further assurances to SST and CPS, HA&S provided such an opinion letter, and the opinion letter became part of the basis of the bargain. In the opinion letter, HA&S represented in relevant part:

> The SSTAI Trust is a duly constituted trust under Rhode Island law and in full force and effect as of the date hereof. Except as set forth in Section ___ [sic] of the Purchase and Sale Agreement, *the Corporation is the sole beneficiary and sole trustor under the SSTAI Trust. There are no facts known to us which give us reason to believe that the SSTAI Trust does not hold all of the assets now held by it, free and clear of all liens, charges and encumbrances and adverse claims of every kind or nature.* (Emphasis added.)

45. In the opinion letter, HA&S also represented and attested that

> We have no knowledge that either the information or the assumptions which are set forth above and which we have relied upon in rendering the opinions herein are false nor do we have knowledge of facts that, under the circumstances, would make our reliance on the information and assumptions unreasonable.

46. As set forth in the Stock Purchase Agreement, the truth and accuracy of the HA&S opinion letter was a condition of CPS's obligations under the Stock Purchase Agreement.

47. In providing the opinion letter, HA&S expressly and implicitly represented that it had a high degree of confidence in the truth and accuracy of the representations contained in the opinion letter and the Stock Purchase Agreement.

48. In providing the opinion letter, HA&S expressly and implicitly represented that it had an honest belief in the truth of the representations contained in the opinion letter and the Stock Purchase Agreement.

49. In providing the opinion letter, HA&S purported to have special knowledge and experience with respect to the history and past transactions of SSTAI that SST and CPS lacked.

50. At the time, attorneys at HA&S, including Farmer, knew or should have known of the purpose and history of the structured settlement agreements and, specifically, that the original structured settlement documents provided that SSTAI's predecessor did not have any right to use the Treasury Bonds for any purpose other than funding periodic payments to the settlement payees.

51. At the time, attorneys at HA&S, including Farmer, knew or believed that the settlement payees had never intended that the Treasury Bonds be used for any purpose other than funding settlement periodic payments.

52. Contrary to what HA&S attorneys knew or believed to be purpose and intent of the structured settlement agreements, HA&S, as legal counsel to SSTAI and Pardee, had assisted Pardee in his efforts to modify, without notice to or consent of the settlement payees, the underlying trust documents to purportedly give the company a financial interest in the trust assets and, *inter alia*, the right to sell, pledge, or encumber the Treasury Bonds. Thus, attorneys at HA&S, including Farmer, knew, believed, or should have known that the purported trust amendments were without legal force or effect to alter the rights of the settlement payees.

53. Contrary to what HA&S attorneys knew or believed to be the purpose and intent of the structured settlement agreements, HA&S, as legal counsel to SSTAI and Pardee, had also assisted Pardee in negotiating and entering various transactions, including so-called repurchase or "repo" transactions, without notice to or consent of the settlement payees, in which SSTAI actually pledged the Treasury Bonds as collateral in order to borrow funds to re-invest for

SSTAI's financial gain. Thus, attorneys at HA&S, including Farmer, knew, believed, or should have known that the "repo" transactions violated the rights of the settlement payees.

54. Attorneys at HA&S, including Farmer, knew or should have known that the settlement payees had not been informed of the trust amendments contained in the 1992, 1994, or 1995 Master Trust Agreements. Attorneys at HA&S, including Farmer, knew or believed that the settlement payees, if informed, would not have consented to those amendments. Thus, attorneys at HA&S, including Farmer, knew, believed, or should have known that upon learning of the trust amendments, a suit by the settlement payees to restore the terms of the original trusts was likely or inevitable.

55. Attorneys at HA&S, including Farmer, knew or should have known that the settlement payees had not been informed of the "repo" transactions or SSTAI's use of the trust assets for its own financial gain. Attorneys at HA&S, including Farmer, knew or believed that the settlement payees, if informed, would not have consented to such transactions or such use of the trust assets by SSTAI. Thus, attorneys at HA&S, including Farmer, knew, believed, or should have known that upon learning of the "repo" transactions, a suit by the settlement payees to enjoin the such transactions and recover any pledged or lost trust assets was likely or inevitable.

