# Exhibit I

# Part 1 of 2

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | |
|---|---|
| IN RE:<br><br>STANWICH FINANCIAL SERVICES CORPORATION,<br><br>Debtor. | CHAPTER 11<br><br>CASE NO. 01-50831 (AHWS) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF STANWICH FINANCIAL SERVICES CORPORATION, on behalf of THE ESTATE OF STANWICH FINANCIAL SERVICES CORPORATION AND ITS CREDITORS,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN H. PARDEE, CAROL HAVICAN, as TRUSTEE of the JONATHAN H. PARDEE CHARITABLE REMAINDER TRUST, CAROL HAVICAN, in her individual capacity, OGDEN H. SUTRO, VIRGINIA S. MORSE, as CO-TRUSTEE of the DUNBAR WHEELER TRUST, PETER M. DODGE, as CO-TRUSTEE of the DUNBAR WHEELER TRUST, VIRGINIA S. MORSE, in her individual capacity, PETER M. DODGE, in his individual capacity, {BEAR STEARNS & CO, INC.,} FIRST UNION CAPITAL MARKETS CORPORATION f/k/a WHEAT FIRST SECURITIES, INC., HINCKLEY, ALLEN & SYNDER, LLP, , SCOTT A. JUNKIN, P.C.,} ROBINSON-HUMPHREY CO., LLC, and JOHN DOES 1 through 20,<br><br>Defendants. | AMENDED COMPLAINT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS ON BEHALF OF THE ESTATE AND ITS CREDITORS TO AVOID TRANSFERS AS FRAUDULENT AND TO RECOVER ESTATE ASSETS<br><br>ADV. PRO. [NO. 02-05023]<br><br>JURY TRIAL DEMANDED |

# AMENDED COMPLAINT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS ON BEHALF OF THE ESTATE AND ITS CREDITORS TO AVOID TRANSFERS AS FRAUDULENT AND TO RECOVER ESTATE ASSETS

The Official Committee of Unsecured Creditors of Stanwich Financial Services Corp. (hereinafter "Plaintiff"), as Estate Representative and on behalf of Stanwich Financial Services Corporation (the "Debtor" or "SFSC") and its creditors, pursuant to the Order dated April 16, 2002 (the "Order Conferring Standing"), approving the Stipulation Granting the Official Unsecured Creditors' Committee Standing to Pursue Certain Claims on Behalf of the Estate of Stanwich Financial Services Corp., dated April 3, 2002 (the "Standing Stipulation"), by and through the undersigned counsel, alleges, upon information and belief:

## I. INTRODUCTION

1. This case is brought by Plaintiff to assert claims against the above-captioned Defendants (i) to recover as fraudulent conveyances under Section 544(b), of Title 11 of the United States Code (the "Bankruptcy Code") payments made to certain of the Defendants as shareholders and immediate transferees pursuant to a leveraged buyout in May, 1997 (the "1997 LBO") (Counts I and II) and payments made to subsequent transferees (Counts III to VI), (ii) to redress claims of conspiracy to breach fiduciary duties, aiding and abetting breach of fiduciary duties and breaches of fiduciary duties by officers counsel and retained professionals of Settlement Services Treasury Assignments, Inc. ("SSTAI") in connection with their approval of and profiting from the 1997 LBO, which rendered the successor to SSTAI insolvent (Counts VII to IX), (iii) to redress negligent, intentional and fraudulent misrepresentations made by officers and counsel of SSTAI in connection with their scheme to profit from the 1997 LBO, which rendered the successor to SSTAI insolvent (Counts X to XII), (iv) to redress unjust enrichment by certain Defendants who were counsel to and shareholders of SSTAI (Count XIII), (v) to

recover property of the Debtor converted by certain of the Defendants during their tenure as shareholders and directors of SSTAI (Count XIV), (vi) for indemnification arising from the actions of the Selling Shareholders and Sutro who breached the representations and warranties contained in the Stock Purchase Agreement and engaged in fraudulent behavior prior to and in connection with the 1997 LBO (Count XV), (vii) to equitably subordinate Defendants' claims to those of all other creditors in the Debtor's bankruptcy case (Count XVI), and (viii) to object to claim No. 149 of Jonathan Pardee filed in the Debtor's bankruptcy.

2. Plaintiff did not discover nor could Plaintiff have discovered with reasonable diligence the facts giving rise to the Complaint filed May 3, 2002, any earlier than one year prior to that date.

## II. PARTIES

3. Plaintiff is the Official Committee of Unsecured Creditors of the above-captioned Debtor, appointed on July 9, 2001 by the United States Trustee for the District of Connecticut pursuant to Section 1102(a)(1) of the Bankruptcy Code.

4. SFSC is a corporation organized and existing under the laws of the State of Connecticut.

5. Pursuant to Section 544(b) of the Bankruptcy Code, SFSC possesses the right to avoid any transfer of an interest in its property and any obligations incurred by it that are voidable under applicable bankruptcy and non-bankruptcy law. Pursuant to the Order Conferring Standing, the Debtor assigned to the Plaintiff, among other rights, those claims under the Bankruptcy Code and applicable non-bankruptcy law asserted in this Complaint against the Defendants. The Order Conferring Standing gives Plaintiff authority and standing to commence

this action because it will benefit the Debtor's estate and creditors and is necessary for the efficient administration of the bankruptcy case.

6. Defendant Jonathan H. Pardee ("Pardee") is an individual who resides in the State of Rhode Island, and who performed certain acts or caused certain events to occur, which form the basis, in whole or in part, of Plaintiff's claims in this action. From 1992 through May 20, 1997, Pardee was President, Secretary, a director and majority shareholder of SSTAI, a Rhode Island Corporation, and received transfers of funds which are alleged to be fraudulent transfers recoverable by SFSC.

7. Defendant Carol Havican is the Trustee of the Jonathan H. Pardee Charitable Remainder Trust (the "Pardee Trust") and is the designated representative of the Pardee Trust which was formed under the laws of the State of Rhode Island. The Pardee Trust was an immediate or mediate transferee of funds which are alleged to be fraudulent transfers recoverable by SFSC.

8. Defendant Carol Havican ("Havican") is an individual who is a resident of Rhode Island. Havican, in her individual capacity, is an immediate or mediate transferee of funds which are alleged to be fraudulent transfers recoverable by SFSC.

9. Defendant Ogden H. Sutro ("Sutro") is an individual who resides in the State of Connecticut who performed certain acts or caused certain events to occur which form the basis, in whole or in part, of Plaintiff's claims in this action. Sutro was Executive Vice President, Treasurer, a director and a minority shareholder of SSTAI until May 20, 1997, and received transfers of funds which are alleged to be fraudulent transfers recoverable by SFSC.

10. Defendants Virginia S. Morse and Peter M. Dodge, as former co-Trustees of the Dunbar Wheeler Trust (the "DW Trust"), were the designated representatives of the DW Trust

which was formed under the laws of the State of Connecticut. The DW Trust is an immediate or mediate transferee of funds which are alleged to be fraudulent transfers recoverable by SFSC.

11. Defendant Virginia S. Morse ("Morse") is an individual who is a resident of Massachusetts. Morse, in her individual capacity, is an immediate or mediate transferee of funds which are alleged to be fraudulent transfers recoverable by SFSC.

12. Defendant Peter M. Dodge ("Dodge"), is an individual who is a resident of the State of Connecticut. Dodge, in his individual capacity, is an immediate or mediate transferee of funds which are alleged to be fraudulent transfers recoverable by SFSC.

