# Exhibit L

FILE

COPY

ROMAN M. SILBERFELD (SB #62783)
BERNICE CONN (SB #161594)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2049 Century Park East, Suite 3700
Los Angeles, California 90067
Tel:(310) 552-0130 Fax:(310) 229-5800

MARC M. SELTZER (SB #54534)
SUSMAN GODFREY L.L.P.
1880 Century Park East, Suite 950
Los Angeles, California 90067-1606
Tel:(310) 789-3100 Fax:(310) 789-3150

DEAN A. ZIEHL (SB #84529)
PACHULSKI, STANG, ZIEHL, YOUNG & JONES
10100 Santa Monica Boulevard, Suite 1100
Los Angeles, California 90067
Tel:(310) 277-6910 Fax:(310) 201-0760

THOMAS G. FOLEY, JR. (SB #065812)
FOLEY & BEZEK, LLP
15 West Carrillo Street
Santa Barbara, California 93101
Tel:(805) 962-9495 Fax:(805) 962-0722

Attorneys for Plaintiffs

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| TAKAKO HAWKINS, CLIVE HAWKINS, and THE ESTATE OF THELMA JEAN FENTER<br><br>Plaintiffs,<br><br>v.<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MERRILL LYNCH & CO., INC.; MERRILL LYNCH LIFE AGENCY INC.; BEAR STEARNS & CO., INC.; SETTLEMENT SERVICES, INC.; JONATHAN H. PARDEE; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. BC 279691<br><br>(Assigned for All Purposes to the Hon. Peter D. Lichtman, Dept. 322)<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>**1. Intentional Interference with Contract**<br>**2. Negligent Interference with Contract**<br>**3. Breach of Contract**<br>**4. Breach of the Implied Covenant of Good Faith and Fair Dealing**<br>**5. Breach of the Implied Covenant of Good Faith and Fair Dealing**<br>**6. Breach of Fiduciary Duty**<br>**7. Breach of Fiduciary Duty**<br>**8. Fraud**<br>**9. Constructive Fraud**<br>**10. Conversion**<br>**11. Negligence**<br>**12. Unjust Enrichment** |

Action Filed: August 14, 2002
Trial Date: May 11, 2005

Plaintiffs, by their attorneys, allege as follows:

## I. PARTIES AND RELATED PARTIES

1. Plaintiff Takako Hawkins aka Takako Tsuru is an individual residing in Tokyo, Japan. In 1982, Ms. Hawkins entered into a structured settlement agreement with Merrill Lynch IBAR, Inc., among other parties.

2. Plaintiff Clive Hawkins aka Clive Tsuru is an individual residing in Los Angeles, California. In 1982, Mr. Hawkins, then a minor, by and through his mother and next friend, Takako Hawkins, entered into a structured settlement agreement with Merrill Lynch IBAR, Inc., among other parties.

3. Plaintiff Estate of Thelma Jean Fenter is the estate of Thelma Fenter. In 1982, Ms. Fenter, then a minor, by and through her guardian ad litem, entered into a structured settlement agreement with Merrill Lynch IBAR, Inc., among other parties. The agreement, called for payments to be made to Ms. Fenter's estate in the event of her death.

4. Defendant Merrill Lynch & Co., Inc. ("Merrill Lynch") is a Delaware corporation that maintains offices and transacts business in Los Angeles County, California and elsewhere.

5. Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S") is a Delaware corporation and a wholly owned subsidiary of Merrill Lynch. MLPF&S has offices and conducts business in Los Angeles County and elsewhere.

6. Defendant Merrill Lynch Life Agency, Inc. ("MLLA") is a Delaware corporation and a wholly owned subsidiary of Defendant Merrill Lynch Pierce Fenner & Smith, Inc. which is a wholly owned subsidiary of Merrill Lynch. MLLA was the sole owner of Merrill Lynch IBAR, Inc. in 1982 when that entity became a subsidiary of Merrill Lynch and marketed, originated, and became a party to plaintiffs' structured settlements.

7. Merrill Lynch, MLPF&S and MLLA are sometimes collectively referred to herein as "the Merrill Lynch Defendants".

8. Defendant Bear Stearns & Co., Inc. ("Bear Stearns") is a Delaware corporation that maintains offices and conducts business in Los Angeles County, California and elsewhere. Bear Stearns settled the claims alleged against it in this lawsuit and pursuant to a Judgment of Dismissal is no longer a party to this action.

9. Defendant Settlement Services, Inc., ("SSI") is a California corporation engaged in the business of originating and administering structured settlements in Los Angeles County, California, and elsewhere. SSI settled the claims alleged against it in this lawsuit and pursuant to a Judgment of Dismissal is no longer a party to this action.

10. Defendant Jonathan H. Pardee ("Pardee") is an individual residing in Newport, Rhode Island.

11. The true names and capacities, whether individual, corporate, associate or otherwise of defendants Does 1 - 100, inclusive, are presently unknown to plaintiffs and plaintiffs therefore sue said defendants by such fictitious names. When the true names and capacities of Doe defendants are ascertained, plaintiffs will amend this complaint to insert their names and capacities accordingly. Plaintiffs are informed and believe, and thereon allege, that each of the defendants designated as a Doe is responsible in some manner and is liable for the events and happenings referred to herein, and caused injury and damages to plaintiffs, as hereinafter alleged.

12. In committing the wrongful acts alleged herein, the defendants have at various times pursued, or joined in the pursuit of, a common course of conduct and acted in concert with and conspired with one another, in furtherance of their common plan, scheme or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the defendants further aided and abetted and knowingly assisted each other in breach of their respective duties as herein alleged.

13. Each of the defendants herein conspired to commit, aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking the actions, as particularized herein, to conspire to commit and substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary

wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of its overall contribution to, and furtherance of, the wrongdoing. The defendants' acts of aiding and abetting include, *inter alia*, the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein, except those relating to the reaching of agreements or understandings sufficient to categorize their conduct as conspiratorial.

## II. JURISDICTION AND VENUE

14. The amount in controversy is in excess of the jurisdictional limitations and is otherwise subject to the jurisdiction of this Court.

15. Venue is appropriate in this Court pursuant to Code of Civil Procedure Sections 395(a) and 395.5. Certain of the defendants reside in the County of Los Angeles, all of the defendants have transacted business in this district, and defendants' liability to plaintiffs arises from defendants' wrongful conduct taking place in substantial part in this County. Further, both of the underlying settlements at issue herein were entered into in Los Angeles County, California, and one was approved by this Court. Accordingly, venue is proper in this Court.

## IV. FACTUAL ALLEGATIONS

### A. Nature and Formation of Structured Settlements

16. A structured settlement is one of a number of different types of arrangements that can be used to facilitate settlement of lawsuits, most notably tort actions for catastrophic personal injuries, wrongful death due to negligence, products liability and medical malpractice. In years past, such tort cases were typically settled by way of a single lump-sum payment made at the time of settlement. A structured settlement, by contrast, provides a means for the injured party to receive periodic settlement payments over time, a lump-sum payment at some time in the future, or some combination thereof. This is especially useful in cases of profoundly injured persons where the injured party will require long-term, often lifetime, medical services and income; and in cases brought by minors whose financial needs will continue for some time after settlement.

