# Exhibit B

# STOCK PURCHASE AGREEMENT

BY AND AMONG

JONATHAN H. PARDEE, DUNBAR/WHEELER TRUST
AND JONATHAN H. PARDEE CHARITABLE REMAINDER TRUST

AND OGDEN H. SUTRO

AND SST ACQUISITION CORP.

AND

CONSUMER PORTFOLIO SERVICES, INC.

Dated as of May 20, 1997

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT dated as of May 20, 1997, is by and among all of the common shareholders of Settlement Services Treasury Assignments, Inc., a Rhode Island corporation (the "Company") listed in Exhibit 1.43 hereto (collectively, the "Sellers"), Ogden H. Sutro of Stonington, Connecticut ("Sutro") and SST Acquisition Corp., a Delaware corporation(the "Purchaser") and Consumer Portfolio Services, Inc., a California corporation (the "Indemnitor").

## RECITALS

WHEREAS, the Shareholders are the owners of all of the issued and outstanding Shares of the Company; and

WHEREAS, the Shareholders desire to sell, and the Purchaser desires to purchase, all of the outstanding Shares for the consideration and upon the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and of the mutual representations, warranties, covenants, agreements and conditions set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01 Accounts. "Accounts" shall mean all accounts receivable, notes receivable and associated rights owned by the Company as of the Closing Date.

Section 1.02 Affiliate. See Section 3.21.

Section 1.03 Agreement. "Agreement" shall mean this Stock Purchase Agreement together with the Exhibits attached hereto, as amended from time to time in accordance with the terms hereof.

Section 1.04 Assets. "Assets" shall mean all of the assets of the Company as of the Closing Date, including, without limitation, any Accounts, Bank Accounts, Contracts, Equipment, Intellectual Property, Inventory, Investments and Real Property, and the Company's interest as the sole beneficiary (except as set forth in Exhibit 3.29 (c)) of the SSTAI Trust.

Section 1.05 Balance Sheet. "Balance Sheet" shall mean the audited consolidated balance sheet of the Company as of December 31, 1995, included in Exhibit 1.05 attached hereto.

Section 1.06 Bank Accounts. "Bank Accounts" shall mean the checking accounts, savings accounts, custodial accounts, certificates of deposit, safe deposit boxes and other bank accounts maintained by the Company as of the Closing Date, all of such Bank Accounts being listed on Exhibit 1.06 attached hereto.

Section 1.07 Closing or Closing Date. "Closing" shall mean the conference held on the date and at the time determined in accordance with Section 2.02 hereof, at the offices of Hinckley, Allen & Snyder, 1500 Fleet Center, Providence, Rhode Island 02903 or at such other place as the parties may mutually agree in writing. "Closing Date" shall mean the date upon which the Closing is completed by performance by each party of his or its obligations hereunder.

Section 1.08 Code. "Code" shall mean the Internal Revenue Code of 1986, as amended.

Section 1.09 Company. "Company" shall mean Settlement Services Treasury Assignments, Inc., a Rhode Island corporation.

Section 1.10 Contracts. "Contracts" shall mean all contracts, agreements, leases, licenses, relationships and commitments, written or oral, to which the Company is a party or by which the Company is bound as of the Closing Date.

Section 1.11 DOL. "DOL" means the United States Department of Labor.

Section 1.12 Equipment. "Equipment" shall mean all machinery, vehicles, equipment, furniture, fixtures, furnishings, parts, tools, engineering and other items of tangible personal property owned or leased by the Company as of the Closing Date.

Section 1.13 ERISA. "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

Section 1.14 GAAP. "GAAP" shall mean generally accepted accounting principles as in effect in the United States of America at the time of the preparation of the subject financial statement.

Section 1.15 "Indemnitor" shall have the meaning set forth in the initial paragraph of this Agreement.

Section 1.16 Intellectual Property. "Intellectual Property" shall mean (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto and all patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, trade names and corporate names, together with all translations,

adaptations, derivations and combinations thereof and including all goodwill associated therewith and all applications, registrations and renewals in connection therewith, (c) all copyrightable works, all copyrights and all applications, registrations and renewals in connection therewith, (d) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information and business and marketing plans and proposals), (e) all computer software (including data and related documentation), (f) all other proprietary rights, (g) all rights as a licensee or authorized user of the intellectual property of any third party and (h) all copies and tangible embodiments thereof (in whatever form or medium), in all the foregoing cases to the extent owned by the Company or used by the Company in the business of the Company as of the Closing Date, including, without limitation, the Intellectual Property listed on Exhibit 1.16 attached hereto. Exhibit 1.16 sets forth separately (x) all Intellectual Property of which the Company is the exclusive owner, identifying the subject matter, any related registration and the owner, (y) all Intellectual Property which the Company uses pursuant to license or other authorization of a third party, listing the subject matter, any ancillary registration and the source of authorization and (z) all Intellectual Property that the Company owns jointly with a third party.

Section 1.17 Interim Financial Statements. "Interim Financial Statements" shall mean the unaudited financial statements of the Company as of and for the month and year-to-date ended December 31, 1996 and March 31, 1997, copies of which are attached as Exhibit 1.17 hereto.

Section 1.18 Inventory. "Inventory" shall mean all inventories of goods and supplies owned by the Company as of the Closing Date.

Section 1.19 Investments. "Investments" shall mean the entire right, title and interest of the Company in investments in any fund or other Person.

Section 1.20 IRS. "IRS" shall mean the Internal Revenue Service.

Section 1.21 Knowledge. "Knowledge" shall mean the actual knowledge of the person referred to. "Knowledge of the Sellers" shall mean the actual knowledge of any Seller or Sutro and "Knowledge of the Purchaser" shall mean the actual knowledge of any officer or director of the Purchaser and/or the Indemnitor.

Section 1.22 Law. "Law" shall mean any federal, state, local or other law or governmental requirement of any kind, domestic or foreign, and the rules, regulations and orders promulgated thereunder.

Section 1.23 Material Adverse Effect. "Material Adverse Effect" shall mean an event, change or occurrence which, individually or together with any other event, change or occurrence, has a material adverse impact on (i) the financial position,

business, or results of operations of a Person and its Subsidiaries, taken as a whole, or (ii) the ability of such Person to perform its obligations under this Agreement or to consummate the other transactions contemplated by this Agreement, provided that "material adverse impact" shall not be deemed to include the impact of (a) changes in Laws of general applicability or interpretations thereof by courts or governmental authorities, (b) changes in generally accepted accounting principles or regulatory accounting principles, or (c) actions and omissions of a party hereto (or any of its Subsidiaries) taken with the prior informed written consent of the other parties in contemplation of the transactions contemplated hereby.