56. Attorneys at HA&S, including Farmer, were substantively involved in negotiating and drafting the various agreements necessary to effect the "repo" transactions and re-investments. Attorneys at HA&S, including Farmer, knew that such "repo" transactions and re-investment substantially increased the risk of losing the Treasury Bonds. Based upon legal analysis undertaken by HA&S attorneys and legal analysis provided by SSTAI's California attorneys, attorneys at HA&S, including Farmer, knew, believed, or should have known that any

changes to the trusts or use of trust assets that had the effect of increasing the risk to the trust assets could form the basis of a suit by the settlement payees against SSTAI and its officers and shareholders.

57. Attorneys at HA&S, including Farmer, knew or believed that, at minimum, SSTAI owed a duty to the settlement payees to re-invest the borrowed funds only in extremely conservative investments. Attorneys at HA&S, including Farmer, knew that SSTAI was being marketed to buyers without any such qualification, and that SST intended to use borrowed funds secured by the Treasury Bonds in non-investment grade investments. Thus, attorneys at HA&S, including Farmer, knew, believed, or should have known that Pardee had misrepresented SSTAI's rights with respect to the Treasury Bonds, and that SST and CPS were relying on the misrepresentations as being true.

58. Attorneys as HA&S, including Farmer, knew or believed that, at minimum, SSTAI owed a duty to the settlement payees to re-invest the borrowed funds only in extremely conservative investments. Without disclosing this knowledge or belief to SST or CPS, attorneys at HA&S, including Farmer, advised Pardee and SSTAI's other shareholders to seek CPS's indemnification to create an "incentive" for SST to utilize funds borrowed against the Treasury Bonds only for the most conservative re-investments and thereby to minimize personal liability to Pardee and SSTAI's other shareholders. Attorneys at HA&S, including Farmer, knew or believed at the time that SST intended to use borrowed funds secured by the Treasury Bonds for purposes including non-investment grade investments.

59. Neither HA&S nor SSTAI disclosed to SST or CPS the existence or substance of HA&S's research and analysis regarding the nature and extent of potential liability arising out of the trust amendments or the "repo" transactions.

60. Neither HA&S nor SSTAI disclosed to SST or CPS the existence or substance of the concerns raised and difficulties posed by the refusal or reluctance of U.S. Trust, Fidelity, or other potential trustees to allow SSTAI to borrow against the Treasury Bonds. Neither HA&S nor SSTAI disclosed to SST or CPS the existence or substance of the concerns raised by U.S. Trust, Fidelity, or other potential trustees regarding the legality or propriety of SSTAI's borrowing against trust assets or use of the trust assets for the financial benefit of SSTAI.

61. SSTAI's shareholders and HA&S made the above-referenced representations to inflate the value of SSTAI (a company Pardee and SSTAI's other shareholders had paid approximately one dollar for a few years earlier) and induce SST to purchase the stock for more than $16.8 million and induce CPS to indemnify SSTAI's shareholders.

62. CPS relied on the representations made by Pardee, SSTAI's other shareholders, and HA&S in determining whether to provide indemnification under the Stock Purchase Agreement in connection with SST's purchase of the stock. Attorneys at HA&S, including Farmer, knew and intended that CPS was relying on such representations and on the legal services that HA&S had rendered to SSTAI prior to the sale.

63. Prior to the closing, multiple drafts of the Stock Purchase Agreement and draft versions of several of its provisions were circulated among and between Farmer and CPS's counsel Mark Creatura to negotiate the final language of the Stock Purchase Agreement.

64. In connection with the sale, SSTAI's sellers wanted CPS's counsel to provide two legal opinion letters concerning certain issues of California law. Farmer and Creatura exchanged correspondence regarding the substance and wording of the opinion letters to be issued by CPS's counsel. The opinion letters issued by CPS's counsel reflected the fact that in offering his opinions, Creatura had relied on the truth and accuracy of the representations contained in the

Stock Purchase Agreement and the truth and accuracy of the other representations made by SSTAI and its agents including HA&S.

65. Prior to the closing, attorneys and HA&S, including Farmer, knew that SST planned to engage in "repo" transactions after the sale and that the resulting funds would be used to make loans to CPS and others. For example, prior to the closing Farmer requested and Creatura supplied copies of the lending commitment from SST to CPS, drafts of the anticipated promissory note, and drafts of various option agreements under which CPS would have the right to acquire SST at a later date. Prior to the closing, it was foreseeable and attorneys at HA&S, including Farmer, actually foresaw that that SST would make and that CPS would receive several million dollars in loans from the proceeds of "repo" transactions.