13. Defendant Bear Stearns & Co., Inc. ("Bear Stearns") is a Delaware corporation. Bear Stearns acted as a broker and financial advisor with respect to the transactions which form the basis of this fraudulent transfer action. In addition, Bear Stearns received fees for services rendered to SSTAI and is therefore an immediate or mediate transferee of funds which are alleged to be fraudulent transfers recoverable by SFSC.

14. Defendant First Union Capital Markets Corporation, f/k/a Wheat First Securities, Inc. ("First Union") is a Connecticut corporation. First Union is an immediate or mediate transferee of funds which are alleged to be fraudulent transfers recoverable by SFSC.

15. Defendant Hinckley, Allen & Synder, LLP ("Hinckley Allen"), is a limited liability partnership formed under the laws of the State of Massachusetts. Hinckley Allen is an immediate or mediate transferee of funds which are alleged to be fraudulent transfers recoverable by SFSC. Hinckley Allen received transfers of funds in payment for legal services provided in connection with the effectuation of the 1997 LBO which are alleged to be fraudulent transfers recoverable by SFSC. At all times, Hinckley Allen acted as general counsel to SSTAI during Pardee's tenure as President and majority shareholder of SSTAI and counseled, participated and

profited with Pardee and SSTAI throughout the events leading up to and including the 1997 LBO.

16. Defendant Scott A. Junkin, PC ("Junkin") is a professional corporation formed under the laws of the State of Connecticut. Junkin is an immediate or mediate transferee of funds which are alleged to be fraudulent transfers recoverable by SFSC.}

17. Defendant Robinson-Humphrey Co., LLC ("R-H") is a limited liability corporation formed under the laws of the State of Georgia. R-H acted as SSTAI's sole and exclusive agent for the purpose of identifying opportunities for the sale of the company and participating in the negotiations on the company's behalf concerning such sale. R-H is an immediate or mediate transferee of funds which are alleged to be fraudulent transfers recoverable by SFSC.

18. John Does 1-20 are or may be recipients of fraudulent transfers or are beneficiaries of trusts that received distributions from fraudulent transfers in connection with the 1997 LBO. John Does 1-20 are not presently known by Plaintiff but Plaintiff reserves its rights with respect to conducting expedited discovery against, and tracing and recovering proceeds of the 1997 LBO from, any or all of such recipients or beneficiaries.

19. In committing the wrongful acts alleged herein, the Defendants have at various times pursued, or joined in the pursuit of, a common course of conduct and acted in concert with and conspired with one another, in furtherance of their common plan, scheme or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, certain of the Defendants, particularly Hinckley Allen, further aided and abetted and knowingly assisted each other in breach of their respective duties as herein alleged. In taking the actions, as particularized herein, to conspire to commit and substantially assist the commission of the

wrongdoing complained of herein, each such Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of its overall contribution to, and furtherance of, the wrongdoing.

## III. JURISDICTION AND VENUE

20. Pursuant to the Order Conferring Standing, the Plaintiff has been granted standing to pursue various actions for the benefit of the Debtor's creditors and estate. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. §§ 156(b)(2)(H) and 157(b)(1).

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## IV. FACTUAL ALLEGATIONS

### A. Nature and Formation of the Structured Settlements

22. A structured settlement is an arrangement that can be used to facilitate settlement of lawsuits, most notably tort actions for catastrophic personal injuries, wrongful death due to negligence, products liability and medical malpractice. In years past, such tort cases were typically settled by way of a lump sum payment. A structured settlement provides a means for the injured party to receive periodic and lump sum payments over many years. Such an arrangement can function, in effect, as a sort of "spendthrift trust" to prevent the injured party from unwisely spending the settlement proceeds and to assure continuous funding for ongoing medical care and maintenance. This is especially useful in cases of profoundly injured persons where the injured party will require long-term, often lifetime, medical services and income.

23. Under a structured settlement agreement, the defendant tortfeasor will contractually agree to pay the payee: (a) future periodic payments, which may be made monthly, semi-annually or in some other combination; and (b) a final lump sum payment upon expiration

of the periodic payments. The payee and the tortfeasor(s) execute an agreement (a "Settlement Agreement"), whereby the tortfeasor and/or its insurer agree to make the future payments to the payee in return for a release by the payee of all claims and causes of action against the tortfeasor and its insurer.

24. In addition to the Settlement Agreement, the tortfeasor and/or the insurer will assign to a third party (an "Assignment Company") the obligation to make the payments due under the Settlement Agreement. The payee contractually agrees to permit the tortfeasor and/or its insurer to assign their payment obligations to the Assignment Company, and usually releases the tortfeasor and/or the insurer. The Assignment Company is merely the administrator of the stream of payments due to many individual payees, and is paid fees to so administer the Settlement Agreements.

25. One type of structured settlement involves the purchase of United States treasury bonds ("Treasury Bonds") and/or an annuity, in an amount sufficient to earn interest payments that correspond to the amount of the agreed upon periodic payments to be paid to the injured party, and which are intended to generate sufficient income to meet the required monthly, periodic and final payments as they become due. The Treasury Bonds used to fund a given settlement are held in a trust, called a "Treasury Bond Trust," until they mature, at which time they are redeemed and the proceeds paid to the payee. This type of structured settlement is called a "Bond Trust Agreement."

26. Treasury Bond Trusts are subject to certain restrictions imposed by federal tax law. Internal Revenue Code § 104 provides that funds received by an individual on account of personal injury, sickness or death are excludable from the gross income of the taxpayer receiving such monies. This exclusion applies whether the monies are received in a lump sum or over a

period of time. Internal Revenue Code § 130 confers certain tax benefits on the Assignment Companies that participate in structured settlements, provided: (a) the Assignment Company must assume liability from a person who was a party to the suit or settlement agreement; (b) the periodic payments must be fixed and determinable as to amount and time; (c) the periodic payments cannot be deferred, accelerated, increased, or decreased by the recipient; (d) the Assignment Company's obligation can be no greater than the obligation of the person who assigned the liability; (e) the periodic payments are excludable from the gross income of the recipient under Internal Revenue Code § 104; and (f) the amount received by the Assignment Company for assuming the periodic payment obligation is used to purchase either an obligation of the United States (*i.e.*, the Treasury Bonds) or an annuity contract.

27. In the case of the structured settlements relevant to the instant Complaint, the terms governing each particular settlement are set forth in the respective Settlement Agreement, an assignment agreement (the "Assignment Agreement"), a trust agreement (the "Trust Agreement"), a guaranty (the "Guaranty") and a trustor's order for payment (the "Trustor's Order for Payment"), if applicable, that was executed in connection with each settlement. The specific terms of these governing agreements were and remain binding upon each payee, on the one hand, and the Assignment Company and the trustee under the Trust Agreement and each of their respective successors (the "Trustee"), on the other hand. The terms set forth in the Trust Agreement governing a particular structured settlement (the "Trust Agreement") were fixed as a matter of contract between the payee and the Assignment Company. The Assignment Company and the Trustee had no authority to change such terms without the consent of the payees.

28. Each Trust Agreement contained functionally identical provisions that: (a) required the Assignment Company to purchase Treasury Bonds and the bank Trustee to hold

them in a Treasury Bond Trust; (b) prohibited disposition of those Treasury Bonds for any purpose other than to pay payees; (c) specified the dates, amounts and recipients of periodic and final distributions from the Treasury Bond Trust; (d) prohibited revocation or amendment of the Trust Agreement or Treasury Bond Trust; and (e) required that any successor Trustee succeed to all of the same rights and duties as its predecessor(s).