17. Under a typical structured settlement agreement, the settling defendant(s) contractually agree to pay the plaintiff: (a) an up-front cash payment (which usually goes to pay

the plaintiff's attorneys fees, court costs and outstanding medical expenses); (b) future periodic payments, which may be made monthly, semi-annually or in some other combination; and (c) a final lump-sum payment upon expiration of the periodic payments. The plaintiff and the settling defendant(s) execute a settlement agreement, whereby the defendant and/or its insurer agree to make the future payments to the plaintiff in return for a release by the plaintiff of all claims and causes of action against the defendant and its insurer.

18. In addition to the settlement agreement, the defendant and/or the insurer typically assign to a third party settlement company the obligation to make the payments due under the settlement agreement. The plaintiff contractually agrees to permit the defendant and/or its insurer to assign their payment obligations to the settlement company, and usually releases the defendant and/or the insurer. The plaintiff also agrees to have the settling defendant(s) deliver the settlement funds directly to the settlement company who uses the funds to purchase the assets necessary to fund the long-term structured settlement.

19. The settlement company typically then purchases secure, guaranteed investment assets in an amount sufficient to ensure funding for the future settlement payments. Structured settlements are intentionally structured to comply with governing tax laws, among them, Internal Revenue Code § 130, in order to provide tax benefits to settling plaintiffs. The assets used to fund structured settlements are required by law to be U. S. Treasury Bonds or annuities. The payment stream from the funding assets typically corresponds with the amount of the agreed-upon future payments to be paid to the plaintiffs, and that secure investment generates sufficient income to meet the required structured settlement payments as they become due.

**B. Merrill Lynch's Structured Settlement Subsidiary**

20. In or about 1969, Robert Schultz and Ray Schultz (collectively the "Schultzes") formed a corporation called IBAR ("the Settlement Company"), which engaged in the business of arranging and administering structured settlements funded by either annuities or U.S. Treasury Bonds held in trust. The structured settlements arranged by IBAR and its successors were intentionally structured to comply with Internal Revenue Code § 130 in order to provide tax benefits to settling plaintiffs. In order to insure the safety of settlements funded with U.S.

Treasury Bonds, IBAR took the additional step of placing the bonds into trusts. The trustees of such trusts were major financial institutions. IBAR then issued irrevocable payment instructions to the trustees to make all future payments to the settling plaintiffs.

21. On or about March 31, 1982, Defendant MLLA acquired the stock of IBAR from the Schultzes, who remained as employees of the corporation. The name of the company was then changed to Merrill Lynch IBAR, Inc. In February 1984, after disagreements between the Schultzes and Merrill Lynch arose, the Schultzes left the company. Shortly thereafter, the name of the Settlement Company was changed to Merrill Lynch Settlement Services, Inc.

22. Merrill Lynch IBAR, Inc. and Merrill Lynch Settlement Services, Inc. undertook to perform all duties and obligations that were owed to plaintiffs pursuant to the preexisting Settlement Agreements, Assignment Agreements and related documents, and established and administered new structured settlements for other settling tort plaintiffs, generally utilizing the forms of documents described hereinabove.

23. In marketing to the plaintiffs and to the general public the settlement services offered by Merrill Lynch IBAR, Inc. and Merrill Lynch Settlement Services, Inc. (collectively referred to herein as the "Settlement Company"), Defendant Merrill Lynch authorized, consented to and/or ratified the use of its name, its logo, and its trademarks by the Settlement Company. In addition to the name of the Settlement Company, the correspondence, checks and brokerage trade receipts used and issued by the Settlement Company in providing its structured settlement services to plaintiffs displayed the name "Merrill Lynch" next to depictions of the globally recognized Merrill Lynch bull logo. The Settlement Company also expressly represented itself to the public as a wholly-owned subsidiary of Merrill Lynch & Co. Inc. and the checks used by the Settlement Company in connection with structured settlements were issued from a Merrill Lynch Cash Management Account(s).

24. One or more of the Merrill Lynch Defendants also authorized, consented to and/or ratified advertisements regarding the Settlement Company and its structured settlement services to be published and circulated in California and promotional materials to be distributed to plaintiffs and to plaintiffs' counsel. The promotional brochures authorized, consented to and/or

ratified by one or more of the Merrill Lynch Defendants for distribution to tort victims such as plaintiffs, and to their counsel, were designed to induce them to enter into structured settlements with the Settlement Company based on the reputation and financial strength of Merrill Lynch. The Merrill Lynch defendants also expressly authorized, consented to and/or ratified the use of the Merrill Lynch name, strength and reputation by the Settlement Company in marketing, advertising and sales activities. For example, one such brochure stated that the "respected name of Merrill Lynch inspires the confidence of plaintiffs and their counsel." The brochures also touted that plaintiffs and their counsel were more likely to agree to utilize the Settlement Company for structured settlements because it was "an affiliate of Merrill Lynch, a name they know and trust."

25. In marketing its structured settlement services, the Settlement Company represented that Merrill Lynch & Co., Inc. maintained appropriate control over the operating activities of all of its subsidiaries and that it was subject to regular management review to assure its compliance with Merrill Lynch's high ethical and operating standards.

26. The foregoing advertising and promotional materials authorized and distributed by the Merrill Lynch Defendants were designed to assure settling plaintiffs and their counsel that if they entered into structured settlements which called for plaintiffs to agree to have their settlement funds delivered to the Settlement Company and to agree to the assignment of the settling defendant's settlement payment obligations to the Settlement Company, the safety of the financial instruments used to fund their long-term structured settlements, and the future payment of such settlements would be backed by the strength and reputation of the Merrill Lynch Defendants and the Merrill Lynch Defendants would be responsible for making the structured settlement payments throughout the term of the settlement.

27. By engaging in the aforesaid advertising, marketing and business activities, and by making the aforesaid representations which were authorized, consented to and/or ratified by the Merrill Lynch Defendants, the Settlement Company held itself out to be, and was, the actual and ostensible agent of the Merrill Lynch Defendants at all relevant times.

//

**B. The Tort Actions and Settlements Underlying This Action**

28. On or about February 10, 1981, a Complaint was filed in this Court on behalf of Thelma Fenter against the County of Los Angeles et al., Case No. SCC 3826, alleging certain negligent acts or omissions resulting in injury to Ms. Fenter.

29. Subsequently, a guardian ad litem was appointed for Ms. Fenter, and a settlement was reached with the County of Los Angeles memorialized in a Settlement Agreement between plaintiffs and the settling defendants wherein Ms. Fenter agreed to release all of her claims against the County in return for the payment of a specified sum of money. Pursuant to the settlement, Ms. Fenter's claims against the county were assigned to Merrill Lynch IBAR, Inc., and pursuant to a separate written Assignment Agreement to which Ms. Fenter and Merrill Lynch IBAR, Inc. were parties, Merrill Lynch IBAR, Inc. assumed the obligation to make settlement payments over time to Ms. Fenter, or, in the event of her death, to her estate. Some of the structured settlement payments owed to Ms. Fenter were funded with United States Treasury Bonds purchased at the time of settlement and placed into trust for the sole purpose of providing principal and income sufficient to make these payments to Ms. Fenter; the settlement payments that were backed by a Treasury Bond Trust were the subject of separate litigation before this Court.