Section 1.24 PBGC. "PBGC" shall mean the Pension Benefit Guaranty Corporation.

Section 1.25 Payees. "Payees" shall have the meaning set forth in Section 3.28.

Section 1.26 Permits. "Permits" shall mean all permits, licenses and governmental authorizations, registrations and approvals used or required in the conduct of the business of any Person.

Section 1.27 Permitted Liens. "Permitted Liens" shall mean those liens, encumbrances, mortgages, charges, claims, restrictions, pledges, security interests, impositions and other matters affecting the Assets that are specifically listed on Exhibit 1.27 attached hereto.

Section 1.28 Person. "Person" shall mean a natural person or any legal, commercial or governmental entity, such as, but not limited to, a corporation, general partnership, joint venture, limited partnership, limited liability company, trust, business association, group acting in concert, or any person acting in a representative capacity.

Section 1.29 Purchaser. "Purchaser" shall have the meaning set forth in the initial paragraph of this Agreement.

Section 1.30 [Intentionally omitted.].

Section 1.31 Purchaser Indemnified Parties. "Purchaser Indemnified Parties" shall have the meaning set forth in Section 9.01(a).

Section 1.32 Real Property. "Real Property" shall mean any real property owned or leased by the Company as of the Closing Date, together with the improvements located thereon, including all appurtenant rights, claims and interests, all of such Real Property being listed on Exhibit 1.32 attached hereto.

Section 1.33 Required Consents. "Required Consents" shall mean the consents of third parties necessary to consummate and make effective the transactions contemplated by this Agreement as set forth on Exhibit 1.33.

Section 1.34 Reserves. "Reserves" shall mean the Company's reserves, including excess and obsolete inventory reserves, in the amounts set forth in the Interim Financial Statements.

Section 1.35 SEC. "SEC" shall mean the Securities and Exchange Commission.

Section 1.36 SEC Reports. "SEC Reports" shall have the meaning set forth in Section 5.03(a).

Section 1.37 Securities Act. "Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.38 Securities Laws. "Securities Laws" shall mean the Securities Act, the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, the Investment Advisors Act of 1940, as amended, the Trust Indenture Act of 1939, as amended, and the rules and regulations of any regulatory authority promulgated thereunder, but excluding any rules, regulations or procedures of self-regulatory organizations.

Section 1.39 Seller Indemnified Parties. "Seller Indemnified Parties" shall have the meaning set forth in Section 9.02.

Section 1.40 Seller Indemnifying Parties. "Seller Indemnifying Parties" shall have the meaning set forth in Section 9.01(a).

Section 1.41 Sellers. "Sellers" shall have the meaning set forth in the initial paragraph of this Agreement.

Section 1.42 Shares. "Shares" shall mean all issued and outstanding shares of capital stock of the Company, consisting of 555.5556 shares of common stock, $1.00 par value per share.

Section 1.43 Shareholders. "Shareholders" shall mean all record holders of the Shares. A true and correct schedule of the names, addresses and Share holdings of each Shareholder along with any agreements between the Company and any Shareholder, and any agreements between Shareholders relating to the Shares, is attached hereto as Exhibit 1.43.

Section 1.44 SSTAI Trust. "SSTAI Trust" shall have the meaning set forth in Section 3.28.

Section 1.45 Subsidiaries. "Subsidiaries" shall mean all of the corporate or other business entities with respect to which a Person has the direct or indirect right to vote shares representing 50% or more of the votes eligible to be cast in the election of directors of each such entity as of the Closing Date.

Section 1.46 Sutro. "Sutro" means Ogden H. Sutro of Stonington, Connecticut and the beneficiary of the Dunbar/Wheeler Trust.

Section 1.47 Taxes. "Taxes" means all Federal, state, local and foreign income, payroll, withholding, excise, sales, use, license, lease, personal and other property, use and occupancy, business and occupation, mercantile, real estate, gross receipts, employment, severance, stamp, premium, windfall profits, social security (or similar unemployment), disability, transfer, registration, value-added, alternative or add-on minimum, estimated, capital stock and franchise, and goods and services taxes; all customs, import and export taxes or duties; and all unemployment insurance premiums, and other tax of any kind whatsoever, including interest, penalties and fines on any of foregoing, whether or not disputed.

ARTICLE II
PURCHASE AND SALE OF SHARES

Section 2.00 Purchase and Sale. The Sellers agree to sell the Shares to the Purchaser and the Purchaser agrees to purchase the Shares from the Sellers, in all cases subject to and in accordance with the provisions of this Agreement.

Section 2.01 Purchase Price. The aggregate purchase price for the Shares (the "Purchase Price") shall be an amount equal to $30,706.60 per Share for Jonathan H. Pardee Shares and $29,556.72 per Share for all other Shares for a total of $16,833,400.00 payable in immediately available funds at the Closing.

Section 2.02 Closing. Subject to the terms and conditions of this Agreement, the Closing will be held at the offices of Hinckley, Allen & Snyder, 1500 Fleet Center, Providence, Rhode Island 02903, as soon as practicable after all of the conditions to the obligations of the parties hereunder have been satisfied or waived, but in no event later than 10:00 a.m. on May 20, 1997, unless extended by either the Sellers or the Purchaser to a date no later than May 31, 1997, and unless a further extension is mutually agreed upon by the parties.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF
THE SELLERS AND SUTRO WITH RESPECT TO THE COMPANY

All representations and warranties of each of the Sellers and Sutro contained in this Agreement or in any other document delivered to the Purchaser and/or Indemnitor

ARTICLE IX
INDEMNIFICATION

Section 9.01 Indemnification by the Sellers and Sutro.