66. In connection with the closing, HA&S received approximately $3.5 million from the proceeds of the sale. On information and belief, a portion of these funds constituted payment for legal services HA&S had provided to Pardee and SSTAI.

67. After the closing on the stock purchase, SST became known as Stanwich Financial Services Corp. ("Stanwich").

68. Based on the representations of SSTAI's sellers and HA&S, Stanwich and CPS reasonably believed that Stanwich had the right to engage in "repo" transactions with the Treasury Bonds and use the proceeds of such transactions to make loans to CPS and others.

69. In reliance on the representations of SSTAI's sellers and HA&S, CPS obtained commercially reasonable loans from Stanwich. At all times thereafter, CPS was current on all interest and principal payments due under the terms of the loans. In accordance with the terms of the loans, CPS has repaid all amounts it borrowed from Stanwich with interest.

70. For reasons having nothing to do with any breach or default by CPS, Stanwich became unable to continue making periodic payments due to structured settlement payees in late 2000. As a consequence of the non-payment by Stanwich, many of the structured settlement payees first learned of Pardee's trust modifications and use of trust assets for "repo" transactions. Many of the structured settlement payees asserted claims in California courts against Pardee and other entities that had had been associated with the structured settlements, the trust amendments, or the "repo" transactions. Many of these claims were consolidated in the Los Angeles Superior Court (the "Structured Settlement Litigation").

71. In the Structured Settlement Litigation, the settlement payees asserted, *inter alia*, that Pardee had interfered with their contractual rights and breached fiduciary duties. The settlement payees assert that the fundamental cause of their losses was Pardee's unlawful altering of the trust agreements in order to allow him and SSTAI's other shareholders to utilize the trust funds for their own improper purposes.

72. CPS was named as a defendant in the Structured Settlement Litigation because it took loans from Stanwich. CPS has denied liability in the Structured Settlement Litigation. CPS has expended in excess of $300,000 in defense of itself and its chief executive officer in the Structured Settlement Litigation.

73. Pardee and SSTAI's other shareholders have been named as defendants in adversary proceedings in the United States Bankruptcy Court for the District of Connecticut arising out of the bankruptcy of Stanwich ("Connecticut Adversary Proceeding"). In those proceedings, the creditor-plaintiffs are pursuing Pardee and others, *inter alia*, for fraudulent transfers, intentional and fraudulent misrepresentations, breaches of fiduciary duties, unjust enrichment, and conversion.

74. Pardee has been named as a defendant in a lawsuit in which he is alleged to have looted SSTAI during the years prior to selling the company, *inter alia*, by wrongfully selling Treasury Investment Growth Receipts ("TIGRs") intended to fund structured settlement payments and using the proceeds as his own. This lawsuit (the "TIGRs Case") is currently pending in superior court in California.

75. As a result of these various lawsuits, Pardee and SSTAI's other former-shareholders have asserted indemnity claims against CPS based on the indemnification provisions of the Stock Purchase Agreement. To assert such claims, Pardee and others have sued CPS in the United States District Court for the District of Rhode Island ("Rhode Island Indemnity Litigation"). CPS denies that it is liable on the indemnity claims and has expended substantial funds defending itself in the Rhode Island Indemnity Litigation.

76. Separately, Pardee and another of SSTAI's other former shareholders have demanded that CPS indemnify them for their costs and liabilities in the TIGRs Case. CPS denies that it is liable on these indemnity claims.

77. As a result of being named as a defendant in the Structured Settlement Litigation, CPS has suffered in excess of $7 Million dollars in damages for lost profits, higher transaction costs, diminished corporate value, and loss of goodwill.

78. In the exercise of reasonable diligence CPS did not discover and could not have discovered the act or acts of HA&S that form the basis of CPS's claims in this suit until after: discovery in the Rhode Island Indemnity Litigation had commenced; Stanwich waived SSTAI's attorney-client privilege for the time prior to the closing of the sale; and HA&S produced documents indicating the extent of its role in and knowledge regarding the events that gave rise to the Structured Settlement Litigation and the other lawsuits.

**COUNT I**

**Intentional Misrepresentation**

79. In fact, HA&S's express and implicit representations to SST and CPS that it had a high degree of confidence in the truth and accuracy of the representations contained in the opinion letter and the Stock Purchase Agreement were intentionally false.