29. At first, each of the subject structured settlements utilized a separate Trust Agreement incorporating the foregoing protections. However, most Trust Agreements entered into by payees on and after January 1982 consisted of a standard form of Trust Agreement, known as a "Master Trust Agreement," that contained identical protections. Each structured settlement that utilized a Master Trust Agreement provided that the Treasury Bond Trust would be augmented by the purchase of Treasury Bonds of a specified amount and term, provided cash for the purchase of the Treasury Bonds, and included a Trustor's Order for Payment with irrevocable instructions from the trustor Assignment Company to the Trustee to purchase the Treasury Bonds and to make the specified payments to the payee.

**B. <u>Formation and Operation of SSTAI</u>**

30. On or about April 28, 1988, an Assignment Company known as Merrill Lynch Settlement Services, Inc. ("MLSS") transferred 80% of its stock to Laugharn Associates, Inc., whose principals were C. John Laugharn and his father, Hubert F. Laugharn. MLSS changed its name to ML Settlement Services, Inc. ("MLSSI"). On or about October 18, 1991, Merrill Lynch sold its remaining interest in MLSSI to C. John Laugharn and Pardee. In or about 1993, Laugharn transferred all of his interest in MLSSI to Pardee who thereafter became President, director and sole shareholder and eventually changed the name of MLSSI to SSTAI.

31. As MLSSI and SSTAI, the Assignment Company continued to owe all of the duties and obligations that were owed to the payees whose contracts it administered pursuant to the preexisting Settlement Agreements, Assignment Agreements and Trust Agreements. From 1992 through May 20, 1997, SSTAI did not market or generate "new" business, but rather administered a finite number of settlement trust accounts for the benefit of approximately two-hundred fifty (250) payees (collectively, the "Settlement Payees").

32. By 1997, SSTAI had no employees, but retained "advisors and consultants," who included Pardee and Sutro, a director, Executive Vice President and minority shareholder, as well as certain legal professionals.

33. As a principal of SSTAI, Pardee acquired physical possession of the originals and/or copies of each and all of the Settlement Agreements, Assignment Agreements, Trust Agreements, Trustor's Orders for Payment if applicable and Guaranties governing such structured settlements (collectively, the "Governing Documents"). Pardee knew or should have known and understood, *inter alia*, the purpose, nature and terms of the Governing Documents: that the structured settlements had been entered and Treasury Bond Trusts created for the sole purpose of ensuring settlement payments to vulnerable persons, many catastrophically injured, for whom timely and regular receipt of structured settlement payments was vitally important; that the commitment of SSTAI and the Trustee to protect and preserve the Treasury Bonds in trust for the benefit of the Settlement Payees was a critical component of such Settlement Payees' willingness to enter into structured settlements rather than accept a lump sum payment; that Settlement Payees were intended beneficiaries of the Treasury Bond Trusts; that the Treasury Bond Trusts had been structured to comply with Internal Revenue Code § 130, which required trust assets to consist of Treasury Bonds; and that the terms of the Governing

Documents were fixed by agreement between Settlement Payees and SSTAI, prohibited any alteration or revocation of their original terms, and required successor Trustees to assume all duties of their predecessors.

### C. <u>Modification of Treasury Bond Trusts</u>

34. From July 1993 through May 1997, Pardee, as controlling shareholder of SSTAI, with the assistance of attorneys including Hinckley Allen and financial institutions, altered and amended the original Trust Agreements. These amendments allowed him, as controlling shareholder of SSTAI, to control and liquidate the Treasury Bond Trusts, which secured payment to the Settlement Payees. In a deliberate effort to reach trust assets for his own personal gain, Pardee succeeded in orchestrating the systematic evisceration of the provisions in the Trust Agreements that had protected the trust assets for the benefit of the Settlement Payees. Ultimately Pardee was able to cause the liquidation of trust assets for his own profit.

35. After acquiring control of SSTAI, Pardee sought to obtain control over the Treasury Bonds held by Wells Fargo Bank, N.A. ("Wells Fargo") in the Treasury Bond Trusts. To that end, Pardee sought to appoint a replacement Trustee who would acquiesce to the release of the Treasury Bonds. However, Wells Fargo refused to resign without the consent of the Settlement Payees, who it asserted were trust beneficiaries. On September 17, 1991, MLSSI sued Wells Fargo in the Superior Court for the State of California, seeking to remove Wells Fargo as Trustee of the Treasury Bond Trusts. The Superior Court sustained demurrers to the original and amended petitions, ruling that: (a) MLSSI had no contractual authority to remove the Trustee; (b) MLSSI was not the sole trust beneficiary; (c) other trust beneficiaries (i.e., Settlement Payees) had not consented; and (d) the Settlement Payees were necessary parties.

36. While the ruling was on appeal, Pardee and Wells Fargo agreed to stipulate to reverse the Superior Court's ruling and that Wells Fargo would resign in exchange for payment of its attorneys' fees and costs and an indemnity against claims against it by Settlement Payees. Neither the proposed changes to the Trust Agreements, the existence of the litigation, the Superior Court's ruling or the settlement and stipulated reversal were ever disclosed to the Settlement Payees by Wells Fargo, Pardee, Sutro, or anyone acting on behalf of MLSSI.

37. Wells Fargo subsequently resigned and transferred the Treasury Bonds that it held in trust for the Settlement Payees' benefit to U.S. Trust Co. of California ("U.S. Trust Co. CA.").

38. Prior to the Wells Fargo litigation, Hinckley Allen became legal counsel for SSTAI (and its predecessor) and Pardee.[1] Hinckley Allen remained SSTAI's legal counsel until the 1997 LBO on May 20, 1997. Hinckley Allen continues to act as Pardee's legal counsel. From at least early 1992 through the 1997 LBO, Hinckley Allen, through Malcom Farmer, III ("Farmer") and other partners and attorneys at the firm, provided substantial legal advice to Pardee and to SSTAI in connection with every aspect of its business.

39. On December 1, 1992, SSTAI and U.S. Trust Co. CA. executed an agreement entitled "Settlement Services Treasury Assignments, Inc. Amended and Restated Master Trust Agreement," dated December 1, 1992 (the "1992 Master Trust Agreement"). Under the 1992 Master Trust Agreement, U.S. Trust Co. CA. was appointed "Successor Trustee" under all previous Trust Agreements. The 1992 Master Trust Agreement eliminated many of the protections for Settlement Payees that had existed in all prior Trust Agreements. For example, the 1992 Master Trust Agreement removed the prohibition against revocation or alteration of the terms of the trust, revised the anti-hypothecation provisions to apply only to the Settlement

[1] Upon information and belief, Pardee has retained the legal services of Hinckley Allen and maintained a professional relationship with partner Malcolm Farmer, III, Esq. from as early as 1989.

Payees and not SSTAI, created a right of SSTAI to replace the Trustee at its sole discretion, and deleted the requirement that any successor trustee assume the obligations of the prior trustee. Settlement Payees were not notified of and did not consent to any modifications of their Governing Documents. In addition, neither SSTAI nor Hinckley Allen sought any court's approval for the changes made in the 1992 Master Trust Agreement despite specific knowledge of the legal import of the original Wells Fargo ruling. Thus, to the extent that the 1992 Master Trust Agreement purported to alter and amend any of the provisions contained in the original Governing Documents, it was without legal force or effect.