30. In addition, Ms. Fenter's structured settlement called for another, deferred payment stream of $3,750 payable on each and every May 15th and November 15th beginning on May 15, 2006 and ending with the payment due November 15, 2010, on which date the additional sum of $60,000 was to be paid. This deferred payment stream was not funded with either annuities or U.S. Treasury Bonds, but by the purchase by Merrill Lynch IBAR, Inc. of a proprietary investment product of Merrill Lynch and/or MLPF&S called Treasury Investment Growth Receipts ("TIGRs"). TIGRs were/are a trademarked investment product of Merrill Lynch and/or MLPF&S evidencing ownership of future interest and principal payments of United States Treasury Bonds and were offered for sale to the public. TIGRs were/are a zero-coupon or stripped treasury bond derivative sold at a discount and redeemed for face value at maturity. According to the terms of the Settlement Agreement, the TIGRs were to "serve as a medium for

payment of" these structured settlement payments "and to assure the payment of such funds" to Ms. Fenter or her estate.

31. Unlike the U.S. Treasury Bonds, however, the TIGRs were not placed in trust. Plaintiffs are informed and believe and thereon allege that the TIGRs purchased for Ms. Fenter were instead held in brokerage and/or cash management and/or other account(s) operated by one ore more of the Merrill Lynch Defendants and/or by agents appointed by one or more of the Merrill Lynch Defendants.

32. On or about August 21, 1979, Takako Hawkins, individually and as mother and next friend of Clive Hawkins, an infant, filed a Complaint in the United States District Court for the Central District of California, Case No. CV 79-03198 MML (GX), MDL Docket No. 391, alleging certain negligent acts or omissions by American Airlines and other defendants and asserting claims for personal injury, wrongful death, and property damage arising out of the crash of American Airlines Flight 191 near O'Hare International Airport, Chicago, Illinois, on May 25, 1979.

33. Thereafter, a settlement was reached memorialized by a written Settlement Agreement between plaintiffs and the settling defendants by which the settling defendants agreed to pay plaintiffs a specified sum of money in return for which plaintiffs agreed to release all of their claims against the settling defendants. Pursuant to the settlement, in a separate written Assignment Agreement to which plaintiffs and Merrill Lynch IBAR, Inc. were parties, the settling defendants and their insurers assigned to Merrill Lynch IBAR, Inc. their obligation to make structured settlement payments to the Hawkins and Merrill Lynch IBAR, Inc. undertook to make the settlement payments. Pursuant to the settlement, Takako Hawkins was to be paid increasing monthly payments beginning November 1, 1982 and ending October 1, 2002 and Clive Hawkins was to be paid increasing monthly payments beginning November 1, 1982 and ending October 1, 2002. In order to fund these payments, the settling defendants and their insurers transferred to Merrill Lynch IBAR, Inc. $1,014,000.00 to be used to purchase single-premium annuity contracts yielding monthly payments. These payments are not at issue in this case.

34. In addition, the settlement called for Takako Hawkins to be paid the lump sum of $2,466,232.50 on November 15, 2002 and for Clive Hawkins to be paid the lump sum of $1,231,267.50 on November 15, 2002. In order to fund these final lump-sum payments, the settling defendants and their insurers transferred to Merrill Lynch IBAR, Inc. an additional $370,040 which Merrill Lynch IBAR, Inc. used to purchase TIGRs maturing November 15, 2002 and having a face value of $3,697,500.00. According to the terms of the settlement agreement, the TIGRs were to "serve as a medium for payment of" these structured settlement payments, "and to assure the payment of such funds" to Takako and Clive Hawkins.

35. Unlike the U.S. Treasury Bonds, however, the TIGRs were not placed in trust. Plaintiffs are informed and believe and thereon allege that the TIGRs purchased for Takako and Clive Hawkins were instead held in brokerage and/or cash management and/or other accounts owned and operated by one ore more of the Merrill Lynch Defendants and/or by an agent appointed by one or more of the Merrill Lynch Defendants.

36. Plaintiffs are informed and believe, and based thereon allege, that funds were delivered by the settling defendants on behalf of plaintiffs to the Settlement Company in accordance with the provisions of each of the governing Settlement Agreements. Plaintiffs are informed and believe, and based thereon allege, that the defendants purchased funding assets, including annuities, Treasury Bonds, and/or TIGRs sufficient to meet the payment obligations assumed by the Settlement Company, and that such assets were in fact purchased and to be held for the benefit of the plaintiffs.

37. Plaintiffs are further informed and believe, and thereon allege, that the TIGRs purchased for the benefit of the plaintiffs were not placed into trust, as were the U.S. Treasury Bonds, based on the express and/or implied representations of the Settlement Company and/or the Merrill Lynch Defendants that because the TIGRs were a proprietary investment product of one or more of the Merrill Lynch Defendants, they would be held inviolate by one or all of the Merrill Lynch Defendants and/or their appointed agents in accounts held and/or managed by one or more of the Merrill Lynch Defendants and/or their appointed agents, that the product was backed by the financial strength and reputation of the Merrill Lynch Defendants and that

therefore, the integrity and safety of the TIGRs and plaintiffs' future structured settlement payments was guaranteed.

38. Plaintiffs agreed to, and entered into, structured settlements because they understood and trusted that the payments made by the settling defendants to the Settlement Company would be used to purchase funding assets whose income and principal would be used only to pay the plaintiffs. Plaintiffs further agreed to, and entered into, structured settlements because they understood and intended the income to be derived from such structured settlements to be tax-free. Plaintiffs agreed to and entered into structured settlements in reliance upon the express provisions of the governing settlement documents and upon the representations, financial stability and reputation of the Merrill Lynch Defendants to secure plaintiffs' future long-term settlement payments.

39. The Settlement Company and the Merrill Lynch Defendants knew and understood the purpose, nature and terms of the structured settlements, including that all of the funding assets, including the TIGRs, were purchased with settlement funds delivered and intended for plaintiffs' benefit and were to be held for the sole purpose of ensuring settlement payments to the plaintiffs, some of whom were minors at the time of settlement; that the funding assets were to be held for the protection and benefit of such persons; that the income from the funding assets was intended to be tax-free and therefore, that the funding assets needed to comply with governing tax law; and that the reputation and financial stability of the Merrill Lynch Defendants, as well as their commitment and undertaking to secure those future settlement payments was essential to plaintiffs' willingness to enter into these structured settlements rather than accept a lump-sum payment at the time of settlement.

40. By virtue of the above knowledge, facts, representations, advertising, marketing, sales and business activities, the Merrill Lynch Defendants, and each of them, through their ostensible and actual agent, the Settlement Company, entered into a contractual relationship with the plaintiffs to make the settlement payments pursuant to the Assignment Contract and undertook a non-delegable duty to plaintiffs to make, and to insure, the payment of their structured settlements.

41. Plaintiffs are informed and believe and thereon allege that defendants Merrill Lynch and/or MLPF& S and/or MLLA, either directly and/or through their ostensible and actual agent, Merrill Lynch IBAR Inc. also acted as an agent and/or broker for plaintiffs by marketing to plaintiffs a proprietary investment product offered to the public by Merrill Lynch and/or MLPF&S as a funding vehicle for their structured settlements, by convincing plaintiffs to use TIGRs to fund their structured settlements, by accepting delivery of, and using, settlement funds intended for plaintiffs' benefit for the purpose of purchasing TIGRs, and by holding the TIGRS intended for plaintiffs' benefit in accounts they owned and/or operated or which were owned and/or operated by their agents and by accepting commissions and other monetary benefits from such acts.