(a) Subject to Sections 9.01(b) hereof, each of the Sellers and Sutro, (collectively the "Seller Indemnifying Parties") hereby jointly and severally indemnify and hold the Purchaser, the Indemnitor and each of the Purchaser's and Indemnitor's respective officers, directors, employees, agents, and shareholders and, from and after the Closing Date, the Company and the Company's officers, directors, employees, agents and shareholders (collectively, the "Purchaser Indemnified Parties") harmless from and against, and agree to defend promptly each of the Purchaser Indemnified Parties for, any and all losses, damages, costs, expenses, fines, penalties, settlement payments and expenses, liabilities, obligations and claims of any kind, including, without limitation, reasonable attorneys' fees and other legal and professional costs and expenses (hereinafter referred to collectively as "Purchaser Losses"), that any of the Purchaser Indemnified Parties may at any time suffer or incur, or become subject to, as a result of or in connection with the following (the "Purchaser Claims"): (i) any breach or inaccuracy of any of the representations and warranties made by the Sellers or Sutro in or pursuant to this Agreement; (ii) any failure of the Sellers to carry out, perform, satisfy and discharge any of their covenants, agreements, undertakings, liabilities or obligations under this Agreement or under any of the documents and instruments delivered by the Sellers pursuant to this Agreement; (iii) any liability for the payment by the Sellers of federal, state or foreign taxes, (iv) any fraudulent behavior by any Seller Indemnifying Party of any kind or nature in connection with the transactions under or pursuant to this Agreement or any subparagraphs of this Section 9.01(a) and (v) any failure of the Sellers to pay the fees and expenses listed on Exhibit 3.22. Notwithstanding the foregoing provisions of this Section 9.01(a), any indemnification obligation under clause (i) above based on any representation or warranty contained in Article IV, shall be solely the obligation of the Seller with respect to whom or which the representation and warranty is inaccurate.

(b) the right of the Purchaser Indemnified Parties to indemnification set forth in Section 9.01(a) is limited as follows:

(i) the Seller Indemnifying Parties shall not be required to indemnify the Purchaser Indemnified Parties under Section 9.01(a) (except under Section 9.01(a)(iv) and (v) unless and until the amount of all Purchaser Losses for which indemnification is sought shall first exceed $25,000, the ("Threshold Amount") at which point the Seller Indemnifying Parties will be obligated to indemnify the Purchaser Indemnified Parties for all Purchaser Losses in excess of the Threshold Amount; and

(ii) the period for which Purchaser Claims may be made under the indemnification obligations of the Seller Indemnifying Parties under Section 9.01(a) shall be (a) with respect to Section 9.01(a)(i) under representations and warranties contained in Section 3.23 and Section 9.01(a)(iii) the date on which the income tax returns of the Company and the Sellers, respectively for calendar year 1997 are no longer subject to audit by applicable federal and state tax authorities and (b) with respect to Section 9.01(a)(i) under other representations and warranties, or Section 9.01(a)(ii), except in each such case on account of any failure to make required payments to the Payees due and payable prior to the Closing Date or payments under Section 9.01(a)(v) or on account of any Purchaser Claims arising under any other clause of Section 9.01(a), two (2) years from the Closing Date, (c) with respect to Section 9.01(a)(iv) or (v) unlimited and (d) with respect to any failure to make required payments to the Payees due and payable prior to the Closing Date, the period ending on the date set forth in Section 9.02(b)( ).

(c) Indemnification for Tax Matters.

(v) General. Seller Indemnifying Parties agree to indemnify and hold harmless the Purchaser Indemnified Parties from and against all Taxes of the Company including Taxes due by virtue of the Company being a successor to another Person by merger, liquidation, purchase of assets or similar transaction (or for which the Company is liable pursuant to Treasury Regulations Section 1.1502-6 or any analogous state or local tax provisions) (i) with respect to all taxable periods ending on or prior to the Closing Date, (ii) with respect to any taxable period beginning before the Closing Date and ending after the Closing Date, but only with respect to the portion of such period up to and including the Closing Date (such portion, a "Pre-Closing Partial Period"), or (iii) payable as a result of a breach of any representation or warranty set forth in Section 3.23. Notwithstanding the foregoing, the Seller Indemnifying Parties shall not be required to indemnify the Purchaser Indemnified Parties for Taxes (x) to the extent of the liability for the Company's accrued taxes reflected on the Interim Financial Statements, (y) payable as a result of any election made (or deemed made) or caused to be made by the Purchaser under Section 338 of the Code, or (z) payable as a result of any events occurring on the Closing Date, but after the Closing, which are outside of the ordinary course of business and are caused to occur by the Purchaser Indemnified Parties.

(w) Effect of Carryovers and Carrybacks. For purposes of this Section 9.01(c) any reduction of a Tax or Taxes which would have been due but for the application of any credit or net operating or capital loss carryover or carryback of Purchaser or a member of a consolidated group of which Purchaser is a member, shall be ignored.

(x) Allocation between Partial Periods. Any Taxes for a period including a Pre-Closing Partial Period and a taxable period beginning before the Closing Date and ending after the Closing Date, but only with respect to the portion of

such period commencing on and after the Closing Date (such portion, a "Post-Closing Partial Period shall, for purposes of Section 9.01(c), be allocated between a Pre-Closing Partial Period and a Post-Closing Partial Period (i) for personal property Taxes, on a per diem basis and (ii) in the case of other Taxes, on the actual activities, accruals, taxable income or taxable loss of the Company during such Pre-Closing Partial Period and such Post-Closing Partial Period.

(y) Tax Effect of Payments. Purchaser, Indemnitor, Sutro and Sellers agree that any indemnification payments made pursuant to this Section 9.01(c) shall be treated for tax purposes as an adjustment to the Purchase Price unless otherwise required by applicable law.

Section 9.02 Indemnification by the Purchaser, the Company and the Indemnitor.

(a) The Purchaser, the Indemnitor and, from and after the Closing Date, the Company hereby indemnify and hold each of the Sellers, Sutro and each of the Sellers' respective trustees and agents (collectively, the "Seller Indemnified Parties") harmless from and against, and agree to defend promptly each of the Seller Indemnified Parties for, any and all losses, damages, costs, expenses, fines, penalties, settlement payments and expenses, liabilities, obligations and claims of any kind, including, without limitation, reasonable attorneys' fees and other legal and professional costs and expenses (hereinafter referred to collectively as "Seller Losses"), that any of the Seller Indemnified Parties may at any time suffer or incur, or become subject to, as a result of or in connection with the following (the "Seller Claims"): (i) any breach or inaccuracy of any of the representations and warranties made by the Purchaser and/or the Indemnitor in or pursuant to this Agreement; (ii) any failure of the Purchaser and/or the Indemnitor to carry out, perform, satisfy and discharge any of its or their covenants, agreements, undertakings, liabilities or obligations under this Agreement or under any of the documents and instruments delivered by the Purchaser and/or the Indemnitor pursuant to this Agreement; (iii) any liability for the payment by the Purchaser, the Indemnitor and/or the Company of federal, state or foreign taxes arising from and after the date hereof; (iv) any failure of the Purchaser, the Indemnitor and/or the Company, after the date hereof, to carry out and perform its obligations under any agreement, instrument or other document to which the Company is now bound or hereafter becomes bound, (v) any fraudulent behavior by the Company, the Purchaser and/or the Indemnitor arising after the date hereof, (vi) any claim that the purchase and sale of the Shares constitutes a fraudulent transfer or fraudulent conveyance under applicable federal or state law and (vii) any failure to fulfill any obligation of the Sellers, the Company and/or the SSTAI Trust to any Payee as and when due at any time after the Closing Date.