80. In fact, HA&S's express and implicit representations to SST and CPS that it had an honest belief in the truth of the representations contained in the opinion letter and the Stock Purchase Agreement were intentionally false.

81. HA&S's express and implicit representations of confidence and honest belief were false because, *inter alia*, attorneys at HA&S, including Farmer:

a. knew or believed that the representations in the opinion letter and Stock Purchase Agreement were false;

b. knew or believed that there was no basis for the degree of confidence and accuracy that those representations state and imply;

c. were conscious that they held merely a belief that the representations were so, but recognized that there was a chance that the facts might not be as represented; and/or

d. made the representations with utter disregard for the truth of the representations.

82. HA&S made these false representations to CPS with the intent to induce reliance by CPS in agreeing to become a party to the Stock Purchase Agreement and indemnifying Pardee and SSTAI's other shareholders.

83. CPS did in fact take action in reliance on HA&S's misrepresentations by becoming a party to the Stock Purchase Agreement and agreeing to indemnify Pardee and SSTAI's other shareholders.

84. HA&S's false representations were material.

85. In light of the language of the HA&S opinion letter, the sellers' warranties, and the documents provided to CPS prior to the acquisition, CPS's reliance was intended, reasonable, and actually foreseen.

86. CPS did not know and could not reasonably have known that the representations made by HA&S were false.

87. As a direct and proximate result of HA&S's intentional misrepresentations, CPS has been substantially damaged.

**COUNT II**
**Negligent Misrepresentation**

88. CPS incorporates by reference the allegations contained in paragraphs 1 through 87 as set forth above.

89. In fact, one or more of the representations made by HA&S in the opinion letter were false.

90. HA&S had no reasonable grounds to support its representations to CPS and failed to exercise due care with respect to those false representations.

91. HA&S made these false representations to CPS with the intent to induce reliance by CPS in agreeing to become a party to the Stock Purchase Agreement and indemnifying Pardee and SSTAI's other shareholders.

92. CPS did in fact take action in reliance on HA&S's misrepresentations by becoming a party to the Stock Purchase Agreement and agreeing to indemnify Pardee and SSTAI's other shareholders.

93. HA&S's false representations were material.

94. In light of the language of the HA&S opinion letter, the sellers' warranties, and the documents provided to CPS prior to the acquisition, CPS's reliance was intended, reasonable, and actually foreseen.

95. CPS did not know and could not reasonably have known that the representations made by HA&S were false.

96. As a direct and proximate result of HA&S's negligent misrepresentations, CPS has been damaged.

**COUNT III**
**Indemnity as to Claims of Structured Settlement Payees**

97. CPS incorporates by reference the allegations contained in paragraphs 1 through 96 as set forth above.

98. In the Structured Settlement Litigation, the settlement payees and Bankers Trust (as their assignee) have asserted that CPS is liable to them. HA&S is also liable to the settlement payees and Bankers Trust due to its complicity or negligence in advising and assisting in Pardee's wrongful trust modifications and wrongful use the Treasury Bonds for his and SSTAI's own purposes.

99. As between CPS and HA&S, any losses, damages, or costs, including attorneys' fees, incurred by CPS in the Structured Settlement Litigation should be borne by HA&S, and CPS is therefore entitled to equitable indemnification from HA&S.

**COUNT IV**
**Indemnity as to Claims of Pardee and SSTAI's Other Former Shareholders**

100. CPS incorporates by reference the allegations contained in paragraphs 1 through 99 as set forth above.

101. In the Rhode Island Indemnity Litigation, Pardee and SSTAI's other shareholders assert that CPS is liable to them. HA&S is also liable to Pardee and SSTAI's other shareholders due to its negligence and malpractice in advising and assisting in the modifications of the trust agreements to purportedly allow SSTAI to obtain a financial interest in the trusts and SSTAI's use of the Treasury Bonds for SSTAI's and its shareholders' own purposes.

102. In response to the claims asserted in the TIGRs Case, Pardee and SSTAI's other shareholders have also demanded that CPS indemnify them. HA&S is liable to Pardee and SSTAI's other shareholders due to its negligence and malpractice in advising and assisting in the events that gave rise to the TIGRs Case.

103. As between CPS and HA&S, any losses, damages, and costs, including attorneys' fees, incurred by CPS in the Rhode Island Indemnity Litigation or as a result of the TIRGs Case should be borne by HA&S, and CPS is therefore entitled to equitable indemnification from HA&S.