40. By early 1993, attorneys at Hinckley Allen, including Farmer, knew and understood that Pardee and SSTAI's minority shareholders believed that "surplus equity" existed with respect to the Treasury Bond Trusts because the market value of the Treasury Bonds had increased. In reality, this "surplus equity" was illusory because, *inter alia,* SSTAI had no financial interest in the trust assets, SSTAI had no right to satisfy the Settlement Payees early at a discount, and the entire increase in the value of the bonds merely reflected the fact that interest rates had fallen – that a great quantity of new, lower-rate bonds would be required simply to generate the same fixed rate interest income currently being generated by the older, higher- rate bonds held in trust.

41. By early 1993, attorneys at Hinckley Allen, including Farmer, had begun, at Pardee's request, to assist and advise Pardee and SSTAI's other shareholder, Sutro, in their scheme to "harvest" the phantom "surplus equity" for SSTAI solely for the shareholders' financial gain. Hinckley Allen actively participated in the formulation and implementation of this scheme as illustrated by a June 3, 1993 memorandum from Farmer to junior attorneys ("the June 3 Memo") explaining that he had been asked by Pardee to specifically investigate

> whether (1) under the trust [SSTAI] can amend the trust to provide for disposition and replacement of the securities and (2) if under the settlement agreement, assignment and assumption and trustor's order for payment there is *any risk of personal liability* or risk a California court ordering a restoration of the original securities in trust upon a complaint by a plaintiff.(Emphasis added)

42. In the same memorandum, Farmer acknowledges his awareness that one of the major problems with SSTAI borrowing against the Treasury Bonds is language in the relevant documents "which prohibits disposition of the collateral [trust assets] except to make distributions to the plaintiffs."

43. Thereafter, in June 1993, Farmer wrote to California counsel that had previously represented SSTAI in the Wells Fargo litigation with inquires regarding the questions raised in the June 3 Memo. In his letter, Farmer explained,

> [i]t would appear that the risk inherent in the language [of the Governing Documents] is a claim that the plaintiff relied upon the Trustor's Order for Payment in entering into the Assignment and Assumption Agreement, that the plaintiff has a claim should the nature of the collateral change to something less than creditworthy and that the plaintiff is entitled to restoration of the original collateral, which pursuant to the Trustor's Order for Payment became part of the contract.
>
> * * *
>
> In summary, it would appear that a plaintiff would have to rely upon either an attached Trustor's Order for Payment... or a reference to specific treasury bonds in the attached trust agreement. The confusing language in the various agreements would seem to mitigate the significance of the plaintiff's arguments, as might a theory of "no harm, no foul" *so long as plaintiff's are getting paid.*(Emphasis added)

44. In his July 26, 1993 reply to Farmer and Pardee, California counsel confirmed that the "security of all payments" was something that "SSTAI, as Trustor may be contractually obligated to provide the plaintiffs." California counsel also opined that the risk of future liability for amendments to the trusts were "negligible," but only so long as the amendments were "lawful modifications" and "in all cases the corpus of the trusts, however composed, will be more than

sufficient to provide for the security of all payments" to the Settlement Payees. Attorneys at Hinckley Allen, including Farmer, knew and understood that the pledge of trust assets contemplated by Pardee and SSTAI's other shareholder, Sutro, would put that security at risk.

45. Through their own legal research and analysis, attorneys at Hinckley Allen, including Farmer, also became aware that there was substantial doubt as to SSTAI's right to use the trust assets for its own benefit.

46. In May 1993, Farmer conferred with associate Mark Bianchi regarding what Farmer referred to as "SSTAI's Special Project". Farmer and Bianchi concluded, *inter alia,* that there could be "no assurances [of] no lawsuit." Regardless of any trust language, Farmer wrote that a court in equity could still determine that the Settlement Payees were trust beneficiaries to whom SSTAI owed a fiduciary duty because the "*whole purpose of the corp. was to benefit plaintiffs.*" This admission demonstrates that Hinckley Allen knowingly assisted and aided Pardee in altering the business purpose of SSTAI from its custodial and administrative function to make distributions to Settlement Payees to an investment vehicle *for the benefit of the corporation* thus benefiting its majority shareholder, Pardee.

47. For example, in October 1993, Farmer conferred with Hinckley Allen attorney Howard Walker regarding the potential for SSTAI corporate, officer and shareholder liability in connection with Pardee's scheme. Farmer's notes reflect that SSTAI and its officers could be held liable to the Settlement Payees under any number of legal theories including breach of contract, tortious interference with contractual relations, breach of fiduciary duties, and negligence in making "risky investments." Moreover, they concluded SSTAI's shareholders could be held individually liable on a piercing the corporate veil theory.

48. Nevertheless, in furtherance of Pardee's scheme, attorneys at Hinckley Allen eventually persuaded U.S. Trust Co. CA. to allow SSTAI to borrow against a small portion of the trust assets. However, U.S. Trust Co. CA. raised concerns with the Hinckley Allen attorneys, including Farmer, in light of the purpose of the trust and the Governing Documents, that the Settlement Payees were actually trust beneficiaries and that SSTAI and/or U.S. Trust Co. CA. would therefore be subject to liability if the trust assets were depleted. Pardee, and his attorneys at Hinckley Allen, including Farmer, were able to convince U.S. Trust Co. CA. to allow SSTAI to use the entire corpus of trust assets as collateral even though U.S. Trust Co. CA. believed such use to be contrary to and inconsistent with the terms and purpose of the relevant structured settlement documents and the 1992 Master Trust Agreement.

49. Throughout 1993 and 1994, attorneys at Hinckley Allen, including Farmer, became actively involved in attempting to secure a replacement trustee because of U.S. Trust's reluctance to allow SSTAI unrestricted use of the trust assets. During this endeavor, attorneys at Hinckley Allen became aware that other financial institutions being considered as potential trustees, had serious concerns about the legality and propriety of Pardee's scheme.

50. In early 1994, Pardee suggested to Farmer that the 1992 Master Trust Agreement be substantially altered again to give SSTAI the "necessary room to run the business" and to explicitly authorize the use of the Treasury Bonds for SSTAI's own financial gain. Attorneys at Hinckley Allen, including Farmer, embarked on assisting Pardee, Sutro and SSTAI with another set of revisions to the 1992 Master Trust Agreement in furtherance of Pardee's scheme. Those revisions consisted of the elimination of any reference to the orders of payment being part of the trust agreement. Pardee and Farmer worked in tandem editing several drafts of a new trust agreement with Pardee's specific instruction to delete language requiring that "in no instance

will the Trustor impair the rights of any Payee to receive his or her payments pursuant to the respective Order, settlement agreement, assignment agreement and related documents…".

51. Thereafter, using the powers purportedly conferred by the amendments contained in the 1992 Master Trust Agreement, SSTAI terminated U.S. Trust Co. CA. as Trustee. Attorney Farmer drafted the letter for Pardee terminating U.S. Trust Co. CA.