**C. Merrill Lynch's Sale of its Subsidiary to Jonathan Pardee**

42. On or about April 28, 1988, Merrill Lynch transferred 80% of its stock in the Settlement Company to Laugharn Associates, Inc., whose principals were C. John Laugharn and his father, Hubert F. Laugharn. In or about June, 1988, the Settlement Company changed its name to ML Settlement Services, Inc. On or about October 18, 1991, Merrill Lynch sold its remaining interest in ML Settlement Services, Inc. to C. John Laugharn and Pardee. In or about early 1992, Laugharn transferred all of his interest in ML Settlement Services, Inc. to Pardee who thereafter became president and sole shareholder and eventually changed the name of the Settlement Company to Settlement Services Treasury Assignments, Inc. ("SSTAI"). As ML Settlement Services, Inc. and SSTAI, the company continued to owe all of the duties and obligations that were owed to plaintiffs pursuant to the preexisting Settlement Agreements and related documents.

43. One or more of the Merrill Lynch Defendants delivered to Pardee, and Pardee acquired physical possession of, the originals and/or copies of the documents relating to the structured settlements at issue. Pardee knew or should have known and understood the purpose, nature and terms of these structured settlements, including, *inter alia*, that the TIGRs were being held for the sole purpose of ensuring settlement payments to the plaintiffs; that the commitment of the company and the Merrill Lynch Defendants to protect and preserve the TIGRs for the

benefit of the plaintiffs was a critical component of plaintiffs' willingness to enter into structured settlements providing for deferred payments rather than accept a lump-sum payment at the time of settlement; and that plaintiffs were the sole intended beneficiaries of the TIGRs.

44. Plaintiffs are informed and believe and thereon allege that one or more of the Merrill Lynch Defendants and/or their appointed agents retained custody of the TIGRs even after the Settlement Company was sold to Pardee.

45. Plaintiffs are informed and believe and thereon allege that Pardee, after acquiring control of the company, placed an order or orders to sell the TIGRs that were being held by one or more of the Merrill Lynch Defendants and/or their agents for the benefit of the plaintiffs and that despite the Merrill Lynch Defendants' actual and constructive knowledge that the TIGRs were purchased and held pursuant to settlements and court orders for the sole purpose of funding structured settlement payments to the plaintiffs, the Merrill Lynch Defendants and/or their agents complied with Pardee's order, liquidated the TIGRs, and allowed Pardee unrestricted access to the proceeds therefrom. Plaintiffs are informed and believe and thereon allege that one or more of the Merrill Lynch defendants received some form of brokerage fee or commission in return by executing the sell order.

46. Neither Pardee nor the Merrill Lynch Defendants nor any of their agents notified the plaintiffs of the sale of the TIGRs that were purchased and were to be held for their benefit pursuant to the terms of their structured settlements and applicable court orders.

47. Plaintiffs did not consent to the sale of the TIGRs or the distribution of the proceeds therefrom.

48. No court approval was sought or obtained for the liquidation of the TIGRs held for the benefit of the plaintiffs, although Clive Hawkins still was a minor at that time.

49. Plaintiffs are informed and believe that Pardee used the proceeds from the sale of the TIGRs for loans to Pardee affiliates and related entities or in other financial transactions intended to benefit Pardee, SSTAI, or SSI.

50. The Merrill Lynch Defendants and their agents knew or should have known that the sale of the TIGRs jeopardized the safety and security of the income stream to be generated

therefrom which was intended to pay the plaintiffs pursuant to their court-approved settlement agreements. They further knew or should have known that any alienation, sale or use of the TIGRs for any other purpose would violate their fiduciary duty to plaintiffs and the contractual obligation of the Settlement Company and the Merrill Lynch Defendants to the plaintiffs and jeopardize the settlement payments due to be made to plaintiffs. Despite this knowledge none of the Merrill Lynch Defendants nor their agents did anything to stop the sale of the TIGRs or to inform the plaintiffs thereof.

51. On or about November 15, 2000, SSTAI defaulted on its obligations to make payments to structured settlement payees including plaintiff Thelma Fenter. In December of 2000, Stanwich sent plaintiffs a letter, signed by Bradley, Sr., which disclosed for the first time that the U.S. Treasury Bonds held in trust for the benefit of structured settlement payees had been lost. The letter did not disclose that the TIGRs purchased for the benefit of plaintiffs had been liquidated in 1993 and that Pardee and/or the company had obtained access to and utilized the funds derived therefrom.

52. On June 25, 2001, SSTAI dba Stanwich filed a voluntary chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Connecticut, a stay is in effect, and Stanwich cannot be sued in this action.

**FIRST CAUSE OF ACTION**

**(Against Merrill Lynch, Pierce, Fenner & Smith Incorporated;**
**Merrill Lynch & Co., Inc.; Merrill Lynch Life Agency, Inc.;**
**Pardee for Intentional Interference with Contract)**

53. Plaintiffs incorporate by reference and reallege paragraphs 1 through 52 herein, inclusive, as if fully set forth herein.

54. The Merrill Lynch Defendants knowingly and intentionally interfered with plaintiffs' Settlement Agreement by complying with Pardee's orders to liquidate the TIGRs and by giving him access to the proceeds of the TIGRs. The Merrill Lynch Defendants also knowingly and intentionally interfered with plaintiffs' Settlement Agreement by failing to take any steps to adequately safeguard the TIGRs, which were long-term investments, from

liquidation, such as by putting the TIGRs into trust or by holding them in specially designated accounts or in such other manner as would have prevented their liquidation. Such actions and omissions by the Merrill Lynch Defendants resulted in the loss of the funding assets that were purchased and intended for the sole purpose of ensuring that structured settlement payments would be made to plaintiffs in accordance with the terms of their Settlement Agreement.

55. Pardee knowingly, intentionally, and unlawfully interfered with the express contractual rights of plaintiffs under their Settlement Agreements by selling the TIGRs intended for plaintiffs' benefit and using the proceeds derived therefrom for his own benefit. Pardee's knowing and intentional conduct in selling the TIGRs and in using the proceeds therefrom for purposes other than making structured settlement payments to plaintiffs, resulted in the loss of the funding assets that were purchased and intended for the sole purpose of ensuring such payments to plaintiffs, as a further consequence of which the plaintiffs will not receive the payments to which they are entitled.

56. As a result of the tortious interference of the Merrill Lynch Defendants and Pardee with plaintiffs' Settlement Agreements, plaintiffs have been denied the settlement payments owed to them, and to which they were entitled in return for the release of all of their legal claims against the settling defendants. Plaintiffs have been injured and sustained millions of dollars of damage as a direct and proximate result of Pardee's and the Merrill Lynch Defendants' tortious interference with their settlement agreements, which agreements are in default.

57. The Merrill Lynch Defendants and Pardee acted with fraud, oppression and malice, and with reckless and callous indifference to the rights of plaintiffs, and, as a result, plaintiffs are entitled to punitive damages in an amount to be proven at trial.

**<u>SECOND CAUSE OF ACTION</u>**

**(Against Merrill Lynch & Co, Inc., MLLA, and MLPF&S, Inc. for Negligent Interference with Contract)**

58. Plaintiffs incorporate by reference and reallege paragraphs 1 through 52, inclusive, as if fully set forth herein.

59. By virtue of the aforesaid facts, the Merrill Lynch Defendants undertook and

owed plaintiffs a duty of reasonable care in their conduct and operations with respect to the plaintiffs' structured settlements, the assets used to fund them, and the contractual rights of the plaintiffs thereunder. The Merrill Lynch Defendants also owed plaintiffs a duty to disclose to them in 1993 that Pardee had liquidated the TIGRs and taken the sales proceeds and that the TIGRs would not be available to fund the future settlement payments owed to Ms. Fenter as of 2006 and to the Hawkins in 2002.