(b) the right of the Seller Indemnified Parties to indemnification set forth in Section 9.02(a) is limited as follows:

(i) the Purchaser Indemnifying Parties shall not be required to indemnify the Seller Indemnified Parties under Section 9.02(a) (except under Section 9.02(a)(v) unless and until the amount of all Seller Losses for which indemnification is sought shall first exceed the Threshold Amount at which point the Purchaser Indemnifying Parties will be obligated to indemnify the Seller Indemnified Parties for all Seller Losses in excess of the Threshold Amount; and

(ii) the period for which Seller Claims may be made under the indemnification obligations of the Purchaser Indemnifying Parties under Section 9.02(a) shall be (a) with respect to Section 9.02(a)(iii) the date on which the income tax returns of the Company for calendar year 1997 are no longer subject to audit by applicable federal and state tax authorities and (b) with respect to Section 9.02(a)(i), Section 9.02(a)(ii) and Section 9.02(a)(iv), except in each such case on account of any failure to make required payments of Taxes or to the Payees due and payable after the Closing Date or on account of any Seller Claims arising under any other clause of Section 9.02(a), two (2) years from the Closing Date, (c) with respect to Section 9.02(a)(v) and Section 9.02(a)(vi) unlimited and (d) with respect to any failure to make required payments to the Payees due and payable after to the Closing Date, December 31, 2014 except with respect to Treasury bonds of the SSTAI Trust which are called, as to which the date shall be December 31, 2009.

(c) In connection with preparation and filing of the Company's 1997 income tax returns (or consolidated returns of the Purchaser which include the Company), the Purchaser and the Company will not take positions reasonably likely to be adverse to the Sellers or Sutro or the Seller Indemnifying Parties' indemnification obligations and the Purchaser and the Company will permit the Sellers' accountants to review such returns prior to filing in order to determine whether the Purchaser or the Company is taking positions therein which are reasonably likely to be adverse to the Sellers or Sutro or the Seller Indemnifying Parties' indemnification obligations under Section 9.01(a) and in the event that the Sellers' accountants make such a determination, the Sellers and the Purchaser will cause their respective accountants to resolve the matter in a manner acceptable to the Sellers and the Purchaser. In the event of failure to so resolve the matter within 30 days after Purchaser receives notice of Sellers' accountants' determination, the matter shall be referred to a nationally recognized accounting firm for resolution and the decision of such nationally recognized accounting firm shall be final and binding on the parties to this Agreement; provided that the Company or the Purchaser shall be permitted to file the tax return(s) in question in a timely manner, but if the matter is resolved in favor of the Sellers, Sutro and/or the Seller Indemnifying Parties, the Seller Indemnifying Parties shall have no indemnification obligation to the Purchaser Indemnified Parties on account thereof.

(d) Indemnification for Tax Matters.

(i) General. Purchaser Indemnifying Parties agree to indemnify and hold harmless the Seller Indemnified Parties from and against all Taxes of

the Company (1) with respect to all taxable periods beginning on or after the Closing Date, (2) with respect to any taxable period beginning before the Closing Date and ending after the Closing Date, but only with respect to the portion of such period commencing on and after the Closing Date (such portion, a "Post-Closing Partial Period"). Notwithstanding the foregoing, the Purchaser Indemnifying Parties shall not be required to indemnify the Seller Indemnified Parties for Taxes payable as a result of any events occurring on the Closing Date, but before the Closing, which are outside of the ordinary course of business and are caused to occur by the Seller Indemnified Parties.

(ii) Effect of Carryovers and Carrybacks. For purposes of this Section 9.02(d) any reduction of a Tax or Taxes which would have been due but for the application of any credit or net operating or capital loss carryover or carryback of the Company or a member of a consolidated group of which Company is a member, shall be ignored.

(iii) Allocation between Partial Periods. Any Taxes for a period including a Pre-Closing Partial Period and a Post-Closing Partial Period shall, for purposes of Section 9.02(d), be allocated between a Pre-Closing Partial Period and a Post-Closing Partial Period (i) for personal property Taxes, on a per diem basis and (ii) in the case of other Taxes, on the actual activities, accruals, taxable income or taxable loss of the Company during such Pre-Closing Partial Period and such Post-Closing Partial Period.

(iv) Tax Effect of Payments. Purchaser and Sellers agree that any indemnification payments made pursuant to this Section 9.02(c) shall be treated for tax purposes as an adjustment to the Purchase Price unless otherwise required by applicable law.

Section 9.03 Indemnification Procedures.

(a) Without limiting the rights of either party at law or in equity, the indemnified party or indemnified parties (the "Indemnified Party") shall have the right to receive payment from the indemnifying party or indemnifying parties (the "Indemnifying Party") hereunder for indemnification claims pursuant to Section 9.01 or 9.02, as applicable, subject to the following:

i. The Indemnified Party shall provide to the Indemnifying Party a certificate signed, if the Indemnified Party is a Purchaser Indemnified Party, by the Purchaser Indemnified Party's chief financial officer or president, or, if the Indemnified Party is a Seller Indemnified Party, by such Seller or Sutro, describing the amount of the indemnification claim and the basis thereof (a "Claim Notice").

ii. If the Indemnifying Party shall notify the Indemnified Party within ten (10) days of the Indemnifying Party's receipt of the Indemnified Party's certification that the Indemnifying Party disputes the claim or the amount thereof, and thereafter the Indemnifying Party and the Indemnified Party are unable to resolve such dispute within thirty (30) days, then the Indemnified Party may seek its legal remedies to enforce such indemnification.

iii. If the Indemnifying Party does not so notify Indemnified Party as provided above, or if there is a dispute, then upon resolution of the dispute as evidenced by a written agreement by both the Indemnifying Party and the Indemnified Party or a determination by a court of competent jurisdiction in an order that is not subject to appeal, the Indemnifying Party shall promptly pay to the Indemnified Party the amount of the claim, subject to the limitations set forth in this Article IX.

iv. Legal proceedings with respect to indemnification shall be commenced in the courts of the State of Rhode Island, whose courts shall have exclusive jurisdiction over the matter, and each of the parties does hereby submit to such jurisdiction and service of process with respect to any such proceeding.