**COUNT V**
**Third-Party Beneficiary**

104. CPS incorporates by reference the allegations contained in paragraphs 1 through 103 as set forth above.

105. HA&S entered into a contract or contracts with SSTAI to render legal services in connection with the modification of the various individual and master trusts, the negotiation and

execution of "repo" transactions, the marketing and sale of SSTAI, and the provision of an opinion letter in connection with the sale.

106. HA&S and SSTAI agreed and intended that prospective purchasers of SSTAI, other prospective parties to the sale transaction, and particularly CPS as a party to the Stock Purchase Agreement and loan recipient would benefit from HA&S's contract or contracts to provide legal services to SSTAI. CPS understood that it was a third-party beneficiary of HA&S's contract or contracts to provide legal services to SSTAI. HA&S and SSTAI knew and intended that CPS would rely on and benefit from the legal services HA&S had rendered to SSTAI.

107. SSTAI fulfilled all of its contractual obligations to HA&S including paying HA&S for the legal services rendered through the time of the sale of SSTAI.

108. HA&S breached its contract or contracts with SSTAI by failing to modify the various individual and master trusts in a legally valid manner that was consistent with SSTAI's contractual and fiduciary duties to the settlement payees, failing to secure for SSTAI all of the legal and contractual rights necessary to engage in "repo" transactions with the Treasury Bonds, allowing SSTAI and its shareholders to make material misrepresentations in connection with the sale of SSTAI and in the Stock Purchase Agreement, making material misrepresentations in the HA&S opinion letter, and also negligently rendering legal services to SSTAI in connection with the trust modifications, the "repo" transactions, and the marketing and sale of SSTAI.

109. As a direct and proximate result of HA&S's breaches of its contract or contracts with SSTAI, CPS has been damaged.

**WHEREFORE**, CPS demands judgment against HA&S for:

1. An award of CPS's direct and consequential damages, interest, and costs of suit;

2. Indemnification of all losses, damages, attorney's fees, and other costs that CPS has incurred or may incur or become subject to in connection with the Structured Settlement Litigation, the Connecticut Adversary Proceeding, the Rhode Island Indemnity Litigation, the TIGRs Case, and any other related claims or litigation;

3. Punitive damages;

4. Attorneys' fees in this case; and

5. Such other and further relief as the Court may deem proper.

Christopher H. Little (#1789)
Scott K. Pomeroy (#6044)
Little, Medeiros, Kinder, Bulman &
Whitney, P.C.
72 Pine Street
Providence, RI 02903
Tel: (401) 272-8080
Fax: (401) 521-3555

**Counsel for Defendant**
**Consumer Portfolio Services, Inc.**

**DEMAND FOR JURY TRIAL**

Consumer Portfolio Services, Inc. hereby demands a trial by jury.

Christopher H. Little (#1789)
Scott K. Pomeroy (#6044)
Little, Medeiros, Kinder, Bulman &
Whitney, P.C.
72 Pine Street
Providence, RI 02903
Tel: (401) 272-8080
Fax: (401) 521-3555

**Counsel for Defendant**
**Consumer Portfolio Services, Inc.**

## NOTICE OF PENDENCY OF OTHER ACTIONS OR PROCEEDINGS

Pursuant to Local Rule 31, Plaintiff hereby gives notice that the this action involves claims, causes of action, and/or transactions and happenings which comprise a material part of the subject matter of the following related actions:

1. Jonathan H. Pardee, *et al.* v. Consumer Portfolio Services, Inc., Case No. 01-594 L, in the United States District Court for the District of Rhode Island.

2. In re Structured Settlement Litig., Case No. BC-24411, now pending in the Los Angeles, California Superior Court.

3. Official Committee of Unsecured Creditors v. Jonathan H. Pardee, *et al.*, Case No. 02-5023, United States Bankruptcy Court for the District of Connecticut.

4. Takako Hawkins, *et al.* v. Merrill, Lynch, Pierce, Fenner & Smith, *et al.*, Case No. BC-279691, now pending in the Los Angeles, California Superior Court.

Christopher H. Little (#1789)
Scott K. Pomeroy (#6044)
Little, Medeiros, Kinder, Bulman &
Whitney, P.C.
72 Pine Street
Providence, RI 02903
Tel: (401) 272-8080
Fax: (401) 521-3555

**Counsel for Defendant**
**Consumer Portfolio Services, Inc.**

scott/A065/1059