52. Using the powers purportedly conferred by the amendments contained in the 1992 Master Trust Agreement, SSTAI replaced U.S. Trust Co. CA. with Bankers Trust Co. of New York ("Bankers Trust"). Attorneys at Hinckley Allen, including Farmer, were substantially involved in the negotiation and drafting of the resulting trust agreement between SSTAI and Bankers Trust. That agreement, entitled "Settlement Services Treasury Assignments, Inc. Master Trust Agreement" dated December 7, 1994 (the "1994 Master Trust Agreement"), purported to supercede the 1992 Master Trust Agreement. The amendments to this document purported to:

(a) eliminate any requirement that the trust estate consist of Treasury Bonds (instead defining it as whatever property SSTAI saw fit to supply to Bankers Trust);

(b) allow SSTAI to decide in its discretion whether Bankers Trust was holding more assets than it needed to meet payment obligations, and to instruct Bankers Trust to remit the surplus to SSTAI;

(c) shield Bankers Trust from liability for any act done pursuant to SSTAI's written instructions;

(d) authorize the Trustee to invest the assets held in the Treasury Bond Trusts in virtually any conceivable type of investment vehicle, and to sell the Treasury Bonds upon SSTAI's specific written instructions;

(e) grant "SSTAI as Trustor and sole beneficiary of this Master Trust Agreement . . . [the] right to amend, restate, or terminate this trust at its discretion;"

(f) allow SSTAI the right to borrow against the trust assets and use the borrowed funds to reinvest for SSTAI's financial benefit; and

(g) disclaim any liability under "ancillary" documents to prior Trust Agreements.

53. SSTAI did not notify or obtain the consent of the Settlement Payees in connection with the changes contained in the 1994 Mater Trust Agreement. Nor did SSTAI obtain any court's approval for the amendments. Attorneys at Hinckley Allen, including Farmer, did not advise Pardee or SSTAI to give any notice to the Settlement Payees of the substantial revisions contained within the 1994 Master Trust Agreement. Thus, to the extent that the 1994 Master Trust Agreement purports to alter or amend any provisions contained in the Governing Documents, it was without legal force or effect.

54. Using the powers purportedly conferred by the amendments contained in the 1994 Master Trust Agreement, SSTAI subsequently entered into a new trust agreement with Bankers Trust entitled "Settlement Services Treasury Assignments, Inc. Master Agreement" dated July 12, 1995 ("1995 Master Trust Agreement"). Attorneys at Hinckley Allen, including Farmer, were substantially involved in the negotiation and drafting of the 1995 Master Trust Agreement which purported to supercede the 1994 Master Trust Agreement and provided, *inter alia,* that SSTAI had the right to borrow against the Treasury Bonds and used borrowed funds to invest for SSTAI's own financial gain.

55. SSTAI did not notify or obtain the consent of the Settlement Payees in connection with the changes contained in the 1995 Master Trust Agreement. Nor did SSTAI obtain any court's approval for these changes. Attorneys at Hinckley Allen, including Farmer, did not advise Pardee or SSTAI to give any notice to the Settlement Payees of the substantial revisions contained within the 1995 Master Trust Agreement. Thus, to the extent that the 1995 Master

Trust Agreement purported to alter or amend any of the provisions contained in the original structured settlement documents, it was without legal force or effect.

56. The modifications and amendments to the trust agreements, as contained in the 1992, 1994 and 1995 Master Trust Agreements (collectively referred to as the "Master Trust Agreements"), were undertaken and obtained without notice to or consent of the Settlement Payees. Finally, Pardee, with the assistance of attorneys at Hinckley Allen, including Farmer, had achieved their ultimate goal – to gain unrestricted access to the trust assets and obliterate any and all Settlement Payees' rights and protections. Pardee, with the assistance of Hinckley Allen, including Farmer, through the succession of amendments in 1992, 1994 and 1995 had successfully changed the corporate purpose of SSTAI – from benefiting the Settlement Payees to benefiting the shareholders to the detriment of both SSTAI and the Settling Payees.

57. By amending and altering the Governing Documents through the 1992, 1994, and 1995 Master Trust Agreements, Pardee intended to obtain access to the Treasury Bonds purchased for the sole purpose of funding Settlement Payees' structured settlements, and to use the Treasury Bonds for, among other things, collateral for loans to SSTAI and/or Pardee, or to effectuate repurchase agreements. Pardee then used the proceeds of these loans and repurchase agreements to engage in speculative financial transactions including the sale of SSTAI stock through the 1997 LBO, solely intended to benefit Pardee and the other Selling Shareholder of SSTAI. Attorneys at Hinckley Allen, including Farmer, were substantially involved in the negotiation and drafting of the various agreements necessary to facilitate the "repo" transactions and the reinvestment of funds borrowed against the trust assets.

58. SSTAI failed to notify or obtain the consent of the Settlement Payees in connection with the "repo" transactions or the reinvestment of borrowed funds secured by the

Treasury Bonds. Attorneys at Hinckley Allen, including Farmer, did not advise Pardee or SSTAI to give any notice to the settlement payees of the "repo" transactions or the reinvestment of borrowed funds secured by the treasury Bonds. Nor did SSTAI obtain any court's approval for such transactions.

**D. <u>Pardee and Sutro's Annual "Compensation" from SSTAI</u>**

59. Under the original Governing Documents, SSTAI's corporate purpose was to fund the Settlement Payee liabilities and pay the costs and expenses of administration ("Administration Expenses").

60. During the years prior to 1993, the Administration Expenses per year on average were $300,000. From 1993 through the 1997 LBO, during Pardee's tenure as President and majority shareholder of SSTAI, the Administration Expenses should have been approximately $1.3 million. Based upon SSTAI's audited financial statements for those years, SSTAI's Administrative Expenses totaled $4.3 million.

61. The additional $3.0 million of Administrative Expenses came directly from proceeds generated from trust assets since SSTAI did not generate any new business during that period.

62. The additional $3.0 million of Administrative Expenses was used by Pardee and Sutro to fund the following expenses: (1) inflated management and consulting fees to Pardee and Sutro totaling $2,052,326; (2) substantial legal fees paid primarily to Hinckley Allen, and other firms to assist in their scheme to amend the Master Trust Agreements; and (3) costs relating to the marketing of SSTAI for sale.

63. Pardee caused the depletion of trust assets to fund endeavors which benefited the individual shareholders of the company while conferring no benefit whatsoever on SSTAI.

SSTAI received no value for the additional expenditure of $3.0 million and in fact, incurred a substantial financial detriment by the use of these funds.[2]

E. **<u>The Marketing of SSTAI through Robinson- Humphrey and Bear Stearns</u>**

64. In or about 1996 or 1997, SSTAI, through Pardee and Sutro, hired Bear Stearns to assist Pardee in the sale of SSTAI.

65. However, in addition to Bear Stearns, in July 1996, Pardee retained the services of R-H as SSTAI's sole exclusive agent for the purpose of accomplishing any or all of the following: (1) identifying opportunities for the possible sale of SSTAI; (2) advising SSTAI concerning the opportunities for such a sale; and (3) participating on SSTAI's behalf in the negotiations concerning such sale.

66. R-H had been previously retained by Pardee from as early as 1993 to prepare audited financial statements for SSTAI.

67. In September 1996, R-H provided SSTAI and Hinckley Allen, through Farmer, with a Confidential Offering Memorandum ("Offering Memorandum") which contained: (1) an executive summary; (2) key investment considerations; (3) industry overview; (4) a summary of the "Company"; (5) audited financial statements; (6) asset overview; (7) liability overview; (8) income statement overview; (9) income statement overview; and (10) potential expense savings. As part of the Memorandum, R-H prepared a draft purchase agreement and compiled a list of due diligence documents. Pardee, Sutro and Hinckley Allen assisted R-H in the drafting and preparation of the Offering Memorandum.

---

1. [2] In addition to serving his own interest, Pardee authorized SSTAI to loan $5 million of proceeds -from trust assets- to a related company, Boston Capital Venture. An officer of Boston Capital Venture was a former colleague of Pardee's from his previous employer, Robinson Humphrey, also a Defendant in this action. Pardee later changed the name of the company to Bellevue Capital Ventures ("BCV"). This loan was considered high risk and was allegedly paid back in 1997. However, upon information and belief, the proceeds used to repay SSTAI did not come from BVC.