60. The Merrill Lynch Defendants breached this duty by complying with Pardee's request unlawfully to liquidate the TIGRs without taking any reasonable steps to protect and maintain these funding assets upon which plaintiffs' future payments depended or to inform the plaintiffs that their contractual rights under the Settlement Agreements were in jeopardy.

61. As a direct and proximate cause of this breach, the TIGRs that were earmarked for plaintiffs were sold and the proceeds transferred, dissipated, or otherwise lost; and plaintiffs therefore have not and will not receive the periodic payments backed by the now-lost TIGRs as and when due. Plaintiffs have been damaged in an amount that is not precisely known at this time, but which is in excess of the jurisdictional minimum of this Court and will be proven at trial.

**THIRD CAUSE OF ACTION**

**(Against Merrill Lynch, Pierce, Fenner & Smith, Incorporated; Merrill Lynch & Co., Inc.; Merrill Lynch Life Agency, Inc. and Pardee for Breach of Contract)**

62. Plaintiffs refer to, reallege, and incorporate by reference Paragraph 1 through 52, inclusive, of this Complaint as though fully set forth herein.

63. The Merrill Lynch Defendants breached the Assignment Contracts entered into with plaintiffs by permitting the sale of the TIGRs prior to maturity, by permitting the proceeds of the sale to be paid to persons other than plaintiffs, and by failing to make the settlement

payments owed to the Hawkins.[1]

64. To the extent the TIGRs were not held in plaintiffs' name, but were purchased in the name of the Settlement Company, plaintiffs were third party beneficiaries of the TIGRs and have been damaged in the amount of money payable at maturity for each of the TIGRs purchased with their settlement proceeds.

65. As successor-in-interest to the Settlement Company, Pardee also breached the Assignment Contracts entered into with plaintiffs by selling the TIGRS prior to maturity, by using the sale proceeds for his own benefit, and by failing to make the settlement payments owed to Hawkins.

66. To the extent the TIGRS were not held in plaintiffs' name, but were purchased in the name of the Settlement Company, plaintiffs were third party beneficiaries of the TIGRS and have been damaged in the amount of money payable at maturity for each of the TIGRS purchased with their settlement proceeds.

**FOURTH CAUSE OF ACTION**

**(For Breach of the Implied Covenant of Good Faith and Fair Dealing**

**Against All Defendants)**

67. Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 52 herein, inclusive, as if fully set forth herein.

68. The Assignment Agreements carried an implied contractual obligation that the Merrill Lynch Defendants and Pardee would not do anything to deprive plaintiffs of the benefits of their settlement or render performance thereunder impossible, or to deprive them of the receipt of their settlement payments, including without limitation permitting the sale of, and/or selling, the TIGRS prior to the called-for maturity dates and allowing the sale proceeds to be used for purposes other than making payments to plaintiffs.

---

[1] In fact, MLLA did make the settlement payments owed to the Hawkins on November 15, 2002, however, MLLA thereafter filed suit in Tokyo, Japan against the Hawkins for the return of the funds. Pursuant to a settlement agreement reached in the Japanese lawsuit, some part of the funds remain in an escrow account in New York and the Hawkins are not permitted to argue that such payment or any of MLLA's or Merrill Lynch's actions in this regard support any of the claims in this action.

69. By failing to place the TIGRs in trust, by selling the TIGRs prior to the maturity dates called for by plaintiffs' settlements, by permitting Pardee access to the TIGRs proceeds, by failing to advise and concealing these facts from the plaintiffs, and by failing to pay the Hawkins their settlement funds, and by depriving Ms. Fenter of her future settlement payments, the Merrill Lynch Defendants have breached the implied covenant of good faith and fair dealing implied in their contracts with plaintiffs. By selling the TIGRs and by appropriating the proceeds for his own use, by failing to advise, and concealing these facts from, the plaintiffs, and by depriving plaintiffs of the investment purchased with their settlement proceeds, Pardee breached the implied covenant of good faith and fair dealing implied in the contract with plaintiffs.

70. As a direct and proximate cause of the breach of the implied covenant of good faith and fair dealing by the Merrill Lynch Defendants and Pardee, the TIGRs that were earmarked for plaintiffs' structured settlement payments have been sold, transferred or otherwise lost; the Hawkins did not receive their settlement payments; and Ms. Fenter will not receive her settlement payment. Plaintiffs have been damaged in an amount that is not precisely known at this time, but which is at least the amount at full maturity of the TIGRs which is in excess of the jurisdictional minimum of this Court.

71. In breaching the implied covenant of good faith and fair dealing, the Merrill Lynch Defendants and Pardee were guilty of oppression, fraud and malice, have engaged in conduct by which they intended to cause injury to plaintiffs and have engaged in despicable conduct with a willful and conscious disregard of plaintiffs' rights and the consequences of their actions. Accordingly, plaintiffs are entitled to recover punitive damages for the sake of example and by way of deterring such conduct in the future.

**FIFTH CAUSE OF ACTION**

**(For Breach of the Implied Covenant of Good Faith and Fair Dealing**

**Against The Merrill Lynch Defendants)**

72. Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 52 herein, inclusive, as if fully set forth herein.

73. The Merrill Lynch Defendants knew, or should have known, that one of the

purposes of the long-term structuring of plaintiffs' settlements was to permit the plaintiffs to receive tax-free interest income generated by investments which qualified for such tax free treatment under governing tax law. The Merrill Lynch Defendants knew, or should have known, that the only funding vehicles which qualified the income from a structured settlement for tax-free treatment were U.S. Treasury Bonds and annuities.

74. The Merrill Lynch Defendants knew, or should have known, that by purchasing TIGRs with plaintiffs' settlement proceeds, they were jeopardizing the tax free status of the plaintiffs' structured settlements since TIGRs were not approved funding vehicles under governing tax law. The Merrill Lynch Defendants knew, or should have known, that because the TIGRs were neither U.S. Treasury Bonds nor annuities, and were not placed in trust, they should not have been purchased or held in the name of the Settlement Company, if in fact, they were.

75. The Assignment Agreements carried an implied contractual obligation that the Merrill Lynch Defendants and Pardee would not do anything to deprive plaintiffs of the benefits of their settlement or render performance thereunder impossible, or to deprive them of the receipt of their settlement payments and of the tax benefits of their settlements, including without limitation purchasing funding assets with plaintiffs' settlement funds which did not comply with governing tax law; purchasing and holding such assets in the name of the Settlement Company; permitting the sale of, and/or selling, the TIGRs prior to the called-for maturity dates and allowing the sale proceeds to be used for purposes other than making payments to plaintiffs.

76. By marketing TIGRs to plaintiffs as a means of structuring their settlements, by purchasing TIGRS with plaintiffs' settlements funds, by placing the TIGRs in the name of the Settlement Company, if in fact that occurred, and thereby depriving plaintiffs of the tax-benefits which they should have received as a result of structuring their settlement, the Merrill Lynch Defendants have breached the implied covenant of good faith and fair dealing implied in their contracts with plaintiffs.