(b) The Indemnified Party shall, promptly after the receipt of notice of the commencement of any action against such Indemnified Party in respect of which indemnification may be sought against the Indemnifying Party, notify the Indemnifying Party in writing of the commencement thereof. Failure of the Indemnified Party to give such notice will reduce the liability of the Indemnifying Party by the amount of damages attributable to the failure of the Indemnified Party to give notice to the Indemnifying Party; but the omission to notify the Indemnifying Party of any such action shall not relieve the Indemnifying Party from any liability that it may have to such Indemnified Party otherwise than under this Article IX. In case any such action shall be brought against an Indemnified Party and such Indemnified Party shall notify the Indemnifying Party of the commencement thereof, the Indemnifying Party may, or if so requested by such Indemnified Party shall, participate therein or assume the defense thereof, with counsel satisfactory to such Indemnified Party (it being understood that, except as hereinafter provided, the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Party in such action), and after notice from the Indemnifying Party to such Indemnified Party of an election so to assume the defense thereof the Indemnifying Party will not be liable to such Indemnified Party under this Article IX for any legal or other expenses subsequently incurred by such Indemnified Party in connection with the defense thereof other than reasonable costs of investigation; provided, however, that unless and until the Indemnifying Party assumes the defense of any such action at the request of such Indemnified Party, the Indemnified Party shall have the right to participate at the Indemnifying Party's expense in the defense of such action. If the Indemnifying Party shall not have employed counsel to have charge of the defense of any such action or if an Indemnified Party shall have reasonably concluded that there may be defenses

available to it that are different from or additional to those available to the Indemnifying Party (in which cases the Indemnifying Party shall not have the right to direct the defense of such action on behalf of such Indemnified Party), reasonable legal and other expenses, not including settlement expense (unless such settlement is approved by the Indemnifying Party) but including the expenses of separate counsel satisfactory to the Indemnifying Party (which shall not unreasonably withhold such approval), reasonably incurred by such Indemnified Party shall be borne by the Indemnifying Party.

Section 9.04 Survival of Representations, Warranties and Covenants. The representations and warranties made herein by the Sellers, Sutro, the Purchaser and the Indemnitor shall survive the Closing and the Closing Date for respective periods equal to the periods set forth in Section 9.01(b)(ii) and Section 9.02(b)(ii).

Section 9.05 No Offsets, etc. The indemnification obligations of the Purchaser Indemnifying Parties and the Seller Indemnifying Parties contained in Sections 9.01 through 9.04 shall be fulfilled without deduction for any claim, defense or offset of any type, including without limitation any claims, defenses or offsets under any other provision of this Agreement and regardless of whether any claims, defenses or offsets exist.

## ARTICLE X
## MISCELLANEOUS

Section 10.01 Entire Agreement; Assignment. This Agreement (a) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties or any of them with respect to the subject matter hereof, and (b) shall not be assigned by operation of law or otherwise; provided, that the Purchaser may assign its rights and obligations to any affiliate of the Purchaser, but no such assignment shall relieve the Purchaser, as the case may be, of its obligations hereunder if such assignee does not perform such obligations.

Section 10.02 Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by cable, telecopy, telegram or telex, or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties as follows:

if to the Purchaser:

SST Acquisition Corp.
c/o Stanwich Partners, Inc.
One Stamford Landing
Stamford, CT 06902
Attn: President

with a copy to:

Joseph F. Whinery, Esq.
Cameron & Mittleman
56 Exchange Terrace
Providence, Rhode Island 02903

if to the Indemnitor:

Consumer Portfolio Services, Inc.
2 Ada - Suite 100
Irvine, CA 92618
Attn: President

with a copy to:

Mark A. Creatura, Esq.
Sr. Vice President and General Counsel
Consumer Portfolio Services, Inc.
2 Ada - Suite 100
Irvine, CA 92618

if to the Shareholders:

to their respective addresses set
forth on Exhibit 1.43 attached hereto

with a copy to:

Malcolm Farmer III, Esq.
Hinckley, Allen & Snyder
1500 Fleet Center
Providence, Rhode Island 02903

or to such other address as the person to whom notice is given may have previously furnished to the others in writing in the manner set forth above.

Section 10.03 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Rhode Island regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

Section 10.04 Descriptive Headings. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

Section 10.05 Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

Section 10.06 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

Section 10.07 Specific Performance. The parties hereto agree that irreparable damage would occur in the event any of the provisions of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

Section 10.08 Further Assurances. Each party hereto agrees to execute and deliver to any other party hereto such documents, and take such actions, as may be reasonably requested by any such other party and necessary to implement and effectuate the transactions contemplated by this Agreement; provided that no party shall be so obligated if such execution, delivery or action could subject such party to additional cost or liability unless such party is indemnified against such additional cost or liability to such party's reasonable satisfaction. In addition, whichever party received reports, statements, or financial information for the month of May, 1997 with respect to the Company or the SSTAI Trust shall promptly provide the other parties with true copies thereof and each party will provide the other parties and their representatives with access to all information possessed by the providing party with respect to the Company, the SSTAI Trust and the Settlement Agreements in the event of any audit, inquiry or proceeding by any governmental agency or in the event of any Claim by any third party or Payee relating thereto; provided that the costs of providing such information and copies of any documents are borne by the party requesting same unless covered by the indemnification obligations under Article IX.

Section 10.09 Fees and Expenses. Except as otherwise provided in this Agreement, all costs and expenses incurred in connection with this Agreement and the

transactions contemplated hereby shall be paid by the party incurring such expenses, whether or not the transaction is consummated.

Section 10.10 Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effectuate the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

SST ACQUISITION CORP.

By: Charles E. Bradley
Name: Charles E Bradley
Title: President

CONSUMER PORTFOLIO SERVICES, INC.