68. Because of its overall prior knowledge of the structure and operations of SSTAI and its preparation of the Offering Memorandum, R-H was aware of the series of alterations of the Master Trust Agreements by Pardee, Sutro and Hinckley Allen, and was aware of the Wells Fargo litigation in September of 1992 and that SSTAI had not obtained consent or court approval for the subsequent amendments which obliterated the payee protections and modified the business purpose of SSTAI.

69. In the Offering Memorandum, R-H did not disclose its knowledge that the Master Trust Agreements had been amended several times over the past five years to alter the business purpose of the company and stated to potential buyers that: (1) this transaction should be viewed as an asset portfolio purchase; (2) that the assets could be sold under certain conditions; (3) that it would be possible to settle the liabilities of the company; (4) that the Company is able to "repo" these Treasury securities; and (5) the repo proceeds can be reinvested enhancing the return on the overall portfolio. The Offering Memorandum stated that SSTAI had assets in excess of $196 million. R-H knew that Pardee and Sutro had embarked on an scheme to amend the Master Trust Agreements of the benefit of its shareholders to the detriment of the company.

70. After its retention in July 1996, R-H began to prepare the Offering Memorandum to market SSTAI and solicit potential buyers. In December 1996, R-H proposed a sale of SSTAI evidenced by a term sheet which R-H drafted with the assistance of Pardee, Sutro and attorneys at Hinckley Allen. That transaction was never consummated.

71. In the beginning of January 1997, Pardee was increasingly intent on the entering into a sale agreement for SSTAI. In an effort to expedite the sale process, on or about January 28, 1997, Pardee proposed that R-H work with Bear Stearns and directed the financial advisors at

Bear Stearns to contact R-H directly. Bear Stearns utilized the financial statements prepared by R-H as well as incorporating the contacts of the Offering Memorandum in its marketing material.

72. In addition to the financial advisors at R-H and attorneys at Hinckley Allen, including Farmer, provided substantial assistance and legal advice to Pardee and SSTAI in connection with the efforts to market and sell the corporation. By virtue of their continuous involvement with Pardee and SSTAI since early 1992, Hinckley Allen knew the nature and purpose of the original structured settlement and affirmatively assisted Pardee by editing and revising each of the Master Trust Agreements. Financial advisors at R-H and attorneys at Hinckley Allen knew (1)] that the structured settlements had provided for the creation of Treasury Bond Trusts expressly intended to comply with Section 130 of the Internal Revenue Code, which in turn required trust assets to consist of U.S. Treasury securities; (2) that the sole purpose and permissible use of the Treasury Bonds pursuant to Section 130 and the Master Trust Agreements was to make payments to the Settlement Payees; (3) that the Master Trust Agreements prohibited any alienation or hypothecation of the Treasury Bonds or any alteration or modification of the trust terms; and (4) that use of the Treasury Bonds for any other purpose would violate the contractual and fiduciary duties of SSTAI and the Trustee. Furthermore, financial advisors at R-H and attorneys at Hinckley Allen, including Farmer, knew or should have known that the Treasury Bonds were set aside in the exact amount necessary to fund scheduled payments to each Settlement Payee and the costs associated therewith, and that the loss of more than a *de minimus* amount of Treasury Bonds would render SSTAI unable to make payments to the Settlement Payees.

73. Bear Stearns, Financial advisors at R-H and attorneys at Hinckley Allen had specific knowledge of these facts as demonstrated, *inter alia*, by Bear Stearns' offering

memorandum for the sale of SSTAI, in which it stated that: (a) SSTAI was founded "to primarily satisfy defendants' obligations to payees" and that those "future payment obligations are fully funded by a portfolio of US Treasury Bonds"; and (b) the Treasury Bonds "are tied to vehicles intended to provide injured claimants with security."

74. In connection with its efforts to sell the corporation, Bear Stearns adopted the R-H Offering Memorandum which utilized the summary of benefits and value of SSTAI to induce potential purchasers. Bear Stearns's summary provided in relevant part:

**ACQUISITION OPTIONS**

75. Because the Company [SSTAI] has not acquired new business since 1992, any acquisition should be viewed as a purchase of high quality, high liquid and flexible assets, primarily U.S. Treasury Bonds.

76. Value comes from the following:

- Ability to borrow against more than $94 million in US treasuries at Fed Fund rates and earn a positive spread from highly flexible reinvestment (i.e. fund warehouse facilities, short term capital needs, fixed income investments or commercial paper)
- Present value of Treasury payments exceeds future payment liabilities by $2.2 million
- Real cash equity is over $2 million

**OTHER HIGHLIGHTS**

- Company currently pledges US Treasury bonds for repo primarily with Morgan Stanley and uses the proceeds to invest in Morgan Stanley fixed income vehicles and private investments at Sanford Bernstein, Fidelity, Vanguard and other accounts.

77. Pardee, Sutro, the other Selling Shareholders[3] and R-H represented to potential buyers that SSTAI had the legal authority to borrow money at repo rates using the Treasury Bonds as collateral and that they had reinvested the funds in equities and fixed income securities earning a spread of approximately 150 basis points over cost.

78. Attorneys at Hinckley Allen, including Farmer, knew that R-H, Pardee and SSTAI's other Selling Shareholders were making such misleading and false statements to potential buyers. Financial advisors at R-H and attorneys at Hinckley Allen, including Farmer, also knew that the sole basis for SSTAI's value to any buyer was the buyer's belief that the company actually had a financial interest in the Treasury Bonds. Financial advisors at R-H and attorneys at Hinckley Allen, including Farmer also knew that the issues regarding potential liability for the trust amendments and "repo" transactions remained unresolved. For example, in a December 2, 1996 internal memorandum to Hinckley Allen attorney William Grimm, Farmer wrote:

> Two types of buyers have emerged as a result of the investment banker's search. The first type of buyer is valuing the company simply on the basis of the value of the existing treasury bond holding over the existing obligations to plaintiffs over a period of years. These buyers offer prices of $5,000,000 to $10,000,000. They do not appear to be motivated by a high need for cheap capital.
>
> The second class of buyer is exemplified by an automobile finance company.... The automobile finance company will apparently bid a significantly higher price for SSTAI. The reason for the higher bid is that the automobile finance company can utilize the capital provided by ownership of SSTAI at a much lower cost than its current lines of credit. Thus, SSTAI has a large insurance company. In effect, it would appear that the value to the automobile finance company lies in the possibility of maximizing the use of treasury bonds as collateral for borrowings to be used in its automobile finance business. The risk of loss of trust assets is greater than the risk resulting from SSTAI's current borrowing program

[3] The "other Selling Shareholders" are the Jonathan Pardee Charitable Remainder Trust and the Dunbar Wheeler Trust.