77. As a direct and proximate cause of the breach of the implied covenant of good faith and fair dealing by the Merrill Lynch Defendants, the TIGRs that were earmarked for plaintiffs' structured settlement payments have been sold, transferred or otherwise lost; the

Hawkins did not receive their settlement payments and Ms. Fenter will not receive her settlement payment and the tax-free nature of the income which plaintiffs were to have received from the TIGRs is jeopardized. Plaintiffs have been damaged in an amount that is not precisely known at this time, but which is at least the amount at full maturity of the TIGRs and any taxes which are levied as a result of the improper structuring of plaintiffs' settlements, which amount is in excess of the jurisdictional minimum of this Court.

78. In breaching the implied covenant of good faith and fair dealing, the Merrill Lynch Defendants were guilty of oppression, fraud and malice, have engaged in conduct by which they intended to cause injury to plaintiffs and have engaged in despicable conduct with a willful and conscious disregard of plaintiffs' rights and the consequences of their actions. Accordingly, plaintiffs are entitled to recover punitive damages for the sake of example and by way of deterring such conduct in the future.

**SIXTH CAUSE OF ACTION**

**(Against the Merrill Lynch Defendants for Breach of Fiduciary Duty)**

79. Plaintiffs incorporate by reference and reallege paragraphs 1 through 78, herein, inclusive, as if fully set forth herein.

80. A confidential relationship existed between plaintiffs and the Merrill Lynch Defendants because plaintiffs reposed trust and confidence in the honesty, financial strength, reputation, integrity and fidelity of the Merrill Lynch Defendants; the Merrill Lynch Defendants took receipt of the settlement funds paid pursuant to plaintiffs' Settlement Agreements; agreed to make all of the payments to which plaintiffs were entitled under the terms of their settlements; took control of and held the TIGRs which were purchased with plaintiffs' settlement funds and which were intended to fund plaintiffs' structured settlements; marketed and sold to plaintiffs their own proprietary financial product which they agreed to hold for plaintiffs' benefit and therefore did not place into trust as was done with other settlement funding vehicles; by representing to plaintiffs that the TIGRs were qualified funding assets under governing tax law and by promising to plaintiffs that the TIGRs would be safe and held exclusively for their benefit.

81. A confidential relationship also existed by virtue of the fact that plaintiffs had no control over, and were provided with no information about the sale of, the TIGRs which had been purchased with their settlement funds and/or placed in the name of the Settlement Company, or of the transfer of control of the TIGRs to Pardee, or of Pardee's sale of the TIGRs, but the Merrill Lynch Defendants were in possession of such information. A confidential relationship also existed by virtue of the Merrill Lynch Defendants' brokerage activities, engaged in on behalf of the plaintiffs, i.e., the marketing, sale and purchase of TIGRs, Merrill Lynch's proprietary investments.

82. By marketing and selling their own investment products to the plaintiffs; by failing to place the TIGRs in trust, by selling the TIGRs prior to the maturity dates called for by plaintiffs' settlements, by permitting Pardee access to the TIGRS proceeds, by failing to advise, and concealing these facts from the plaintiffs; by failing to pay the Hawkins their settlement funds, by depriving Ms. Fenter of her future settlement payments; and by jeopardizing the tax-free status of plaintiffs' structured settlements with improper funding assets; the Merrill Lynch Defendants have breached their fiduciary duty to plaintiffs.

83. As a direct and proximate cause of these violations of their fiduciary duty by the Merrill Lynch Defendants, the TIGRs that were earmarked for plaintiffs' structured settlement payments have been sold, transferred or otherwise lost; the Hawkins did not receive their settlement payments; Ms. Fenter will not receive her settlement payment and the tax free status of plaintiffs' structured settlements is jeopardized. Plaintiffs have been damaged in an amount that is not precisely known at this time, but which is at least the amount at full maturity of the TIGRs and any taxes which are levied as a result of the improper structuring of plaintiffs' settlements, which amount is in excess of the jurisdictional minimum of this Court

84. In committing these breaches of their duties, the Merrill Lynch Defendants were guilty of oppression, fraud and malice, have engaged in conduct by which they intended to cause injury to plaintiffs and have engaged in despicable conduct with a willful and conscious disregard of plaintiffs' rights and the consequences of their actions. Accordingly, plaintiffs are entitled to recover punitive damages for the sake of example and by way of deterring such conduct in the

future.

85. Despite knowingly or recklessly disregarding the fact that by doing so they were aiding and abetting a breach of fiduciary duty owed to the plaintiffs, the Merrill Lynch Defendants conspired with Pardee to cause the TIGRs to be used for purposes other than the making of required payments to the plaintiffs and to prevent Pardee and SSTAI from completing its payment obligations to the plaintiffs. As a direct and proximate result of the Merrill Lynch Defendants' participation in these breaches of fiduciary duty, the assets that were supposed to fund payments to provide for the needs of the plaintiffs have been sold and the plaintiffs have been damaged by not receiving the payments due them pursuant to their settlements, the amounts of which are readily ascertainable and will be proved at the time of trial.

86. The conduct of the Merrill Lynch Defendants was despicable and subjected plaintiffs and the to cruel and unjust hardship and conscious disregard of plaintiffs' rights so as to justify an award of exemplary and punitive damages.

**SEVENTH CAUSE OF ACTION**

**(Against Pardee for Breach of Fiduciary Duty)**

87. Plaintiffs incorporate by reference and reallege paragraphs 1 through 52 above, inclusive, as if fully set forth herein.

88. A confidential relationship existed between plaintiffs and Pardee by virtue of Pardee's assumption of the payment obligations owed to plaintiffs pursuant to their structured settlements and by virtue of Pardee's control of the TIGRs which were purchased with plaintiffs' settlement funds and which were intended to fund plaintiffs' structured settlements.

89. A confidential relationship also existed by virtue of the fact that plaintiffs had no control over, and were provided with no information about the sale of, the TIGRs which had been purchased with their settlement funds and/or placed in the name of the Settlement Company, or of the transfer of control of the TIGRs to Pardee, or of Pardee's sale of the TIGRs, but Pardee was in possession of such information. Pardee also maintains exclusive knowledge of the use of the proceeds from the sale of the TIGRs.

90. By selling the TIGRs and taking the sales proceeds for his own benefit; by failing

to advise, and concealing these facts from the plaintiffs; by failing to pay the Hawkins their settlement funds; and by depriving Ms. Fenter of her future settlement payments, Pardee breached his fiduciary duty to plaintiffs.

91. As a direct and proximate cause of Pardee's violation of his fiduciary duty, the TIGRs that were earmarked for plaintiffs' structured settlement payments have been sold, transferred or otherwise lost; the Hawkins did not receive their settlement payments; and Ms. Fenter will not receive her settlement payment. Plaintiffs have been damaged in an amount that is not precisely known at this time, but which is at least the amount at full maturity of the TIGRs and any taxes which are levied as a result of Pardee's sale of the TIGRs, which amount is in excess of the jurisdictional minimum of this Court.

92. Despite knowing or recklessly disregarding the fact that by doing so he was aiding and abetting a breach of fiduciary duty owed to the plaintiffs by the Merrill Lynch Defendants, Pardee also conspired with the Merrill Lynch Defendants to cause the TIGRs to be used for purposes other than the making of required payments to the plaintiffs and to prevent Pardee and SSTAI from completing its payment obligations to the plaintiffs. As a direct and proximate result of the Pardee's participation in these breaches of fiduciary duty, the assets that were supposed to fund payments to provide for the needs of the plaintiffs have been sold and the plaintiffs have been damaged by not receiving the payments due them pursuant to their settlements, the amounts of which are readily ascertainable and will be proved at the time of trial.