By: Charles E Bradley
Name: Charles E Bradley
Title: Chairman

SHAREHOLDERS:

Jonathan H. Pardee

DUNBAR/WHEELER TRUST u/a
4/28/86, as amended 5/31/94

By: Virginia S. Morse, Trustee

Virginia S. Morse, as trustee and not individually

By: Peter M. Dodge, Trustee

Peter M. Dodge, as trustee and not individually

Jonathan H. Pardee Charitable
Remainder Trust U/A May 17, 1997

By: Carol P. Havican

Carol P. Havican, as trustee and not individually

SUTRO

Ogden H. Sutro

# EXHIBIT 1.43

## Shareholders

1. Capitalization of the Company:

| Shareholder | Address | No. of Shares Held |
|---|---|---|
| Jonathan H. Pardee | 226 Bellevue Ave.<br>Newport, RI 02840 | 359.1667 |
| Dunbar/Wheeler Trust | c/o David T. Totman, Esq.<br>59 Elm Street<br>New Haven, CT 06510 | 76.3889 |
| Jonathan H. Pardee Charitable Remainder Trust | 226 Bellevue Avenue<br>Newport, RI 02840 | 120 |

2. Agreements between the Company and the Shareholders: None

3. Agreements among the Shareholders: None

# CONTRIBUTION AGREEMENT

This Contribution Agreement is entered into by and between Jonathan H. Pardee of Newport, Rhode Island ("JHP"), Jonathan H. Pardee Charitable Remainder UniTrust, a Rhode Island trust ("JHP CRT"), Virginia S. Morse and Peter M. Dodge as Trustees of the Dunbar Wheeler Trust ("DWT") and Ogden H. Sutro of Stonington, Connecticut ("Sutro").

The parties hereto mutually agree as follows:

1. Recitals. JHP, JHP CRT and DWT (jointly and severally the "Sellers"), Sutro, SST Acquisition Corp., a Delaware corporation ("Purchaser") and Consumer Portfolio Services, Inc., a California corporation ("Indemnitor") entered into that certain Stock Purchase Agreement dated May 20, 1997 (the "Agreement") pursuant to which the Sellers sold all of the issued and outstanding capital stock of Settlement Services Treasury Assignments, Inc., a Rhode Island corporation ("SSTAI") to the Purchaser. Pursuant to Section 9.01 of the Agreement, the Sellers and Sutro ("Seller Indemnifying Parties") agreed to indemnify the Purchaser, Indemnitor and related parties ("Purchaser Indemnified Parties") (as defined in Section 9.01 of the Agreement) from and against Purchaser Losses arising out of Seller Indemnifying Parties' representations and warranties and out of certain other matters, all as more particularly described in Section 9.01 of the Agreement. Pursuant to Section 9.02 of the Agreement the Purchaser, the Indemnitor and SSTAI ("Purchaser Indemnifying Parties") agreed to indemnify the Sellers, Sutro and related parties ("Seller Indemnified Parties") from and against Seller Losses (as defined in Section 9.02 of the Agreement)

arising out of Purchaser Indemnifying Parties' representations and warranties contained in the Agreement and out of various other matters, including without limitation any failure by SSTAI to make required payments to the Payees as defined in the Agreement, all as more particularly described in Section 9.02 of the Agreement. The parties hereto acknowledge that their liability as Seller Indemnifying Parties under the Agreement is joint and several. The parties hereto desire to enter into an agreement pursuant to which their joint and several liability as Seller Indemnifying Parties under the Agreement and their rights to receive indemnification proceeds from the Purchaser Indemnifying Parties under the Agreement, will be allocated as among the parties hereto, in proportion to their respective shares of the proceeds of the sale of the shares of capital stock of SSTAI received by each of them; provided, however since Sutro was not a selling shareholder but was a party to the Agreement as an officer and director of SSTAI and as the sole beneficiary of DWT, the proportionate share of the liability of Sutro under this agreement shall be consolidated with that of DWT so that Sutro and DWT shall have joint and several liability as between the parties hereto only for the portion of any liability equal to DWT's share of the proceeds received from sale of the stock.

2. Percentage Shares. The parties hereto agree that their respective shares of (i) any liability, cost or expense incurred as Seller Indemnifying Parties on account of Purchaser Losses and (ii) any indemnification proceeds receivable or received from the Purchaser Indemnifying Parties on account of Seller Losses under the Agreement shall be as follows:

JHP 65.52%

DWT and Sutro 13.41%

JHP CRT 21.07%

3. Indemnification Payments. The parties hereto agree that in the event that any party hereto is required to pay and pays in cash or in kind any amount to a Purchaser Indemnified Party as a Seller Indemnifying Party in excess of such party's share of the liability in question as set forth in paragraph 2 above, the paying party shall on written demand by such paying party have a right to receive from each other party hereto such amount as will cause the paying party and such other party to be liable for and have paid an amount of the indemnification liability in question equal to each of such parties' percentages thereof as set forth in paragraph 2 above. Each party hereto agrees that on demand by any other party hereto for contribution to such demanding party of such other party's share of an indemnification liability under the Agreement paid by the demanding party in accordance therewith, such other party shall within ten days after receipt of any such demand immediately pay to the demanding party such amount as will cause the demanding party and such other party to have paid his or its share of the indemnification liability in question as set forth in paragraph 2 above.

4. Indemnification Receipts. In the event that any party hereto receives from any Purchaser Indemnifying Party pursuant to the Purchaser Indemnifying Parties' indemnification obligations set forth in Section 9.02 of the Agreement an amount which is in excess of such receiving party's percentage share set forth in paragraph 2, above,

of the aggregate indemnification recovery receivable by the Seller Indemnified Parties from the Purchaser Indemnifying Parties, such receiving party shall, within ten days after receipt of such funds, pay over to each other party hereto such amount as will cause each party hereto to have received a portion of such indemnification payment by the Purchaser Indemnifying Parties equal to such party's percentage share thereof as set forth in paragraph 2 above. In the event that any party hereto has paid to any third party an amount of any Seller Loss against which the parties hereto have been indemnified by the Purchaser Indemnifying Parties, which amount is in excess of or less than such paying party's percentage share thereof as set forth in paragraph 2, above, the parties hereto agree to make payments to each other sufficient to result in each party hereto having been liable for, having paid, having received, having been indemnified against or indemnifying for Seller Loss or Purchaser Loss, as the case may be, in proportion to each party's percentage share thereof as set forth in paragraph 2, above.

5. <u>Miscellaneous</u>. Each party hereto is entering into this agreement voluntarily with the advice of such advisors as such party has deemed appropriate. Each party hereto fully understands all of the terms and conditions of this agreement. Each party hereto agrees that each other party hereto shall have any and all rights and remedies available at law or in equity to enforce such party's rights under this agreement and the obligations of the other parties hereto pursuant to this agreement. This agreement shall be construed under the local laws of the State of Rhode Island and shall be binding on the heirs, administrators, executors, successors and assigns of

each of the parties hereto. In the event of any dispute between any of the parties hereto with regard to any matter covered by and referred to in this agreement, the parties hereto agree that said dispute shall be submitted to arbitration pursuant to the rules of Commercial Arbitration of the American Arbitration Association. Any such arbitration shall take place in Providence, Rhode Island. The parties hereto agree that the decision of any arbitrator pursuant thereto shall be final and binding on the parties hereto and may be entered in a court of law for judgment thereon. The parties hereto submit to the jurisdiction of the federal and state courts located in the State of Rhode Island in connection therewith. The parties hereto agree that notices sent by certified mail - return receipt requested to each party hereto at the address set forth below shall be a valid notice effective two days after deposit of such notice in the United States mail.