> due to the concentration of use of such assets for borrowings in a non-investment grade company's business
>
> In the event that a buyer purchases SSTAI stock and proceeds to lose the trust assets as a result of poor investment decisions, on what theory or basis could Jon Pardee, individually, be held liable for the resulting losses suffered by plaintiffs. Are there recommendations we can make to Pardee to mitigate any such risk?
>
> Pardee is anxious to get an answer to the above questions…

79. Despite their actual knowledge, Bear Stearns, R-H, Pardee, the other Selling Shareholders, and Hinckley Allen knowingly and intentionally marketed SSTAI as "a purchase of high quality, highly liquid and flexible assets, primarily US Treasury Bonds" conferring on the purchaser the ability "to borrow against more than $94 million in US Treasuries at Fed Fund rates and earn a positive spread from highly flexible reinvestment." From at least January 1997, Pardee, with the help of Bear Stearns, Hinckley Allen and R-H, effected the sale of stock in SSTAI to SFSC through SFSC's shareholders, Charles E. Bradley, Sr. ("Bradley, Sr.") and Charles E. Bradley, Jr. (collectively, the "Bradleys") with the representation that SSTAI provided a vehicle to obtain large amounts of capital by using the Treasury Bond Trusts as collateral for loans and repurchase agreements.

80. Bear Stearns, Pardee, the other Selling Shareholders, R-H, and Hinckley Allen marketed the stock of SSTAI at a price of $17 million, and obtained a buyer at such price, despite the fact that they knew or should have known that such a price could only be justified by a purchaser intending to engage in speculative investments inconsistent with the fiduciary nature of the obligations of SSTAI. Bear Stearns, Pardee, Financial advisors at R-H and attorneys at Hinckley Allen, including Farmer knew that SFSC would have no assets other than those belonging to the Treasury Bond Trusts, but caused or facilitated the sale of SSTAI to SFSC through a transaction that depleted trust assets by utilizing them to finance the purchase price.

Plaintiff is informed and believes that Bear Stearns received a base fee and commission of $526,320 for brokering and assisting in the sale of SSTAI to SFSC.

F. **The Acquisition of SSTAI through the 1997 LBO**

81. This Complaint arises out of the 1997 LBO in which the Defendants received fraudulent transfers in the form of cash payments of approximately $17 million directly or indirectly from SSTAI for which SSTAI did not receive reasonably equivalent value and as a result of which SSTAI, and its successor in interest, SFSC, was rendered insolvent, incurred debts beyond its ability to pay, and was left with unreasonably small capital. The purpose of the 1997 LBO was to transfer trust assets held by SSTAI to Pardee and the other minority shareholders, Pardee Trust, Sutro, and the Dunbar Wheeler Trust (the "Selling Shareholders"), which purpose was achieved through the sale of the stock by the Selling Shareholders to an acquiring company – SST Acquisition Corp ("SSTAC"). The sale was financed through Pardee's deliberate liquidation of trusts assets held by SSTAI.

82. While SSTAI received no benefit from the transfer of control of its stock, SSTAI liquidated 20% of its assets to satisfy approximately $17 million of entirely new debt - the sale price to the Selling Shareholders. This improper use of trusts assets led to the catastrophic depletion of the very assets which were intended to fulfill the obligations of SSTAI to the Settlement Payees. As a direct consequence of this enormous increase in debt, SSTAI and its successor in interest, SFSC, consequently were rendered insolvent and unable to pays their debts to the Settlement Payees. This depletion lead SFSC to file for relief under Chapter 11 of the Bankruptcy Code. The structure of the 1997 LBO and the fraudulent transfer of funds from SFSC to the Defendants is set forth below.

83. Beginning on May 19 and concluding on May 23, 1997, an LBO was consummated by which 100% of the outstanding stock of SSTAI was acquired by Stanwich Holding Inc. ("SHI") a shell holding company formed for the sole purpose of ultimately acquiring the SSTAI stock.

84. On May 20, 1997, the Selling Shareholders of SSTAI entered into a Stock Purchase Agreement with SSTAC and Consumer Portfolio Services, Inc. ("CPS"). The Selling Shareholders owned 100% of the stock of SSTAI which shares were sold, pursuant to the Stock Purchase Agreement, to SSTAC, the acquisition company. SSTAC changed its name to SHI and SSTAI changed its name to SFSC so that SHI became the holding company which owned 100% of the shares of SFSC. The diagram below illustrates the evolution of corporate changes during and after the 1997 LBO:

| PRE-LBO | | POST-LBO |
|---|---|---|
| SSTAI | becomes | SFSC |
| * | | * |
| * | | * |
| * | becomes | * |
| SSTAC | | SHI |
| (Purchases SSTAI Stock from Selling Shareholders) | | (Holding company of 100% of SFSC Stock) |

85. Attorneys at Hinckley Allen, including Farmer, represented SSTAI, the Selling Shareholders and Sutro in the negotiation, drafting and consummation of the Stock Purchase Agreement. Attorneys at Hinckley Allen, including Farmer, drafted a majority of the documents which were executed at the closing on May 20, 1997 which took place at their offices at 1500 Fleet Center, Providence, Rhode Island.

86. Under the Stock Purchase Agreement, the sale price for 100% of the shares of SSTAI was $16.833 million. The sale price was negotiated by Pardee, with the assistance of attorneys at Hinckley Allen, including Farmer, and Bradley, Sr. on behalf of SFSC.

87. On May 20, 1997, Pardee, as controlling shareholder of SSTAI, authorized Morgan Stanley Dean Witter & Co. ("Morgan Stanley") to wire transfer proceeds generated by "repo" transactions with SSTAI which liquidated $14 million of face value of Treasury Bonds to the following individuals and entities under various arrangements.

88. On May 20, 1997 and May 21, 1997, SFSC (formerly SSTAI) loaned $14.5 million to CPS under a short-term 60-day 8% unsecured debt arrangement. On May 20, 1997, *CPS in turn transferred $14.5 million to SHI* in exchange for the purchase of 14,500 shares of the Preferred Stock of SHI. In consideration of CPS's agreement to purchase SHI Preferred Stock and enter into the Purchase Agreement, SHI caused SFSC to make this loan to CPS as well as other loans in the future. From an economic standpoint, CPS was acting as SSTAI's conduit in the transfer of $14.5 million of trust assets to SHI, which effectively financed the 1997 LBO and at that point in time SHI paid Pardee and other Selling Shareholders the $16.8 million purchase price. The Purchase Agreement between SHI (through its predecessor SSTAC) and CPS, contained a mandatory redemption provision which obligated SHI to buy-back its Preferred Stock from CPS.[4] In less than three months after the purchase transaction, SHI redeemed CPS's preferred stock for $14.924 million, *the funding for which came from SFSC as a loan.* Immediately thereafter, CPS repaid SFSC $14.5 million and retained a $424,000 profit in the form of a preferred stock redemption premium. Therefore, SFSC generated funds for CPS to

[4] If SHI was unable to redeem its shares the purchase agreement provided that CPS would immediately take control of 100% of the shares of SFSC.

upstream to SHI to pay the Selling Shareholders and then SHI borrowed funds from SFSC to repay CPS who, in turn, repaid SFSC with its own funds.

89. On May 23, 1997, SFSC (formerly SSTAI) transferred $1.5 million to an entity called Reunion Industries ("Reunion") and *which was recorded as a loan to SHI.* Reunion was repaid after three days *from funds borrowed from SFSC* with interest at 9%, plus a $15,000 transaction fee.

90. On May 23, 1997, SFSC (formerly SSTAI) transferred $833,400 to Bradley, Sr. and *that amount was recorded as a loan from SFSC to SHI.* SFSC, not SHI, also paid Charles Bradley, Sr. interest and fees of $8,500 for the funds that he allegedly advanced to SHI.