93. In committing these breaches of fiduciary duty, Pardee was guilty of oppression, fraud and malice, has engaged in conduct by which he intended to cause injury to plaintiffs and has engaged in despicable conduct with a willful and conscious disregard of plaintiffs' rights and the consequences of his actions. Accordingly, plaintiffs are entitled to recover punitive damages for the sake of example and by way of deterring such conduct in the future.

**EIGHTH CAUSE OF ACTION**

**(Against All Defendants for Constructive Fraud)**

94. Plaintiffs incorporate by reference and reallege paragraphs 1 through 52 and 80 through 93 above, as if fully set forth herein.

95. By virtue of their fiduciary duties owed to plaintiffs, the Merrill Lynch Defendants and Pardee owed plaintiffs a duty to disclose: (a) that TIGRs were possibly not qualified funding assets under governing tax law and that by agreeing to fund parts of their settlements with such assets they were jeopardizing the tax free benefits to which they were entitled; (b) that the TIGRs had been purchased and were being held in the name of the Settlement Company; (c) that control of the TIGRs had been transferred to Pardee and that Pardee had sold the TIGRs and taken the sales proceeds for his own benefit. Instead, the Defendants actively concealed and suppressed the true facts from plaintiffs and aided, abetted and conspired with each other and/or with others to conceal and suppress the true facts from plaintiffs and intended to, and did, deceive plaintiffs in order to benefit themselves financially.

96. The Merrill Lynch Defendants took advantage of the trust and confidence reposed in them and violated their fiduciary duties to plaintiffs by, among other things: (a) marketing and selling to plaintiffs as funding assets for their structured settlements, a proprietary financial product of their own which did not necessarily comply with governing tax law; (b) transferring control of the TIGRs to Pardee without advising plaintiffs of their actions and without obtaining plaintiffs approval; (c) failing to place the TIGRs in trust; (d) failing to maintain and protect the TIGRs which had been purchased with plaintiffs' settlement funds and were to be used solely to fund periodic and lump sum payments due to plaintiffs; and/or (e) failing to make the required periodic and lump sum payments to plaintiffs.

97. Pardee took advantage of the trust and confidence reposed in him and violated his fiduciary duty to plaintiffs by, among other things: (a) failing to maintain and protect the TIGRs which had been purchased with plaintiffs' settlement funds and were to be used solely to fund periodic and lump sum payments due to plaintiffs; (b) selling the TIGRs and using the sales proceeds for his own benefit and/or (e) failing to make the required periodic and lump sum payments to plaintiffs.

98. In committing these acts, the Merrill Lynch Defendants took advantage of their confidential relationship with plaintiffs to: (a) obtain sales fees and commissions on assets purchased with plaintiffs' settlement funds; and/or (b) earn brokerage and transactional fees and

commissions. Pardee took advantage of this confidential relationship with plaintiffs in order to obtain the funds held for plaintiffs' trust in the form of TIGRs.

99. As a direct and proximate cause of these violations of defendants' confidential relationship with plaintiffs and the related breaches of fiduciary duties, the TIGRs that were earmarked for plaintiffs' structured settlement payments have been sold, transferred or otherwise lost; plaintiffs have not received and/or will not receive their periodic and lump sum payments on time; and the tax free status of plaintiffs' structured settlements have been jeopardized. Plaintiffs have been damaged in an amount that is not precisely known at this time, but which is in excess of the jurisdictional minimum of this Court and will be proven at trial.

100. In committing these breaches of their duties, the defendants have been guilty of oppression, fraud and malice, have engaged in conduct by which they intended to cause injury to plaintiffs and have engaged in despicable conduct with a willful and conscious disregard of plaintiffs' rights and the consequences of their actions. Accordingly, plaintiffs are entitled to recover punitive damages for the sake of example and by way of deterring such conduct in the future.

**NINTH CAUSE OF ACTION**

**(For Fraud against All Defendants)**

101. Plaintiffs incorporate by reference and reallege paragraphs 1 through 52 and 80 through 93 above, inclusive, as if fully set forth herein.

102. The representations made by, consented to, authorized and/or ratified by the Merrill Lynch Defendants to plaintiffs, as set forth above, were in fact false. The true facts were: (1) that the Merrill Lynch Defendants knew that the only assets from which tax-free interest income could be generated under then-governing tax law were U.S. Treasury Bonds and/or annuities; (2) that the Merrill Lynch Defendants did not intend to hold the TIGRs for the benefit of the plaintiffs, but instead purchased and held the TIGRs in the name of the Settlement Company; (3) that because the TIGRs were negotiable instruments purchased and put in the name of the Settlement Company, they should have been placed in trust for the benefit of the plaintiffs as were the U.S. Treasury Bonds purchased, for instance, for Ms. Fenter's structured

settlements; and (4) that the Merrill Lynch Defendants did not intend to honor the Settlement Company's payment obligations to the plaintiffs.

103. When the Merrill Lynch Defendants made, authorized, consented to and/or ratified such representations to plaintiffs, they knew them to be false and made these representations with the intention to deceive and defraud the plaintiffs and to cause the plaintiffs to act in reliance on these representations, with the expectation that the plaintiffs would rely on their representations, would agree to enter into structured settlements established by the Settlement Company and would agree to partially fund their structured settlements with TIGRs.

104. Plaintiffs, at the time the above representations were made by the Merrill Lynch Defendants and at the time that they agreed to enter into structured settlements and to purchase TIGRs, were ignorant of the falsity of the Merrill Lynch Defendants' representations and believed them to be true. In reliance on these representations, plaintiffs were induced to and did, enter into structured settlements established by the Settlement Company and purchased TIGRs to partially fund their settlements. Had the plaintiffs known the actual facts, they would not have taken such action. Plaintiffs' reliance on Defendants' representations was justified based on the Defendants' marketing, advertising, financial strength, reputation and expertise.

105. As a proximate result of the fraudulent conduct of the Merrill Lynch Defendants, the plaintiffs entered into structured settlements, agreed to the assignment of the settling defendants payment obligations to the Settlement Company, agreed to partially fund their settlements with TIGRs, and agreed to permit the Merrill Lynch Defendants to hold the TIGRs in an investment account rather than placing them in trust.

106. Subsequently, the Merrill Lynch Defendants concealed from plaintiffs that: (1) control of the TIGRs had been transferred to Pardee and that at Pardee's instructions, they had sold the TIGRs and permitted Pardee to obtain and use the sales proceeds for his own benefit; (2) that they were no longer holding the TIGRs for the benefit of the plaintiffs; and (3) that they had no intention of honoring the payment obligations of plaintiffs' Assignment Agreements after selling the Settlement Company to Pardee.

107. Pardee subsequently concealed from plaintiffs that he had acquired control of the

TIGRs purchased with their settlement funds and being held by the Merrill Lynch Defendants, ordered that the TIGRs be sold, that the TIGRs had been sold; and that Pardee subsequently obtained and used the sales proceeds for his own benefit.