IN WITNESS WHEREOF, each of the parties hereto has hereunto set his or its hand and seal effective as of May 20, 1997.

Jonathan H. Pardee, Individually
226 Bellevue Avenue
Newport, RI 02840

JONTHAN H. PARDEE CHARITABLE
REMAINDER UNITRUST

By: Carol P. Havican
Carol P. Havican, Trustee
c/o Jonathan H. Pardee
226 Bellevue Avenue
Newport, RI 02840

169907 v1

DUNBAR/WHEELER TRUST

By: ______________________
Virginia S. Morse, Trustee

By: ______________________
Peter M. Dodge, Trustee
c/o David T. Totman, Esquire
59 Elm Street
New Haven, CT 06510

______________________
Ogden H. Sutro, Individually
c/o David T. Totman, Esquire
59 Elm Street
New Haven, CT 06510

# EXHIBIT B

# LIMITED GUARANTY

GUARANTY, dated as of May 20, 1997 by Charles E. Bradley, Sr. of 31 Indian Spring Trail, Darien, Connecticut 06820 and Charles E. Bradley, Jr. of 509 Emerald Bay, Laguna Beach, California 92651 (jointly and severally the "Guarantors"), in favor of Jonathan H. Pardee, having an office at 226 Bellevue Avenue, Newport, Rhode Island 02840, Dunbar/Wheeler Trust u/a 4/28/86, as amended 5/31/94 of c/o David T. Totman, Esq. 59 Elm Street, New Haven, Connecticut 06510, Jonathan H. Pardee Charitable Remainder Trust u/a May 17, 1997 of 226 Bellevue Avenue, Newport, Rhode Island 02840 and Ogden H. Sutro having an office at 226 Bellevue Avenue, Newport, Rhode Island, 02840 (jointly and severally the "Indemnitees").

For good and valuable consideration, including without limitation the sale by certain of the Indemnitees of the issued and outstanding capital stock of Settlement Services Treasury Assignments, Inc., a Rhode Island corporation (the "Company") to SST Acquisition Corp., a newly formed Delaware corporation the common stock of which is 85% owned by the Guarantors (the "Purchaser") which will enable the Purchaser to provide financing for Consumer Portfolio Services Inc., a California corporation (the "Indemnitor") of which the Guarantors are principal stockholders and in consideration of the benefits provided to the Guarantors through the foregoing acquisition, the Guarantors agree as follows:

1. GUARANTY OF PAYMENT AND PERFORMANCE. The Guarantors hereby jointly and severally guarantee to the Indemnitees the full and punctual payment when due (whether at maturity, by acceleration or otherwise), and the performance, of all indemnification obligations of the Company, the Purchaser and the Indemnitor to the Indemnitees contained in that certain Stock Purchase Agreement (the "Agreement") among the Indemnitees, the Purchaser and the Indemnitor of even date herewith (the "Obligations"). This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance of the Obligations and not of their collectibility only and is in no way conditioned upon any requirement that the Indemnitees first attempt to collect any of the Obligations from the Company, the Purchaser or the Indemnitor or resort to any security or other means of obtaining payment and performance of the Obligations. Should the Company, the Purchaser or the Indemnitor fail to pay or perform any of the Obligations when due, the obligations of the Guarantors hereunder shall become immediately due and payable to the Indemnitees, without demand or notice of any nature, all of which are expressly waived by the Guarantors. Payments by the Guarantors hereunder may be required by the Indemnitees on any number of occasions.

2. LIMITED GUARANTY. The liability of the Guarantors hereunder shall be limited to an aggregate of Five Million Dollars ($5,000,000).

3. WAIVERS BY GUARANTORS; INDEMNITEES' FREEDOM TO ACT. The Guarantors agree that the Obligations will be paid and performed strictly in accordance with

their respective terms regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Indemnitees with respect thereto. The Guarantors waive presentment, demand, protest, notice of acceptance, notice of Obligations incurred and all other notices of any kind, all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar law now or hereafter in effect, any right to require the marshaling of assets of the Company, the Purchaser or the Indemnitor , and all suretyship defenses generally. Without limiting the generality of the foregoing, the Guarantors agree to the provisions of any instrument evidencing, securing or otherwise executed in connection with any of the Obligations and agree that the obligations of the Guarantors hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure of the Indemnitees to assert any claim or demand or to enforce any right or remedy against the Company, the Purchaser or the Indemnitor; (ii) any extensions or renewals of any of the Obligations; (iii) any rescissions, waivers, amendments or modifications of any of the terms or provisions of any agreement evidencing, securing or otherwise executed in connection with any of the Obligations; (iv) the substitution or release of any entity primarily or secondarily liable for any of the Obligations; (v) the adequacy of any rights the Indemnitees may have against any collateral or other means of obtaining repayment of the Obligations; (vi) the impairment of any collateral securing the Obligations, including without limitation the failure to perfect or preserve any rights the Indemnitees might have in such collateral or the substitution, exchange, surrender, release, loss or destruction of any such collateral; or (vii) any other act or omission which might in any manner or to any extent vary the risk of the Guarantors or otherwise operate as a release or discharge of the Guarantors, all of which may be done without notice to the Guarantors.

4. UNENFORCEABILITY OF OBLIGATIONS AGAINST PURCHASER AND INDEMNITOR. If for any reason the Company, the Purchaser or the Indemnitor has no legal existence or is under no legal obligation to discharge any of the Obligations, or if any of the Obligations have become irrecoverable from the Company, the Purchaser or the Indemnitor by operation of law or for any other reason, this Guaranty shall nevertheless be binding on the Guarantors to the same extent as if the Guarantors at all times had been the principal obligor on all such Obligations. In the event that acceleration of the time for payment of the Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Company, the Purchaser or the Indemnitor , or for any other reason, all such amounts otherwise subject to acceleration under the terms of any agreement evidencing, securing or otherwise executed in connection with any of the Obligations shall be immediately due and payable by the Guarantors.