91. In summary, on May 20, 1997, Pardee authorized the funding of the LBO from trust assets by the wire transfer from Morgan Stanley as follows:

| | | |
|---|---|---|
| CPS | $11 million | upstream to SHI |
| CPS | $3.5 million | upstream to SHI |
| Reunion | $1.5 million | upstream to SHI |
| CEB, Sr. | $833,0000 | upstream to SHI |
| TOTAL | $16,833,000 | SHI pays Selling Shareholders |

92. These proceeds were amalgamated with other "repo" proceeds from SSTAI of approximately $19.4 million in cash at the time of the closing of the Stock Purchase Agreement. As outlined above, the amount of the sale price - $16,833,000 came from SSTAI and was "laundered" through a series of transactions which eventually enabled SHI to acquire the stock of the Selling Shareholders of SSTAI.[5]

93. Under the various "loan" arrangements with CPS, Reunion and Bradley, Sr., SHI ultimately borrowed funds from SFSC to repay, CPS, Reunion and Bradley, Sr. In reality, SHI

[5] In addition, SFSC transferred $517,000 to SHI for financing expenses related to the transaction. Accordingly, Pardee, as controlling shareholder of SSTAI, caused a total of $17.3 million to be taken out of SSTAI to enable SHI to acquire the stock of the Selling Shareholders and pay related transaction costs.

had no assets, was never capitalized, and created an illusion of liquidity on the date of the 1997 LBO because it recorded the purchase of the CPS stock as capital rather than a liability under the redemption provision in the Purchase Agreement. Therefore, *SHI had to borrow from SFSC* to meet all of its obligations.

94. In summary, SFSC borrowed proceeds totaling $19.4 million to fund the $16.8 million payment to Pardee and the other Selling Shareholders thereby stripping SFSC of 20% of its assets as a result of the 1997 LBO. The elements of the 1997 LBO illustrated in diagram format is attached as Exhibit A attached hereto.

95. As part of the consummation of the closing of the Stock Purchase Agreement, on May 20, 1997, Pardee directed Citibank N.A. to make the following wire transfers to the Defendants listed below to fund payments to the Selling Shareholders and their professionals in connection with the 1997 LBO which are alleged to be fraudulent transfers:

a. $7,528,788.60 to Wheat Securities for further credit to Jonathan H. Pardee;

b. $3,546,806.40 to Wheat Securities for further credit to Jonathan H. Pardee;

c. $2,257,805.00 to The Dunbar Wheeler Trust/Mellon Bank;

d. $1,166,600.00 to Hinckley, Allen & Synder Client Funds Account;

e. $833,400.00 to Hinckley, Allen & Synder Client Funds Account; and

f. $1,500,000.00 to Hinckley, Allen & Synder, Client Funds Account

96. Pardee also directed that the following Defendants receive transfers at the closing of the 1997 LBO which are alleged to be fraudulent transfers:

a. $523,336 to Bear Stears & Co., Inc.

b. $50,000.00 to Robinson-Humphrey Co., LLC; and

c. $56,000.00 to Cameron & Mittleman, LLC and Scott A. Junkin, PC.

97. Upon information and belief, Havican, the Trustee of the Pardee Trust and Morse and Dodge, the Trustees of the DW Trust received fees in an amount to be determined which were proceeds from the 1997 LBO.

98. Upon information and belief, Pardee instructed and authorized the Pardee Trust to make distributions to trust beneficiaries in an amount to be determined who are identified as John Does, 1-20. The beneficiaries of the Pardee Trust who received distributions are mediate transferees of funds which are alleged herein to be fraudulent transfers in connection with the 1997 LBO.

99. Upon information and belief, Sutro directed and authorized the DW Trust to make distributions to trust beneficiaries in an amount to be determined who are identified as John Does 1-20. The beneficiaries of the DW Trust who received distributions are mediate transferees of funds which are alleged herein to be fraudulent transfers in connection with the 1997 LBO.

100. Based on SFSC's balance sheets, after the transfer of the $17.35 million purchase price which includes transaction fees, with only $79.5 million of available assets, SFSC could no longer fund its ongoing liabilities of $19.4 million to Morgan Stanley and $77.2 million to the Settlement Payees. The 1997 LBO transaction rendered SFSC insolvent on May 20, 1997 or shortly thereafter as a result of stripping $17.35 million from SFSC. SFSC attempted to borrow and invest additional funds in hopes of earning a greater interest spread to make up for the capital shortfall of $17.35 million and the additional interest expense on the borrowed funds.

## G. <u>The Aftermath of the 1997 LBO</u>

101. Approximately two months after the completion of the 1997 LBO, Charles Bradley, Sr. caused substantially all of the Treasury Bonds held by SFSC to be transferred to

Morgan Stanley under repurchase agreements. These transactions generated financing proceeds of approximately $98 million. Approximately $43 million of the $98 million in proceeds was used to fund the purchase price of SSTAI and make distributions to family members and affiliates, including NAB Asset Corporation ("NAB"), a corporation of which Bradley, Sr. was Chairman and Chief Executive Officer until 2001, CPS, a corporation of which Charles Bradley, Jr. is President and a director, and Reunion, a corporation of which Bradley, Sr. is Chairman, Chief Executive Officer, and a director.

102. The remaining loan proceeds of $55 million were held in various equity investment accounts at Morgan Stanley and Bear Stearns. By December 1997, SFSC converted all but $14.6 million of the assets held at Morgan Stanley and Bear Stearns into loans and investments in affiliated companies. From January to September 1998, the remaining $14.6 million was converted into loans and investments into affiliated companies. Plaintiff is informed and believes that the outstanding principal amount of such related-party loans and advances is at least $71 million. The Settlement Payees had no notice of these transactions.

103. Within seven months of the 1997 LBO, in December 1997, Morgan Stanley notified SFSC that it intended to terminate the repurchase agreements and that SFSC either had to repurchase the Treasury Bonds or Morgan Stanley would sell them. After several extensions of time from Morgan Stanley, SFSC was unable to make payments or to find another institution to take over the repurchase agreements. As a result, in March 1998, Morgan Stanley sold the Treasury Bonds, paid itself from the proceeds and remitted the balance to SFSC.

104. On November 15, 2000, SFSC defaulted on its obligations to make payments to the Settlement Payees. In December 2000, SFSC sent the Settlement Payees a letter, signed by Charles Bradley, Sr., which disclosed for the first time that the Treasury Bonds had been lost.

105. Upon receipt of such letter, certain of the Settlement Payees retained counsel in California to initiate an action (the "California Class Action Litigation") against all of the Trustees, the shareholders of SFSC, many of the Defendants to the instant action, and a number of other defendants entitled *In re Structured Settlement Litigation*, Case No. BC 244111, and related cases (Sup. Ct. L.A. County). By Order dated February 13, 2002, the plaintiffs in the consolidated actions were granted class certification under California State law.

106. In the California Class Action, the Settlement Payees assert, *inter alia,* their contractual right and rights as beneficiaries of a trust rather than unsecured creditors. The plaintiffs also assert that the fundamental cause of their losses was Pardee's unlawful altering of the Governing Documents in order to allow him to utilize the Treasury Bond Trusts for his own improper purposes.

107. SFSC, the Bradleys and CPS have been named as defendants in the California Class Action.

108. On June 25, 2001, SFSC filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the District of Connecticut.

109. By virtue of the Order Conferring Standing, the Committee as Estate Representative has commenced this action and has incurred substantial sums in the prosecution of this action and other contested matters within the bankruptcy proceeding. Pardee has asserted an indemnity claim against the estate.

**H. <u>The Representations in the Stock Purchase Agreement</u>**

110. Under the Stock Purchase Agreement, SFSC agreed, subject to the terms set forth in the agreement, both to indemnify Pardee and SSTAI's other shareholders from claims that