108. Plaintiffs have not received and have no expectation of receiving full and timely payment of all amounts due and owing to them under the terms of the Assignment Agreement and from the TIGRs purchased with their settlement funds. By reason of the events set forth above, Plaintiffs have been damaged in an amount in excess of the jurisdictional minimum of this Court.

109. In committing these breaches of their duties, the defendants have been guilty of oppression, fraud and malice, have engaged in conduct by which they intended to cause injury to plaintiffs and have engaged in despicable conduct with a willful and conscious disregard of plaintiffs' rights and the consequences of their actions. Accordingly, plaintiffs are entitled to recover punitive damages for the sake of example and by way of deterring such conduct in the future.

## TENTH CAUSE OF ACTION

**(For Conversion Against All Defendants)**

110. Plaintiffs repeat, reallege and incorporate by this reference as though set forth in full, paragraphs 1 through 52 above.

111. Plaintiffs are informed and believe that at the time the Merrill Lynch Defendants marketed and sold TIGRs to plaintiffs, they knew that TIGRs were possibly not approved structured settlement funding assets under then governing tax law. That, notwithstanding this knowledge, they wrongfully caused the TIGRs purchased with plaintiffs' settlement funds to be purchased and held in the name of the Settlement Company, wrongfully transferred control of the TIGRs to Pardee and sold the TIGRs at the instructions of Pardee and permitted Pardee to obtain and use for his own benefit the proceeds from the TIGRs. The Merrill Lynch Defendants engaged in these acts without plaintiffs' knowledge and without plaintiffs' consent and in order to derive benefits to themselves from the sale and purchase of TIGRs to plaintiffs.

112. Pardee wrongfully converted the TIGRs which had been purchased with plaintiffs'

settlement funds and which were intended for their sole benefit by ordering the TIGRs to be sold in or about 1993 and using the sales proceeds for his own benefit.

113. In committing these breaches of their duties, the defendants have been guilty of oppression, fraud and malice, have engaged in conduct by which they intended to cause injury to plaintiffs and have engaged in despicable conduct with a willful and conscious disregard of plaintiffs' rights and the consequences of their actions. Accordingly, plaintiffs are entitled to recover punitive damages for the sake of example and by way of deterring such conduct in the future.

**ELEVENTH CAUSE OF ACTION**

**(For Negligence Against All Defendants)**

114. Plaintiffs repeat, reallege and incorporate by this reference as though set forth in full, paragraphs 1 through 52 above.

115. The Merrill Lynch Defendants and Pardee owed plaintiffs duties of reasonable care in performance of their duties and obligations related to the structured settlements, including but not limited to, properly structuring the settlements to conform with existing tax-law in order to insure that plaintiffs would receive all tax advantages of such structured settlements and preserving and protecting the TIGRs purchased with plaintiffs' settlement funds. This duty of reasonable care exists because the TIGRs were purchased with plaintiffs' settlement funds and were intended solely to be used to fund future settlement payments owed to plaintiffs, who were persons who would be foreseeable endangered by the breach of the duty of reasonable care if such future payments were not made.

116. The defendants breached their duty of due care owed to plaintiffs by using TIGRs, which were possibly not qualified funding assets, to fund future settlement payments, by failing to place the TIGRs in trust, by selling the TIGRs and by permitting the sales proceeds to be used for purposes other than to pay plaintiffs their structured settlement payments and by failing to disclose such facts to plaintiffs.

117. As a direct and proximate cause of the Defendants' breaches of their duty of reasonable care to plaintiffs, the following foreseeable events occurred: the TIGRs that were

earmarked for plaintiffs have been sold, transferred, or otherwise lost; plaintiffs have not received their settlements payments in a timely fashion and will not receive future payments and the tax-free status of plaintiffs' structured settlements has been jeopardized. Plaintiffs have been damaged in an amount that is not precisely known at this time, but which is in excess of the jurisdictional minimum of this Court and will be proven at trial.

## TWELFTH CAUSE OF ACTION

### (For Unjust Enrichment Against All Defendants)

118. Plaintiffs repeat, reallege and incorporate by this reference as though set forth in full, paragraphs 1 through 52 above.

119. As a result of their wrongful acts, Defendants have been unjustly enriched at the expense of plaintiffs, while plaintiffs have been unjustly deprived of the benefits of their structured settlements. The Merrill Lynch Defendants acquired plaintiffs' settlement funds used to purchase TIGRS and received sales commissions and brokerages fees in connection with the establishment of the structured settlement and purchase and sale of the TIGRs. Pardee acquired the full value of the TIGRs at the time of their sale in 1993.

120. Defendants have been and will be unjustly enriched if allowed to retain such funds and benefits, and therefore, a constructive trust should be imposed on all monies and benefits wrongfully obtained by defendants, and each of them.

121. Plaintiffs seek restitution from defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by defendants from their wrongful conduct.

## PRAYER

**WHEREFORE**, plaintiffs pray for judgment and relief as follows:

1. Awarding the plaintiffs general and special damages according to proof and prejudgment interest at the maximum legal rate;

2. Awarding punitive damages;

3. For the imposition of a constructive trust against Pardee and the Merrill Lynch Defendants;

4. For restitution and disgorgement; and

5. For an award of costs and reasonable attorneys fees to the extent permissible by law;

7. Granting such other and further relief as this Court deems to be just and proper.

May 6, 2004

Respectfully submitted,

ROMAN M. SILBERFELD
BERNICE CONN
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2049 Century Park East, Suite 3700
Telephone: (310) 552-0130
Facsimile: (310) 229-5865

Attorneys for Plaintiffs

**PROOF OF SERVICE**
**[1013A (3) C.C.P.]**

**STATE OF CALIFORNIA** )
) ss.
**COUNTY OF LOS ANGELES** )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 2049 Century Park East, Suite 3700, Los Angeles, California 90067-3211.

On May 17, 2004, I served the foregoing document described as **FIRST AMENDED COMPLAINT** on the interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

**SEE ATTACHED SERVICE LIST**

[X] **BY MAIL:** I caused such envelope to be deposited in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[] **BY FEDERAL EXPRESS - OVERNIGHT:** I caused such envelope to be deposited in a box or other facility regularly maintained by Federal Express in an envelope or package designated by Federal Express with delivery fees paid.

[] **BY FACSIMILE:** I served a true copy of the document(s) described on all parties to this action by facsimile transmission, and the transmission was reported as complete and without error. Facsimile transmissions were sent and addressed as stated above.

[] **BY PERSONAL SERVICE:** I caused such envelope to be delivered by hand to the offices of the addressees.

[X] (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 17, 2004, at Los Angeles, California.

JENNIFER A. VARGAS

**SERVICE LIST**

**Takako Hawkins, et al. v. Merrill Lynch, *et al.***
**Los Angeles Superior Court Case No. BC 279691**

| | |
|---|---|
| Marc T. G. Dworsky, Esq.<br>Kevin S. Allred, Esq.<br>Randall G. Sommer, Esq.<br>Munger, Tolles & Olson LLP<br>355 South Grand Avenue, 35th Floor<br>Los Angeles, CA 90071-1560 | Attorneys for Defendants<br>MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MERRILL LYNCH & CO., INC., and MERRILL LYNCH LIFE AGENCY INC. |
| René P. Tatro, Esq.<br>Tatro Tekosky Sadwich Mendelson LLP<br>444 South Flower Street, 42nd Floor<br>Los Angeles, CA 90071-2901 | Attorneys for Defendant<br>JONATHAN H. PARDEE |