5. SUBROGATION; SUBORDINATION. Until the payment and performance in full of all Obligations and any and all obligations of the Company, the Purchaser or the Indemnitor to the Indemnitees, the Guarantors shall not exercise any rights against the Company, the Purchaser or the Indemnitor arising as a result of payment by the Guarantors hereunder, by way of subrogation or otherwise, and will not prove any claim in competition with any of the Indemnitees in respect of any payment hereunder in bankruptcy or insolvency proceedings of any nature; the Guarantors will not claim any set-off or counterclaim against

the Company, the Purchaser or the Indemnitor in respect of any liability of the Guarantors to the Company, the Purchaser or the Indemnitor; and the Guarantors waive any benefit of and any right to participate in any collateral which may be held by any of the Indemnitees. The payment of any amounts due with respect to any indebtedness of the Company, the Purchaser or the Indemnitor now or hereafter held by any of the Guarantors is hereby subordinated to the prior payment in full of the Obligations; provided that prior to a default in the payment or performance of the Obligations, the Guarantors may receive payments on account of such indebtedness. The Guarantors agree that after the occurrence of any default in the payment or performance of the Obligations, the Guarantors will not receive, demand, sue for or otherwise attempt to collect any such indebtedness of the Company, the Purchaser or the Indemnitor to any of the Guarantors until the Obligations shall have been paid in full. If, notwithstanding the foregoing sentence, any of the Guarantors shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by the Guarantors as trustee for the Indemnitees and be paid over to the Indemnitees on account of the Obligations without affecting in any manner the liability of the Guarantors under the other provisions of this Guaranty.

6. FURTHER ASSURANCES. The Guarantors agree that each of them will, on the date hereof and from time to time (but no more often than every 6 months) at the request of any of the Indemnitees after occurrence of a default in payment of the Obligations, provide to the Indemnitees his most recent federal income tax returns and unaudited personal financial statements and such other information relating to the business and affairs of the Guarantors as the Indemnitees may reasonably request. All of such information shall be delivered subject to confidentiality restrictions. The Guarantors also agree to do all such things and execute all such documents, as the Indemnitees may consider necessary or desirable to give full effect to this Guaranty and to perfect and preserve the rights and powers of the Indemnitees hereunder.

7 REINSTATEMENT. This Guaranty shall remain in full force and effect until all of the Obligations have been fully and finally satisfied and performed This Guaranty shall continue to be effective or be reinstated if at any time any payment made or value received with respect to any Obligations is rescinded or must otherwise be returned by any of the Indemnitees upon the insolvency, bankruptcy or reorganization of the Company, the Purchaser or the Indemnitor, or otherwise, all as though such payment had not been made or value received.

8. SUCCESSORS AND ASSIGNS. This Guaranty shall be binding upon each of the Guarantors, his heirs, administrators, executors, successors and assigns, and shall inure to the benefit of and be enforceable by each of the Indemnitees and his or its heirs, administrators, executors, successors and assigns. Without limiting the generality of the foregoing sentence, each of the Indemnitees may assign or otherwise transfer any agreement or any instrument held by him or it evidencing, securing or otherwise executed in connection with the Obligations, to any other person or entity, and such other person or entity shall thereupon become vested, to the extent set forth in the agreement evidencing

such assignment or transfer, with all the rights in respect thereof granted to the Indemnitees herein.

9. AMENDMENTS AND WAIVERS. No amendment or waiver of any provision of this Guaranty nor consent to any departure by any of the Guarantors therefrom shall be effective unless the same shall be in writing and signed by the Indemnitees. No failure on the part of any of the Indemnitees to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

10. NOTICES. All notices and other communications called for hereunder shall be made in writing and, unless otherwise specifically provided herein, shall be deemed to have been duly made or given when delivered by hand or mailed first class mail postage prepaid addressed as follows: if to the Guarantors, at the address set forth beneath each of their signatures hereto, and if to the Indemnitees, at the addresses set forth in the preamble to this Guaranty, or at such address as any party may designate to the others in writing.

11. GOVERNING LAW; CONSENT TO JURISDICTION. This Guaranty is intended to take effect as a sealed instrument and shall be governed by, and construed in accordance with, the laws of the State of Rhode Island. The Guarantors agree that any suit for the enforcement of this Guaranty may be brought in the courts of the State of Rhode Island or any Federal Court sitting therein and consent to the non-exclusive jurisdiction of such court and to service of process in any such suit being made upon the Guarantors by mail at the address specified in Section 11 hereof. The Guarantors hereby waive any objection that either of them may now or hereafter have to the venue of any such suit or any such court or that such suit was brought in an inconvenient court.

12. MISCELLANEOUS. This Guaranty constitutes the entire agreement of the Guarantors with respect to the matters set forth herein. The rights and remedies herein provided are cumulative and not exclusive of any remedies provided by law or any other agreement, and this Guaranty shall be in addition to any other guaranty of the Obligations. The invalidity or unenforceability of any one or more sections of this Guaranty shall not affect the validity or enforceability of its remaining provisions. Captions are for the ease of reference only and shall not affect the meaning of the relevant provisions. The meanings of all defined terms used in this Guaranty shall be equally applicable to the singular and plural forms of the terms defined.

THE UNDERSIGNED KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVE ANY RIGHTS THE UNDERSIGNED MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION, ACTION OR PROCEEDING WHICH ARISES OUT OF, OR IS IN ANY WAY CONNECTED WITH THIS GUARANTY OR ANY OTHER INSTRUMENT OR DOCUMENT EXECUTED IN CONNECTION WITH THE PURCHASE AND SALE OF THE SHARES REFERRED TO ABOVE, THE AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN. THE GUARANTORS EACH HEREBY CERTIFIES THAT NO REPRESENTATIVE, EMPLOYEE,

AGENT OR COUNSEL OF THE INDEMNITEES HAS REPRESENTED, WHETHER EXPRESSLY OR OTHERWISE, THAT THE INDEMNITEES WOULD NOT IN THE EVENT OF SUCH LITIGATION, ACTION OR PROCEEDING, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO A TRIAL BY JURY.

IN WITNESS WHEREOF, each of the Guarantors has caused this Guaranty to be executed and delivered as of the date appearing on page one.

GUARANTORS:

WITNESS:

Charles E. Bradley,

Estelle K. Moulketis
Print/Type Full Name

ADDRESS FOR NOTICES:

c/o Stanwick Partners, Inc.
One Stamford Landing
Stamford, CT 06092

WITNESS:

Charles E. Bradley, Jr.

William E. Price
Print/Type Full Name

ADDRESS FOR NOTICES:

c/o Consumer Portfolio Services, Inc.
2 Ada - Suite 100
Irvine, CA 92618

#168282V1